UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

ZOHAR CDO 2003-1, LTD.; ZOHAR II            :
2005-1, LTD.; and ZOHAR III, LTD.,          :
                                            :
            Plaintiffs,                     :
                                            :
        - v -                               :
                                            :
PATRIARCH PARTNERS, LLC;                    :       17 Civ. _____
PATRIARCH PARTNERS VIII, LLC;               :
PATRIARCH PARTNERS XIV, LLC;                :       **COMPLAINT**
PATRIARCH PARTNERS XV, LLC;                 :
OCTALUNA LLC; OCTALUNA II LLC;              :
OCTALUNA III LLC; ARK II CLO 2001-1,        :
LLC; ARK INVESTMENT PARTNERS II,            :
L.P.; and LYNN TILTON,                      :
                                            :
            Defendants.                     :
------------------------------------------------------- X

Plaintiffs Zohar CDO 2003-1, Ltd. ("Zohar I"), Zohar II 2005-1, Ltd. ("Zohar II"), and

Zohar III, Ltd. ("Zohar III," and together with Zohar I and Zohar II, the "Zohar Funds"), by and

through their undersigned counsel, allege as follows:

## INTRODUCTION

1.      This case concerns an egregious fraudulent scheme among Defendants Lynn

Tilton and numerous entities created and dominated by her to abuse certain of those entities'

roles as fiduciaries for the Plaintiff Zohar Funds in order to pillage ***more than a billion dollars*** in

cash and valuable assets that have lined Ms. Tilton's pockets while leaving the Zohar Funds on a

collision course to default on obligations to their own investors.  Plaintiffs bring this action

seeking, among other relief, a declaration of their rights in the assets that they properly own as

well as treble damages in recompense for the Defendants' fraudulent and illegal scheme

implemented through a pattern of racketeering activity.

2.      Ms. Tilton's fraudulent scheme, conducted at her direction by and through the other Defendants, emanated from the management of the Plaintiff Zohar Funds, three special purpose vehicles that were created by Ms. Tilton in 2003, 2005, and 2007.  The Zohar Funds were created to raise money through selling a form of notes called collateralized loan obligations ("CLOs") to investors that was then used to extend loans to dozens of distressed mid-size companies (the "Portfolio Companies"), often in connection with the acquisition of those companies out of bankruptcy under the guise of "restructuring" them.  In many (if not most) instances, in connection with the extension of credit, the Zohar Funds took substantial equity positions in the Portfolio Companies, which Ms. Tilton has touted as being more valuable to the Zohar Funds than the loans they extended to the Portfolio Companies.  The Zohar Funds raised more than $2.5 billion from CLO note investors to fund these loan and equity positions, with the investors entitled to repayment on their CLO notes from the proceeds from Portfolio Company loans and any distributions on, or ultimate monetization of, the Portfolio Company equity.

3.      While the Portfolio Companies are owned largely or entirely by the Zohar Funds, Ms. Tilton fraudulently asserted ownership over the equity of those companies, relying on that fictitious assertion of ownership to install and maintain herself or entities that she owned in multiple fundamentally conflicted roles with respect to the Zohar Funds.  For example, Ms. Tilton routinely appointed herself as chief executive and sole director or managing member of the Portfolio Companies, thus acting on behalf of the Zohar Funds' contractual counterparties under numerous loan and equity agreements.  At the same time, Defendants Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC (together, the "Patriarch Managers") were appointed to act as collateral managers responsible for overseeing and managing the Zohar Funds' investments for Zohar I, Zohar II, and Zohar III, respectively.

2

The Patriarch Managers—which were empowered by Collateral Management Agreements ("CMAs") to enter into agreements and otherwise generally act as agents on behalf of the Zohar Funds—were subject to express fiduciary and contractual duties to exercise their management authority in the best interests of the Zohar Funds and their investors.  Likewise, Patriarch Partners Agency Services ("PPAS") was appointed as the Zohar Funds' agent in administering its loan agreements with the Portfolio Companies, imbued with substantial authority over the Zohar Funds' loan assets.  Meanwhile Patriarch Partners Management Group ("PPMG") was hired for lucrative management consulting roles at the Portfolio Companies.  The roles that Ms. Tilton assumed for herself were so extensive and conflicted that the Zohar Funds would routinely enter into agreements where Ms. Tilton would be the single signatory executing on behalf of every party to the agreement.

4.      Taking advantage of this fundamentally conflicted structure, Ms. Tilton has engaged in a longstanding campaign to divert to herself massive amounts of money and other valuable assets that, absent the wrongdoing described herein, would have been retained for the benefit of the Zohar Funds and their investors.  For example, as part of this scheme, for the purpose of benefitting herself at the expense of the Zohar Funds, Ms. Tilton, both individually and through her controlled entities:

- Used capital provided by the Zohar Funds to obtain equity in the Portfolio Companies in the names of the Zohar Funds, including majority or total ownership stakes in numerous Portfolio Companies, and then falsely asserted ownership over that equity—going so far as to sue one of the Zohar Funds, accusing it of attempting to steal its own equity, when it sought to auction off the equity following default;

- Sought to abscond with the equity holdings of the Zohar Funds by disguising or misrepresenting those equity interests as "owned" by Ms. Tilton (or Octaluna LLC, Octaluna II LLC, or Octaluna III LLC ("the Octaluna Defendants)) even though the equity holdings were unambiguously owned by and in the names of the Zohar Funds, and, in one notable instance, selling a company Defendants had acknowledged was owned by Zohar II and keeping the *approximately $300 million in profits* for herself;

- Misappropriated *tens of millions of dollars or more* in equity distributions on those equity interests, which belonged to the Zohar Funds;

- Extracted over *$700 million* in collateral management fees and preference share distributions from the Zohar Funds notwithstanding that the Patriarch Managers were faithless fiduciaries who routinely served to facilitate Ms. Tilton's interests over the interests of the Zohar Funds' investors;

- Caused the Patriarch Managers to falsely report the creditworthiness of the Portfolio Companies in order to manipulate the results of certain "overcollateralization" tests that were used to determine eligibility for performance-based collateral management fees, thereby procuring *hundreds of millions of dollars* in fees to which they were not entitled;

- Mischaracterized restructurings of Portfolio Company loans from the Zohar Funds so as to avoid triggering events of default that would have caused the removal of the Patriarch Managers, and halted Ms. Tilton's lucrative fee income, not to mention her ongoing misappropriation of fund assets;

- Extracted hundreds of millions of dollars in fees from the Portfolio Companies, funds that otherwise could have been used to make payments on outstanding debt, in

4

supposed exchange for Ms. Tilton's corporate management services, notwithstanding that under her management, many of the Portfolio Companies underperformed with numerous Companies ultimately defaulting and closing down;

- Routinely caused the Zohar Funds to waive, forbear, or restructure amounts owed to them under loan agreements (1) even where the borrower Portfolio Company was still required to pay onerous fees for Ms. Tilton's corporate management services, and (2) so that Ms. Tilton could then siphon that money in the form of distributions on equity interests that were owned by the Zohar Funds;

- Extracted tens of millions in fees from the Portfolio Companies for the provision of "administrative agent" services that included little more than the periodic ministerial generation of invoices to the Portfolio Companies of amounts owed under loan agreements;

- Caused the Zohar Funds to consent to valuable control rights over their equity holdings being *irrevocably* transferred to certain of the Defendants without any consideration provided in exchange, in an effort to render Ms. Tilton immune from removal from her lucrative positions as sole director or managing member of the Portfolio Companies; and

- Caused the Zohar Funds to consent to amendments to credit agreements that solely benefited other investment funds owned by Ms. Tilton, including Defendants Ark II CLO 2001-1, LLC and Ark Investment Partners II, L.P., such as through granting them priority liens on Portfolio Company assets ahead of the Zohar Funds.

5.     Thus, rather than manage the Zohar Funds in the Funds' best interest so as to maximize recoveries for them and their investors, Ms. Tilton blatantly abused her control over

the Zohar Funds to illegally siphon cash and other assets from the Zohar Funds for the ultimate benefit of herself and the Defendants that she owned and controlled.

6.      In furtherance of this scheme, Ms. Tilton has also sought to misrepresent, obscure, and conceal the full extent of the Zohar Funds' assets so that the Zohar Funds and their noteholders and other interested parties would not be able to detect her looting activities.  For example, following the Patriarch Managers' resignations as collateral managers for the Zohar Funds in February 2016, the Patriarch Managers refused to turn over essential Zohar Fund records to the subsequent collateral manager.  The concealed documents included the records of the Zohar Funds' full collateral portfolio, including records as to their equity positions (which records would have revealed illegal distributions to Ms. Tilton on equity interests belonging to the Zohar Funds, illegal attempted transfers of the Zohar Funds' equity rights to Ms. Tilton and her companies, and other wrongdoing).  At the same time that she was concealing these documents, however, Ms. Tilton was also publicly proclaiming, including through multiple legal proceedings, that *she* and her entities were the rightful owners of Portfolio Company equity positions while the Zohar Funds held only limited, undefined, and undocumented "equity upside interests."  When the Patriarch Managers were ultimately found at trial to be in breach of their duties to the Zohar Funds and ordered to turn over the concealed Zohar Funds' records, those records began to reveal the truth that Ms. Tilton's representations regarding her ownership of the equity positions were falsehoods intended as part of her overall scheme to abscond with the Zohar Funds' property.  Beyond obscuring the Zohar Funds' holdings, Ms. Tilton's obfuscations have further necessitated multiple expensive litigations to protect the Zohar Funds' interests, including this Action, costing the Zohar Funds enormous sums in legal fees, and delaying their ability to fully manage and monetize their own assets.

7.     Through this toxic mix of fraud, theft, and mismanagement, Ms. Tilton has plundered the Zohar Funds, leaving them bereft of liquid assets sufficient to timely satisfy the billions of dollars in obligations they owe to their investors.  In November 2015, Zohar I defaulted on the obligations to repay its investors when their CLO notes matured.  Similarly, Zohar II will shortly default on obligations to repay its investors when their CLO notes mature in January 2017.  And, without a change to the status quo through this and related litigation, Zohar III will similarly face significant challenges to repay its investors when their CLO notes mature in 2019.  Thus, while Ms. Tilton has made herself famously wealthy, she has left nothing but losses in her wake for the Zohar Fund investors who trusted in her integrity and promises.

8.     The Zohar Funds therefore seek to remedy the injuries they have suffered at the hands of Ms. Tilton and her entities by bringing this action alleging a continuous, ongoing, and fraudulent scheme, carried out over the course of years by the Defendants, to abuse their positions of control over the Zohar Funds for the purpose of pilfering cash and other valuable assets worth more than a billion dollars, which the Zohar Funds should rightfully have been able to use to repay their investors.  This scheme was a flagrant violation of the Defendants' contractual and fiduciary obligations, and amounts to theft, conversion, and fraud that constitutes a pattern of racketeering activity prohibited by federal law.  The Zohar Funds therefore seek a declaration of their rights in the assets to which they are properly entitled, disgorgement of benefits that have been improperly conferred on Ms. Tilton and her controlled entities, damages for the Defendants' breaches of contract and fiduciary duties, and treble damages for Ms. Tilton's conduct in violation of the Racketeer Influenced and Corrupt Organizations Act.

## PARTIES

### A.     Plaintiffs

9.      Plaintiff Zohar I is a Cayman Islands exempted company.  Through an auction of

of Zohar I's assets conducted in December 2016, non-party MBIA Insurance Corporation

("MBIA") became the beneficial and equitable owner of Zohar I's assets.

10.     Plaintiff Zohar II is a Cayman Islands exempted company.

11.     Plaintiff Zohar III is a Cayman Islands exempted company.

### B.     Defendants

12.     Defendant Patriarch Partners, LLC ("Patriarch Partners" and together with the

Patriarch Managers, "Patriarch") is a Delaware limited liability company, with its principal place

of business in New York, New York.  Upon information and belief, the only member of

Patriarch Partners is Defendant Lynn Tilton.

13.     Defendant Patriarch Partners VIII, LLC ("Patriarch VIII") is a Delaware limited

liability company with its principal place of business in New York, New York.  Until March 2,

2016, Patriarch VIII was the collateral manager for Plaintiff Zohar I.  Upon information and

belief, the only member of Patriarch VIII is Defendant Lynn Tilton.

14.     Defendant Patriarch Partners XIV, LLC ("Patriarch XIV") is a Delaware limited

liability company with its principal place of business in New York, New York.  Until March 2,

2016, Patriarch XIV was the collateral manager for Plaintiff Zohar II.  Upon information and

belief, the only member of Patriarch XIV is Defendant Lynn Tilton.

15.     Defendant Patriarch Partners XV, LLC ("Patriarch XV") is a Delaware limited

liability company with its principal place of business in New York, New York.  Until March 2,

2016, Patriarch XV was the collateral manager for Plaintiff Zohar III.  Upon information and

belief, the only member of Patriarch XV is Defendant Lynn Tilton.

16.     Defendant Octaluna LLC ("Octaluna I") is a Delaware limited liability company with its principal place of business in New York, New York.  Ms. Tilton has represented that she owns and controls Octaluna I.

17.     Defendant Octaluna II LLC ("Octaluna II") is a Delaware limited liability company with its principal place of business in New York, New York.  Ms. Tilton has represented that she owns and controls Octaluna II.

18.     Defendant Octaluna III LLC ("Octaluna III") is a Delaware limited liability company with its principal place of business in New York, New York.  Ms. Tilton has represented that she owns and controls Octaluna III.

19.     Ark II CLO 2001-1, LLC ("Ark II") is a Delaware limited liability company with its principal place of business in New York, New York.  Upon information and belief, the only member of Ark II is Defendant Lynn Tilton.

20.     Ark Investment Partners II, L.P. ("AIP II") is a Delaware limited partnership with its principal place of business in New York, New York.  Upon information and belief, the only partner of AIP II is Defendant Lynn Tilton.

21.     Defendant Lynn Tilton is a resident of Florida.  She is the principal and, upon information and belief, sole member of Patriarch Partners, the Patriarch Managers, the Octaluna Defendants, and Ark II; she is the principal and, upon information and belief, sole partner of AIP II.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over the Zohar Funds' claims under 28 U.S.C. § 1331 and 18 U.S.C. §§ 1964, 1965.

23.     This Court has subject matter jurisdiction over the Zohar Funds' claims under 28 U.S.C. § 1332.

24.     This Court also has supplemental jurisdiction over the Zohar Funds' common law claims pursuant to 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over Patriarch Partners, the Patriarch Managers, the Octaluna Defendants, Ark II, and AIP II because their principal places of business are in New York County, New York and because it has personal jurisdiction over Lynn Tilton, the sole member or partner of these Defendants.  This Court has personal jurisdiction over Lynn Tilton because she has offices, and regularly transacts business, in New York County, New York.

26.     Venue in the Southern District of New York is appropriate under 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the actions giving rise to the claims occurred, and it is the district in which property that is the subject of the action is situated. Zohar Fund Indentures, § 10.1(b).

## BACKGROUND

**A.     Patriarch Conceives, Structures, And Markets The Zohar Funds.**

27.     Patriarch Partners is an investment firm, owned and directed by Ms. Tilton, that claims to, among other things, restructure and rebuild struggling and distressed companies into profitable businesses.  Since 2000, Patriarch Partners claims to have had ownership in and/or restructured more than 240 companies with combined revenues in excess of $100 billion.

28.     In addition to its private equity and turnaround business, Patriarch Partners has designed and sponsored CLO transactions.  At the center of a CLO transaction is a special purpose vehicle that issues notes of varying priority to investors and uses the proceeds of the sales of CLO notes to purchase or make loans and other investments that serve as the collateral for the repayment of principal and interest on the notes.  Because the special purpose vehicle

typically has no employees, a collateral manager, like the Patriarch Managers, selects the loans and other assets to be included in the collateral pool and manages them once they are in the pool.

29.     The Zohar Funds are CLO transactions that Ms. Tilton and Patriarch Partners created and marketed to investors for the ostensible purpose of investing in distressed debt.  The first Zohar fund, Zohar I, launched in November 2003, raising approximately $530 million from the sale of notes; Zohar II and Zohar III followed in January 2005 and April 2007, respectively, each raising approximately $1 billion from the sale of notes.

30.     Each Zohar Fund had a separate Patriarch collateral manager, each of which was provided with employees, office space, and other valuable operating services by Patriarch Partners: Patriarch VIII was Zohar I's collateral manager, Patriarch XIV was Zohar II's collateral manager, and Patriarch XV was Zohar III's collateral manager.

31.     As discussed further below, the Zohar Funds were each governed by a set of documents that include an Indenture (the "Indentures"), a CMA, and a Collateral Administration Agreement (the "CAAs") for each Fund.[1]  The roles and obligations of the collateral manager were set out in the CMAs, which granted the Patriarch Managers the power to act for and on behalf of the Zohar Funds in managing the loans and other assets of the Zohar Funds, subject to certain limitations set forth in the CMAs.[2]  The Patriarch Managers' powers were also limited by the terms of the Indenture for each of the Zohar Funds, which govern the rights and obligations of the Zohar Funds *vis-à-vis* the noteholders, Credit Enhancer, and Controlling Party; the

---

[1]    The Indentures, CMAs, and CAAs are substantially identical, and will be cited in the singular herein, except where there are relevant differences between the documents.

[2]    The CMAs are expressly made subject to the terms of the Indenture, with provisions of the Indenture controlling over conflicting provisions in the CMAs.  *See* Zohar I and Zohar II CMAs, §7.14; Zohar III CMA, § 7.13.

Patriarch Managers also assumed certain obligations under the Indentures.  For example, the

Patriarch Managers were tasked with:

- "determin[ing] ... the specific Collateral to be acquired, originated, restructured, exchanged, held or disposed of by the [Zohar Funds]";

- "effectuat[ing] the acquisition, origination, restructuring, exchange or disposition of Collateral on behalf of the [Zohar Funds]";

- "monitor[ing] the Collateral on an ongoing basis";

- "mak[ing] determinations with respect to the exercise or enforcement of any and all rights by the [Zohar Funds] ... or rights or remedies in connection with the Collateral ..."; and

- "negotiat[ing] on behalf of the [Zohar Funds] with prospective purchasers of the Collateral [and] with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor ... thereon ... ."

Zohar II and Zohar III CMAs, § 2.2 (a), (b), (c), (d), and (f).[3]  The Zohar Funds authorized the

Patriarch Managers to "execute and deliver all necessary, desirable and appropriate documents

and/or instruments in the name and on behalf of the [Zohar Funds] as [their] attorney-in-fact with

respect thereto."  CMAs, § 2.5.  As a practical matter, the Patriarch Managers, under the

direction and control of Ms. Tilton, made every single investment decision on behalf of the

Zohar Funds, and exercised control over the Zohar Funds' investment and collateral management

activities.

---

[3]   The Zohar I CMA similarly provides that the Collateral Manager is tasked with "determin[ing] ... the specific Collateral to be purchased, restructured, exchanged, held, or disposed of by the [Zohar Funds]"; "effectuat[ing] the purchase, restructuring, exchange or disposition of Collateral on behalf of the [Zohar Funds]"; "monitor[ing] the Collateral on an ongoing basis"; "mak[ing] determinations with respect to the exercise or enforcement of any and all rights by the [Zohar Funds] ... or remedies in connection with the Collateral ..."; and "negotiat[ing] on behalf of the [Zohar Funds] with prospective purchasers of the Collateral [and] with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor ... thereon ... ."  Zohar I CMA, § 2.2 (a), (b), (c) (d), and (f).

32.    In light of the significant responsibility granted to the Patriarch Managers, their actions for and on behalf of the Zohar Funds were subjected to express fiduciary standards.  The Patriarch Managers agreed that, "in rendering [their] services as Collateral Manager," they would "use reasonable care and the same degree of skill and attention (a) that the Collateral Manager (i) exercises with respect to comparable assets that it manages for itself and its Affiliates and (ii) exercises with respect to comparable assets that it manages for others and (b) exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions ... ."  *Id.* § 2.4.

33.    The Patriarch Managers further covenanted "not [to] take any action which [they] know[] or should be reasonably expected to know in accordance with prevailing market practices would ...  adversely affect the interests of the Holders of the Securities [*i.e.*, the Notes and Preference Shares issued by the Zohar Funds] in any material respect."  The Zohar I and Zohar II CMAs provided that "all purchases, exchanges and sales of Collateral by the Collateral Manager on behalf of the Company and/or the Zohar Subsidiary … will be effected on arm's-length terms."  Zohar I and Zohar II CMAs, § 2.9.  Zohar I and II CMAs, § 2.6.[4]  And while Patriarch XV was permitted to effectuate transactions between Zohar III and affiliates of the Patriarch Managers, such transactions were to be "at arms' length, for fair market value and in compliance with applicable law."  Zohar III CMA, §6.2 (d).

34.    Finally, like all investment advisers, the Patriarch Managers owed implied general fiduciary duties of care and loyalty to the Zohar Funds in providing advisory services and acting

---

[4]   The Zohar III CMA provides that it will not take any action that would "materially adversely affect" these interests.  Zohar III CMA, § 2.6.

as the Zohar Funds' agent and attorney-in-fact in administering the Zohar Funds' investment activities. These common law and statutory fiduciary duties are in addition to the specific duties of care set forth in the CMAs.

35.     The CMAs acknowledged that the assets to be acquired were often distressed, which would require some flexibility on the part of the Patriarch Managers to manage them. They also acknowledged the potential for conflicts of interest to arise from the "overall advisory, investment and other activities of the Collateral Manager" and all of its affiliates, and provided that the Patriarch Managers and their affiliates may hold several roles related to the Zohar Funds' investments, such as consultant or manager. CMA § 6.2. However, as described above, the CMAs also explicitly stated the Patriarch Managers' obligations to, among other things, ensure compliance with the Indentures and applicable laws, avoid actions that would adversely affect the Zohar Funds' noteholders, avoid intentional actions that they knew would cause an Event of Default, ensure that their actions were in accordance with customary and reasonable business practices, ensure that all purchases and sales be effected on arm's-length terms, and to act with skill, attention, and reasonable care. They also expressly acknowledged the Patriarch Managers' fiduciary duties and that they would be subject to liability for any conduct constituting fraud, bad faith, willful misconduct, gross negligence, or breach of fiduciary duty. Zohar I and II CMA, §§ 2.2(n), 2.4, 2.6, 2.9, 4.4, 4.5(a); Zohar III CMA, §§ 2.2(l), 2.4, 2.6, 2.9, 4.4, 4.5(a). Investors in the Zohar Funds therefore had every expectation that the Patriarch Managers would act in accordance with these requirements on their behalves.

36.     Information about the Zohar Funds—including current assets (defined in the Indenture as "Collateral"), their performance, and numerous other critical data points—was required to be communicated to noteholders, rating agencies, and others via Monthly Reports

14

and quarterly Note Valuation Reports, whose contents were prescribed by the Indentures.  These reports were prepared by the Collateral Administrator—a role played by the same entity that provides Trustee services to the Zohar Funds—based on information provided by the Patriarch Managers.  The Patriarch Managers were contractually obligated to "review and verify the contents of the [] reports" and, "[t]o the extent any of the information in such reports ... conflicts with data or calculations in the records of the [Portfolio] Manager, the [Portfolio] Manger shall promptly notify the Collateral Administrator of such discrepancy and use reasonable efforts to assist the Collateral Administrator in reconciling such discrepancy."  *See, e.g.*, Zohar I and III CAAs, § 2(h).[5]

37.     Other entities owned and controlled by Ms. Tilton held additional, distinct, and inherently conflicted roles relating to the Zohar Funds' assets.  For example, PPAS (which is in the business of providing agency services to lenders) acted as the Zohar Funds' agent under their loan agreements with the Portfolio Companies, responsible for invoicing, collecting, and disbursing payments, and receiving Portfolio Company financial information on behalf of the Zohar Funds.[6]  PPMG, which is in the business of financial and management consulting, provided "management and consulting services" to the Portfolio Companies, which principally

---

[5]     The Zohar II CAA provides that "The [Portfolio] Manager shall review and verify the contents of the Monthly Collateral Report" and "[t]o the extent any of the information in the Monthly Collateral Report conflicts with data or calculations in the records of the [Portfolio] Manager, the [Portfolio] Manager shall promptly notify the Collateral  Administrator of such discrepancy and use reasonable efforts to assist the Collateral Administrator in reconciling such discrepancy."  Zohar II CAA, § 2(c).

[6]     PPAS was terminated as agent by the Zohar Funds on June 14, 2016, effective June 17, 2016, but has refused to cede that role to its replacement, and has refused to provide the Zohar Funds with access to the Portfolio Companies' financial information in the interim.  PPAS's refusal to accept termination of its agency is the subject of another action currently pending in this district. *Patriarch Partners Agency Services v. Zohar CDO 2003-1 Ltd. et al.*, No. 16 Civ. 4488 (S.D.N.Y.) (VM) (KHP).

included Ms. Tilton serving as director or managing member, in exchange for management fees. Patriarch entities also retained ownership over preference shares issued by the Zohar Funds.

38.     Ms. Tilton also owned and managed the other Defendant entities, the Octaluna Defendants, Ark II, and AIP II.  These entities were formed for varying purposes, but ultimately came to be used as personal investment vehicles by Ms. Tilton.  In particular, Ms. Tilton from time to time used Ark II and AIP II to take or assert debt and equity positions in the Portfolio Companies alongside the Zohar Funds, while Ms. Tilton used the Octaluna Defendants as a vehicle to hold preference share rights or interests.  Ms. Tilton has recently asserted that the Octaluna Defendants are "owners" of valuable equity interests that in fact belong to the Zohar Funds.

39.     Zohar I and Zohar II also had a Credit Enhancer, MBIA, which was responsible for providing insurance to the senior noteholders in case of a default by these Funds.  Upon the occurrence of certain interruptions to the flow of payments to the senior noteholders, the Credit Enhancer would become responsible for paying off the senior notes in full.  The Credit Enhancer is also referred to in the Indentures as the Controlling Party for Zohar I and Zohar II, with the ability to direct certain limited actions on behalf of the Funds, particularly following an Event of Default under the Indentures.

40.     The Zohar Funds were formed to invest in or originate loans extended to distressed companies, and could also receive equity in connection with the acquisition of a company, the extension of a new loan, or the restructuring of an existing loan.  Under the terms of the Indentures, all such assets, regardless of how they were acquired by the Zohar Funds, are deemed "Collateral" of the Zohar Funds, which was defined under the Indentures in the broadest possible terms to effectively include "all [] property of any type or nature owned by [the Zohar

Funds]."  The Collateral secured the repayment of principal and interest on the notes and, upon payment by MBIA under its policies, MBIA's guaranty of the Zohar Funds' note payment obligations.

**B.     The Zohar Funds Acquire Substantial Equity Positions In The Portfolio Companies, Which Defendants Exploit For Their Own Benefit.**

41.     One of the most valuable types of assets owned by the Zohar Funds are their equity holdings in the Portfolio Companies.  These holdings are particularly important because the Portfolio Companies are distressed investments and many have failed to repay their loans— which were generally acquired at par—to the Zohar Funds.  By holding equity in addition to loans, for those Portfolio Companies that do succeed, the Zohar Funds have the potential to obtain not only repayment on their loans, but also equity returns that could help offset the losses on loans to the Portfolio Companies that failed.  In fact, however, the Defendants have repeatedly sought to deny the Zohar Funds the proper benefit of their equity investments, either by attempting to abscond with the equity investments themselves, by improperly diverting the benefit of those equity holdings for their own use, or by outright stealing the distributions on the equity.

42.     As background, the Zohar Funds' equity holdings were acquired by the Zohar Funds in a number of different contexts.  The Zohar Funds' equity holdings were sometimes acquired when they provided funds that constituted at least part of the capital or financing that was used to acquire a Portfolio Company.  For example, in December 2007, Ms. Tilton formed a company named RM Acquisition, LLC ("RM Acquisition"), for the purpose of acquiring Rand McNally & Company, a well-known purveyor of maps that was in financial distress at the time. She arranged for the Zohar Funds each to extend loans to RM Acquisition, which were expressly to be used to finance the purchase of Rand McNally and to provide operating capital.  Within

days of the credit agreements being executed, the Zohar Funds also received equity interests in

RM Acquisition pursuant to its Operating Agreement, in recognition that their loans had been

used as funding to acquire ownership of the company.  Similarly, in February 2005, a company

called Snelling & Snelling was acquired using capital that was provided through loans provided

by Zohar I and II under loan agreements executed on the same day as the Securities and Asset

Purchase Agreement through which Snelling was acquired.  Zohar I and II subsequently received

equity interests in Snelling Holdings, LLC, in the form of common shares.

43.     When extending loans to a Portfolio Company, even after it was acquired, the

Zohar Funds were sometimes provided with equity interests in the company in recognition of the

distressed nature of the loans.  These equity interests provided additional value to the Zohar

Funds, over and above expected repayments on the loans.  For example, at the time Zohar II was

formed, it purchased loans to 27 companies from another Tilton-controlled fund, Ark CLO 2000-

1, Ltd., and simultaneously received equity interests in 23 of those companies as part of the

transaction. The governing documents for the Zohar II transaction prepared by Patriarch

described these equity interests as providing "additional value in realizing par recoveries" on the

overall portfolio of purchased loans.  In sworn testimony, Ms. Tilton later described these equity

interests as "attached to the loan[s]" purchased by Zohar II and as equity interests that Zohar II

had "paid for."

44.     In yet other instances, the Zohar Funds obtained equity in connection with

restructurings of existing loans to Portfolio Companies.  For example, on June 15, 2007, Zohar II

agreed to amend its credit agreement with another Portfolio Company, Fetco Home Décor, Inc.

("Fetco"), as part of a debt restructuring in which the outstanding balances on certain outstanding

loans were increased to capitalize unpaid interest, a new term loan was extended, and interest

rates on all of the loans were decreased while maturity dates were extended by three years. Resolutions by the Fetco board of directors contemporaneously approved the issuance of 33,737 shares of common stock and 12,199 shares of preferred stock to Zohar II as express "consideration" for Zohar II agreeing to this restructuring of Fetco's debt.  Corresponding stock certificates were issued that identified Zohar II as the "owner" of the issued shares.  Similarly, an October 12, 2006, Stockholders Agreement for another Portfolio Company, Acme International Enterprises, Inc., stated that pursuant to a contemporaneous "Restructuring Agreement," Zohar II had "agreed to waive certain rights as a lender … in exchange for, among other things … the issuance by the Company to Zohar of 13,500 Series A Shares … and 150 Series C Shares … ." Ms. Tilton has provided sworn written testimony of another instance, concerning the parent company of IMG Fragrance Brands, LLC, where "[o]n October 17, 2008, Zohar I, Zohar II, and Zohar III obtained, collectively, 75% of the shares of IMG Holdings, Inc. … in exchange for agreement by the Zohar funds to withdraw a loan acceleration based on the borrowers' default." (Notably, in that same affidavit, Ms. Tilton testified that "Patriarch does not own (nor has it ever owned) any such equity"; Ms. Tilton now claims precisely the opposite.)

45.    These are just examples of numerous such transactions over the years in which the Zohar Funds received equity interests either in connection with loans used to finance the acquisition of a Portfolio Company, the extension of a loan to a Portfolio Company, or in exchange for restructuring outstanding loans to Portfolio Companies.  Through these and other instances, each of the Zohar Funds has obtained substantial equity interests titled their names in many of the Portfolio Companies—some in form of preferred or common stock and others in the form of LLC membership interests—in exchange for valuable consideration.

46.     At various times, in largely confidential contexts or recent court filings, Defendants have conceded the significant breadth and substantial value of these equity investments owned by the Zohar Funds.  For example, Ms. Tilton stated in court filings that, as of 2007, the Zohar Funds together held a majority interest in 23 Portfolio Companies, including 100% stakes in seven of those companies.  She further claimed that the "vast majority" of returns from the Zohar Funds were projected to come from equity returns.  Similarly, in February 2007, a Patriarch rating agency presentation projected equity returns of over *1.5 billion* for Zohar II alone from approximately 40 different Portfolio Companies, and approximately *500 million* for Zohar III from more than a dozen Portfolio Companies.  In another presentation from 2009, under the heading "The Zohar CDOs Benefit from Valuable Equity," Patriarch touted equity ownership percentages by the Zohar Funds in 43 separate Portfolio Companies, including 14 companies in which the Zohar Funds owned 100% of the equity.  Indeed, Ms. Tilton has testified that the "portfolio strategy" for the Zohar Funds was to "loan-to-own or [] own-to-loan" (apparently unable to recall which of these was actually the strategy) because "the only way to get beyond the face value of the loan is to have that equity upside."

47.     Notwithstanding these admissions as to the Zohar Funds' extensive equity holdings, Defendants have sought to obscure and conceal the extent of the Zohar Funds' equity holdings from noteholders and the Credit Enhancer.  For example, the Zohar Funds' Monthly Reports, which were noteholders' primary source of information about the deals, and which the Patriarch Managers were required to review and verify, contained sections that were intended for the reporting of equity interests.  However, the Zohar I Monthly Reports routinely misreported and substantially underreported that Fund's true equity holdings, while the Zohar II and III Monthly Reports rarely, if ever, reported any equity interests for the Funds at all.  Likewise, the

Zohar Funds were required to produce quarterly financial statements, in compliance with generally accepted accounting principles, which are attached to an Officer's Certificate and provided to noteholders among others.  None of these financial statements ever reported the Zohar Funds' equity interests, even though the Indentures required that they "present[] fairly, in all material respects, the [Zohar Funds'] financial position."  Indentures, § 7.9.

48.     These steps by the Defendants to obscure the details of the Zohar Funds' equity holdings appear designed to conceal from the Zohar Funds' noteholders and Credit Enhancer that Defendants have been engaged in a longstanding scheme to convert most of the value of the Zohar Funds' equity holdings for Ms. Tilton's own benefit.  The Defendants were uniquely situated to engage in such a scheme because of their multiple roles that allowed them to control both the Portfolio Companies and the Zohar Funds.  This meant that they were often the *only parties* determining and documenting what equity interests were received by the Zohar Funds and how those interests were protected and enforced.  Indeed, in many cases, the governing agreements memorializing the Zohar Funds' equity holdings and rights were signed by Ms. Tilton on behalf of all of the respective parties.  This placed Defendants in a position where they could abuse their control over the Zohar Funds and the Portfolio Companies to deprive the Zohar Funds of their rightful equity interests in order to line Ms. Tilton's own pockets.  This scheme has been implemented through numerous means.

49.     First, upon information and belief, while the Zohar Funds' funds were used as part of the capital or financing to acquire Portfolio Companies, equity received in exchange for those Funds was allocated not just to the Zohar Funds, but also to certain Defendants, granting those Defendants a concrete benefit that was paid for by the Zohar Funds, for nothing in exchange.  In light of Ms. Tilton's role managing and directing these companies, this also created

rampant opportunities for the Defendants to obtain their ownership shares in the Companies without making any contributions, or with only disproportionate or minimal contributions.

50.     Second, as to the equity interests that were allocated to the Zohar Funds, the Defendants have repeatedly stolen the ongoing financial benefit of those equity holdings. Specifically, where the Portfolio Companies in which the Zohar Funds hold equity interests have paid dividends or otherwise made distributions to their equity owners, Ms. Tilton has absconded with those payments rather than allowing them to properly be paid to the Zohar Funds' trustee for ultimate distribution to the Zohar Funds' noteholders.  Indeed, tax filings recently obtained by the Zohar Funds going back to at least 2006 show that dividend and equity distributions made by Portfolio Companies, which are located in a variety of different states, to the Zohar Funds in New York, were intercepted by Ms. Tilton who wrongfully claimed these distributions as her personal property. These stolen amounts are substantial.  In fact, based upon court filings by Ms. Tilton, they are believed to have been in the tens of millions of dollars or more.

51.     Third, in other instances, the Defendants appear to have taken equity interests originally allocated to the Zohar Funds and simply transferred them back to themselves.  For example, in multiple presentations to Moody's, including one in 2009, Patriarch disclosed that Zohar II owned 100% of HVEASI Holding BV ("HVEASI") and had expected returns on its equity ownership in that company of $199 million.  However, when HVEASI was sold in 2012 for more than $300 million, Zohar II did not receive a penny from the sale.  When confronted with this fact at a recent trial in Delaware that is discussed below, Ms. Tilton claimed that *she* had been the true owner of HVEASI and denied that Zohar II had *ever* owned any interest in the company.  She claimed the contrary representation to Moody's had simply been a mistake—notwithstanding that the representation was made in multiple presentations and HVEASI was

identified as the most valuable of the 40 equity positions owned by Zohar II at the time of the 2009 Moody's presentation.  Patriarch has failed to provide any evidence to substantiate Ms. Tilton's claim of a mistake, raising the specter that HVEASI represents yet another instance of Ms. Tilton pilfering the Zohar Funds' equity interests for her own.

52.     Fourth, even when not attempting to steal the Zohar Funds' equity interests outright, the Defendants have engaged in efforts to steal the voting and other rights associated with those equity interests.  Specific efforts to do so in late 2015 on the eve of Defendants relinquishing control of the Zohar Funds are discussed in Section D below.  These efforts were intended to deprive the Zohar Funds of the ability to exercise ownership control over the Portfolio Companies—including through a sale of the companies—or to remove Ms. Tilton from the lucrative management positions she holds.

53.     In particular, Ms. Tilton often installed herself as chief executive and always installed herself as a—and often the sole—managing member or director of the Portfolio Companies.  In connection with those appointments, Ms. Tilton caused the Portfolio Companies to enter into Management Services Agreements with PPMG to provide "general executive, professional, and management consulting services," "finance functions," and "human resource functions," among others.  These agreements, in turn, require the Portfolio Companies to pay onerous corporate management fees to PPMG for, in effect, having Ms. Tilton and her entities provide management services.  Based upon review of one of these agreements, which is believed to be representative of others, they were structured to terminate when Patriarch no longer owned or controlled at least 30% of the company's outstanding equity.  Nonetheless, in breach of this term, PPMG purports to continue to manage the Portfolio Companies and collect management fees, despite Patriarch's resignation as collateral manager of the Zohar Funds, which terminated

Patriarch's control over the equity positions held by the Zohar Funds, leaving Patriarch controlling less than 30% in most or all of the Portfolio Companies. Moreover, because of Defendants' efforts to abscond with the voting rights associated with the Zohar Funds' equity holdings, they have deprived the Zohar Funds of the ability to exercise their rights as equity owners to remove Ms. Tilton from her management roles and terminate the PPMG agreements (or enforce their existing termination provisions).

54.     Finally, and more recently, Defendants have engaged in a campaign to place a cloud over *all* of the Zohar Funds' equity holdings by making specious contentions, discussed in Section E below, that *none* of those equity holdings are actually owned by the Zohar Funds but are rather all owned by Ms. Tilton, either directly or indirectly through other Defendants. Defendants have made these claims notwithstanding that the equity holdings are reflected in agreements and instruments—such as stock certificates titled in the Zohar Funds names—that unambiguously reflect the Zohar Funds' ownership of these equity interests. These recent efforts appear intended to further the Defendants' longstanding scheme to misappropriate the benefits of the Zohar Funds' equity holdings by both providing a fig leaf justification for their prior illegal conduct—such as stealing equity distributions—as well as to resist the Zohar Funds' efforts to enforce their true ownership rights over the Portfolio Companies.

### C.     Patriarch Manipulates The Zohar Funds To Fraudulently Inflate Management Fees And Retain Control.

55.     While the Patriarch Managers were given the authority, in the Indentures and the CMAs, to manage the Zohar Funds' Collateral with the goal of maximizing recovery *for the Funds*, there were several important checks on that authority. Certain of these checks looked to the performance of the assets in the Zohar Funds' portfolios, and created consequences when their performance sunk below acceptable levels.

56.     For example, as part of the protections for noteholders built into the Zohar Funds'
Indentures, each quarter the Zohar Funds are required to calculate the results for an
Overcollateralization Test ("OC Test") which gets reported in the Monthly Report and Note
Valuation Report.  The OC Test is calculated as a ratio between the outstanding amounts due on
the loans held in the particular Zohar Fund portfolio, adjusted to take into account certain credit
risks on those loans, against the outstanding principal balances on the outstanding senior notes.
The general purpose of the OC Test is to confirm that the Zohar Funds are likely to be able to
collect sufficient amounts on their outstanding loans to meet their obligations to senior
noteholders.  To pass, the OC Test result must be above specified amounts under the Indentures
in excess of 100%, reflecting that there is more collateral than needed to meet noteholder
obligations (*i.e.,* there is "overcollateralization").  Failure of the OC Test triggers a number of
consequences under the Indentures intended to conserve funds, including diverting or suspending
a number of payments.

57.     Collateral management fees are one of the types of payments that are impacted by
an OC Test failure.  Under the Zohar Funds' Indentures, the collateral manager is potentially
entitled to both a senior management fee and a subordinated management fee, each calculated as
1% of the outstanding principal amount of assets held by the Zohar Fund (including unfunded
loan amounts and excluding principal that represents previously deferred or capitalized interest
except in limited circumstances), excluding any equity securities, for a maximum of a 2% total
management fee.  However, when the OC Test fails, pursuant to the Indentures' priority of
payments, the subordinated management fee is cut off during the pendency of the failure, cutting
the fees paid to the collateral manager in half.  The priority of payments also cuts off payments
made to preference share holders—the Octaluna Defendants—when the OC Test fails.

Additionally, under the Zohar I and Zohar II Indentures, if the OC Test is failed, the Controlling Party gains control of the Fund's Collateral.

58.     Since 2009 at the very latest, properly calculated, the OC Test under the Zohar Funds' Indentures should have been failing due to significant deterioration in the Funds' loan portfolios.  However, rather than reporting failing OC Test results, the Monthly Reports and Note Valuation Reports consistently reported passing test results due to fraudulent manipulations of those results by Patriarch, under Ms. Tilton's direction.  These manipulations took multiple forms.

59.     First, Patriarch routinely misreported the credit risk classification for Portfolio Companies.  One of the critical components of the OC Test calculation are metrics used to determine the likelihood of a Portfolio Company repaying its loan.  Under the Zohar I and II Indentures, to make those determinations, each asset is assigned to a numerical category between 1, reflecting non-performing high-credit-risk companies, and 4, reflecting performing low-credit-risk companies.  These numerical categories, which are also reported in the Monthly Reports, in turn, determine the amount of that Portfolio Company's outstanding loan balance that is included in the numerator of the OC Test calculation.  Under the Zohar I and II Indentures, an asset cannot qualify as a Category 4 if there are "negotiations, at the time of measurement, to restructure (either in or outside of a bankruptcy or reorganization proceeding) the financial obligations" of the relevant Portfolio Company, or if the Portfolio Company has defaulted on a principal or interest payment, "without regard to any applicable grace period or any waiver of such default … but only so long as such default has not been cured."  Zohar I and II Indentures, § 1.1.  Under the Zohar III Indenture, assets are categorized as either "Collateral Investments" (*i.e.*, a Category 4) or "Defaulted Investments" (*i.e.*, a Category 1).  Under these definitions, an asset is a Defaulted

Investment if, among other things, "a default as to the payment of principal and/or interest has

occurred, but only so long as such default has not been cured."  Zohar III Indenture, § 1.1.

60.     The Portfolio Company classifications are determined by the collateral manager,

applying certain standards set forth in the Indentures.  While the Indentures and CMAs at certain

points gave the Patriarch Managers limited abilities to waive or otherwise forbear payments that

were owed by Portfolio Companies to the Zohar Funds, they did *not* make the categorizations

discretionary, and indeed required that Portfolio Companies be downgraded in the event that they

defaulted on a payment of principal or interest, *regardless* of whether it had been waived.

However, Patriarch routinely ignored the mandated objective standards that were supposed to

determine these classifications under the Indentures, instead regularly classifying non-

performing loans as a "Category 4" or "Collateral Investment" solely on the basis of Ms. Tilton's

supposed subjective intention to support the company, without regard to how likely (or

inevitable) that company's default was, and even after that company had defaulted on numerous

interest payments due to the Zohar Funds, without cure.  By applying this amorphous and

subjective classification, in breach of the Indentures and CMAs, Patriarch inflated the Zohar

Funds' OC Test results, and by extension the collateral management fees that were paid to the

Patriarch Managers.

61.     As just one example, Zohar III extended loans under a revolving credit line to a

Portfolio Company named Gorham Mill Acquisition ("Gorham").  From 2013 to 2015, Gorham

paid Zohar III less than 10% of the interest that was properly due under the revolving credit

agreement, falling more than $4 million in arrears.  Notwithstanding the fact that Gorham was

plainly failing to perform on its loan obligations, Patriarch classified Gorham as a "Collateral

Investment" during the entire period, thereby allowing the entirety of Gorham's loan to be

included in the numerator of the OC Test calculation.   Ultimately, as part of a massive effort to steal value from the Zohar Funds (which will be discussed further below), Patriarch reduced the interest rate on Gorham's loans from 10% to just 0.5%.  Any such changes to loan terms should themselves have independently required changes to a Portfolio Company's classification under the Indentures, which require a re-categorization for *any* asset that has been restructured.

62.     Likewise, notwithstanding that multiple Portfolio Companies, such as American LaFrance and RapidRack, appeared to be in severe financial distress, and may even have ceased operations before being restructured into new, ostensibly performing companies, both the original and the restructured companies were rated as Category 4 by Patriarch.

63.     Second, Patriarch frequently took debt that had been purchased at a significant discount and wrote it up to par for purposes of calculating the OC Test under the Indentures. While the Indentures permit the collateral manager some flexibility in determining whether purchased debt should be valued at par, the fact that debt had just been acquired at a substantial discount to par was objective evidence that the value of these assets was impaired.  Moreover, upon information and belief, these assets did not meet the other requirements set forth in the Indentures as conditions for assigning a par valuation to an asset purchased at a discount. Nonetheless, Patriarch consistently reported the value of those assets at par, with the result once again that the Patriarch Managers' fees were fraudulently inflated.

64.     For example, in 2005, Zohar II purchased at least $29.6 million of debt issued by Intera Group for approximately $5.3 million—reflecting an *82% discount* to par.  Yet, notwithstanding the highly distressed nature of Intera's debt as reflected in this massive discount, Patriarch used the full face amount of $29.6 million for reporting its outstanding principal balance and treated it as a Category 3 loan, meaning that it was being restructured and this full

amount could be used for purposes of calculating the OC Test and its fees. After restructuring the Intera debt, Patriarch upgraded its categorization to Category 4 notwithstanding that it was failing to make the required interest payments. Seven months after being restructured, it defaulted.

65.     By manipulating the OC Test results in this manner, Ms. Tilton and Patriarch facilitated the Patriarch Managers and the Octaluna Defendants receiving hundreds of millions of dollars in management fees and preference share distributions to which they were not entitled and would not have otherwise received, and prevented the Controlling Party from gaining control over the Zohar Funds' Collateral. This included a substantial part of the more than *$700 million* in collateral management fees and other distributions Defendants received over the life of the Zohar Funds.

66.     Moreover, under the Zohar Indentures, a severe failure of the OC Test (below the "Adjusted Event of Default Overcollateralization Ratio") is an Event of Default, which gives the Controlling Party (with respect to Zohar I and II) or Controlling Class (with respect to Zohar III) cause to terminate the collateral manager (thereby, of course, also terminating senior and subordinated management fees). Accordingly, by fraudulently inflating the OC Test, Patriarch also extended the period of time during which it was able to engage in its fraudulent scheme by preventing investors from having the opportunity to terminate the Patriarch Managers when they should rightfully have had that choice.

67.     On March 30, 2015, following an extensive investigation into the OC Test manipulations, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings against Ms. Tilton, Patriarch Partners, and the Patriarch Managers, alleging that they had "defrauded" the Zohar Funds and their investors "by providing false and misleading

29

information, and engaging in a deceptive scheme, practice and course of business, relating to the values they reported for these funds' assets" by inflating the Zohar Funds' assets' classifications, as set out in this section.  The SEC alleged that the Defendants had made "false and misleading" statements about the fair value of the loans in the Funds.  Trial on the SEC's charges was held in October and November 2016 in front of an SEC administrative law judge, who has not yet rendered judgment.

68.     The SEC's case was premised in large part on violations of the Investment Advisers Act that are not precisely aligned with the claims made here and did not include the breach of contract or other claims specific to the Zohar Funds that are made here.  Despite these differences, the evidence adduced at trial supports and supplements the Zohar Funds' allegations. For example, Ms. Tilton testified at trial that the Patriarch Managers had a fiduciary duty to the Zohar Funds and an obligation to manage their investments according to the Indentures.  And, she acknowledged that Patriarch had not reduced the categorization of investments (from a "Category 4" to a "Category 1" or from a "Collateral Investment" to a "Defaulted Investment") to reflect their declining credit quality—as required by the Indentures—and instead had only reduced their categorization when the likelihood of any recovery on the investment had dropped to nearly zero.  As a result, the OC Test was shown as passing—and the Patriarch Managers were paid their subordinated management fees, the Octaluna Defendants received preference share distributions, and Ms. Tilton avoided an Event of Default—when, under the plain terms of the Indentures, the OC Test was failing and the Patriarch Managers and Octaluna Defendants should have received none of those benefits.

D.     **Defendants Transfer Assets And Rights To Themselves Out Of The Zohar Funds.**

69.     Notwithstanding the Patriarch Managers' fiduciary and contractual duties to the Zohar Funds, they have repeatedly consented to modifications of their loans to Portfolio Companies that reduced the value of those loans to the Zohar Funds and increased the likelihood that the Zohar Funds would default on payments to their noteholders.  For example, in numerous instances, the Patriarch Managers consented to extensions of maturity dates for loans from the Zohar Funds past the scheduled maturities of the Zohar Funds' obligations to their own noteholders.  Extending repayment on the loans past the Zohar Funds' own maturity dates was both a violation of the Indentures and rendered it a virtual certainty that the Zohar Funds would be forced to default on their obligations to their investors because the principal repayment of the loans was the primary source of funds that would be available to the Zohar Funds to repay the notes.  This is precisely what happened with respect to Zohar I and II.

70.     Likewise, the Patriarch Managers repeatedly agreed to provisions in the Zohar Funds' contracts that would give Defendants and other Patriarch entities control over the Zohar Funds' assets without any apparent benefit provided to the Zohar Funds.  For example, the Patriarch Managers agreed to transfer restrictions in credit agreements, requiring PPAS's consent to any loan assignments, without any apparent consideration provided to the Zohar Funds for relinquishing their right to unilaterally sell their loans.  In effect, these transfer restrictions purport to shift key rights of ownership held by the Zohar Funds to an entity owned and controlled by Ms. Tilton that has no ownership interest whatsoever in the underlying loans to which they relate, all for nothing in return.

71.     As the note maturity dates of the Zohar I and II notes neared and the likelihood that the Zohar Funds would repay their noteholders became increasingly remote, disputes

between Patriarch and the Controlling Parties that had begun early in the Zohar Funds' history were exacerbated.  By mid-2015, Ms. Tilton concluded that MBIA, which was the Controlling Party for Zohar I and Zohar II, and the investors that constituted the Controlling Class for Zohar III, were looking to replace the Patriarch Managers as collateral manager for the Zohar Funds.

72.     Facing fraud charges from the SEC and recognizing that, upon the removal of the Patriarch Managers, Defendants would no longer be able to exercise control over the Zohar Funds, Defendants accelerated their campaign to secretly grant themselves valuable assets and rights at the Zohar Funds' expense while they still could.

73.     In particular, beginning in mid-2015, Ms. Tilton executed dozens of amendments to the loan agreements between the Zohar Funds and the Portfolio Companies, which (if they were effective) substantially reduced the value of the Zohar Funds' debt holdings, for the benefit of Ms. Tilton's own personal funds.  For example, numerous amendments purported to subordinate the Zohar Funds' loans to loans made by Ark II and/or AIP II[7] and to reduce or eliminate the interest to be paid on the Zohar Funds' loans.[8]  Other amendments increased the Zohar Funds' loan commitments to Portfolio Companies, extended maturity dates, and removed financial covenants that the Portfolio Companies had been required to meet.[9]  Through these

---

[7]     These include amendments to the credit agreements for Duro Textiles LLC (dated July __, 2015), Gorham Paper and Tissue, LLC (dated June 24, 2015), Silverack, LLC (dated May 8, 2015), Spiegel, LLC (dated October 2, 2015), and Galey & Lord Industries, LLC (dated January 23, 2016).

[8]     These include amendments to the credit agreements for Red Shield Acquisition LLC (dated May 21, 2015), Petry Television Inc. (dated November 4, 2015), and Iconic American Trucks, LLC (dated February 25, 2016).

[9]     These include amendments to the credit agreements for 180s Inc. (dated September 1, 2015 and October 29, 2015), ACME International Enterprises,Inc. (dated September 1, 2015 and October __, 2015), Best Textiles Acquisition, LLC (dated August 7, 2015 and September 1, 2015), Croscill Home LLC (dated September 1, 2015), Denali Incorporated (dated November

amendments, Defendants gave away enormous value owned by or owed to the Zohar Funds,

transferring that value either to the Portfolio Companies over which they exercised control, or to

investment funds that Ms. Tilton owned directly.

74.     In September 2015, Ms. Tilton executed a series of legal documents purportedly

transferring the Zohar Funds' voting and other rights in its equity holdings to entities owned

directly by Ms. Tilton.  These documents, which took the form of irrevocable proxies or

amendments to LLC or stockholder agreements, purported to transfer equity voting rights,

including the rights to change directors or managing members or to effect a sale of the company,

from the Zohar Funds to Defendants, often the Patriarch Managers, or to provide the Defendants

with veto rights over any attempt to exercise such rights.  At least 35 such proxies or

---

19, 2015), Dura Operating LLC and Dura Automotive Systems (dated November 19, 2015),
Duro Textiles LLC (dated July __, 2015), East Alliance Limited (dated September 1, 2015),
eMag Solutions, LLC (dated September 1, 2015 and October __, 2015), Galey & Lord
Industries, LLC (dated July 8, 2015, September 1, 2015, October 29, 2015, and November 3,
2015), Global Automotive Systems, LLC (dated May 31, 2015 and September 1, 2015),
Gorham Paper and Tissue, LLC (dated June 24, 2015 and September 1, 2015), Hartwell
Industries, Inc. (dated September 1, 2015), Heritage Aviation, Ltd. (dated September 1,
2015), Iconic American Trucks, LLC (dated November 19, 2015), Inter-Marketing Group,
Inc. and Dana Classic Fragrances, Inc. (dated June 24, 2015 and September 1, 2015), Intrepid
U.S.A., Inc. (dated November 19, 2015), Jewel of Jane LLC (dated July 30, 2015, September
1, 2015, and November 19, 2015), LVD Acquisition, LLC (dated September 1, 2015 and
November __, 2015), MD Helicopters, Inc. (dated September 1, 2015), Mobile Armored
Vehicles, LLC (dated September 1, 2015), Natura Water, LLC (dated September 1, 2015 and
October __, 2015), NetVersant Solutions, LLC (dated September 1, 2015 and November 19,
2015), RM Acquisition, LLC (dated November 19, 2015), Remco Maintenance, LLC (dated
June 8, 2015, October 28, 2015, and November 19, 2015), Scan-Optics, LLC (dated
September 1, 2015 and October 28, 2015), Silverack, LLC (dated May 8, 2015, September 1,
2015, and September __, 2015), Snelling Staffing, LLC (dated September 1, 2015, October 2,
2015, October 8, 2015, October 22, 2015, November 5, 2015, November 18, 2015, and
November 19, 2015), Spiegel, LLC (dated September 1, 2015 and November 19, 2015), Stila
Styles, LLC (dated August 14, 2015), Transcare Corporation (dated September 1, 2015),
Vulcan Engineering Co. (dated November 19, 2015), and White Mountain Tissue, LLC
(dated September 1, 2015).  In many cases, these amendments were not signed by the
borrowers, but were signed only by Ms. Tilton.

amendments were executed by Ms. Tilton over a two-day period.[10]  The Zohar Funds received

no consideration in return for their purported forfeiture of critical ownership rights in the

Portfolio Companies' equity to entities owned and controlled by Ms. Tilton.

75.    In November 2015, when the notes issued by Zohar I matured and it defaulted on

its payment obligations to its investors, Ms. Tilton executed another series of amendments to the

credit agreements on behalf of the Zohar Funds that purported to restructure outstanding loans to

waive or restructure unpaid interest or commitment fees; waive the Zohar Funds' ability to

declare an Event of Default based on prior missed payments; waive other existing Events of

Default; grant sole discretion to waive any Event of Default under the credit agreements to

PPAS; and require consent from PPAS for any amendment, modification, termination or waiver

---

[10]   These include irrevocable proxies relating to 180s Inc. (dated September 21, 2015), Fetco
Home Décor, Inc. (dated September 21, 2015), Glenoit LLC (dated September 21, 2015),
Hartwell Industries, Inc. (dated September 21, 2015), Inter-Marketing Group, Inc. (dated
September 21, 2015), MD Helicopters, Inc. (dated September 21, 2015), Performance
Designed Products LLC (dated September 21, 2015), and UI Holdings (dated September 21,
2015), and voting rights amendments to LLC Agreements of ACME International
Enterprises, Inc. (dated September 21, 2015), American LaFrance, LLC (dated September
22, 2015), Best Textiles Acquisition, LLC (dated September 22, 2015), Black Mountain
Door, LLC (dated September 22, 2015), Croscill Home LLC (dated September 22, 2015),
Denali Incorporated (dated September 22, 2015), Dura Automotive Systems (dated
September 22, 2015), Duro Textiles LLC (dated September 22, 2015), eMag Solutions, LLC
(dated September 22, 2015), Galey & Lord Industries, LLC (dated September 22, 2015),
Global Automotive Systems, LLC (dated September 22, 2015), Gorham Paper and Tissue,
LLC (dated September 22, 2015), Iconic American Trucks, LLC (dated September 22, 2015),
Jewel of Jane LLC (dated September 22, 2015), Libertas Copper, LLC (dated September 22,
2015), LVD Acquisition, LLC (dated September 22, 2015), Mobile Armored Vehicles, LLC
(dated September 22, 2015), Netversant Solutions, LLC (dated September 22, 2015), Remco
Maintenance, LLC (dated September 22, 2015), RM Acquisition, LLC (dated September 22,
2015), Scan-Optics, LLC (dated September 22, 2015), Silverack, LLC (dated September 22,
2015), Snelling Staffing, LLC (dated September 22, 2015), Spiegel, LLC (dated September
22, 2015), Stila Styles, LLC (dated September 22, 2015), White Mountain Tissue, LLC
(dated September 22, 2015), and Xinhua (dated September 22, 2015).  Patriarch has
previously attempted to make voting rights amendments to the LLC Agreements of certain
portfolio companies, like Amweld International, in May 2011.

of any provision of the credit agreement, among other changes.[11]  On November 19, 2015 alone, Patriarch entered into at least thirty different credit agreement amendments giving PPAS sole discretion to waive Events of Default by the Portfolio Companies, requiring PPAS consent to any amendment, modification, termination or waiver of the credit agreement, and waiving any Events of Default then existing under the credit agreements.[12]

76.    In February 2016, Ms. Tilton executed an additional round of amendments, making some of the amendments stated above for additional Portfolio Companies,[13] and making additional amendments that gave Ark II "sole and absolute discretion" to make revolving credit

---

[11]  These include amendments to the credit agreements for 180s Inc. (dated November 3, 2015), Duro Textiles LLC (dated November 3, 2015), Global Automotive Systems, LLC (dated October 31, 2015), Heritage Aviation, Ltd. (dated November 3, 2015), Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc. (dated November 3, 2015), Jewel of Jane LLC (dated November 3, 2015), LVD Acquisition, LLC (dated November __, 2015), MD Helicopters, Inc. (dated November 3, 2015), Natura Water, LLC (dated November 3, 2015), Scan-Optics, LLC (dated November 3, 2015), Spiegel, LLC (dated November 3, 2015), and Transcare Corporation (dated November 3, 2015).

[12]  These include amendments to the credit agreements for 180s Inc., ACME International Enterprises, Inc., Best Textiles Acquisition, LLC, Croscill Home LLC, Denali Incorporated, Dura Operating LLC and Dura Automotive Systems, Duro Textiles LLC, East Alliance Limited, eMag Solutions, LLC, Fetco Home Décor, Inc., Galey & Lord Industries, LLC, Global Automotive Systems, LLC, Hartwell Industries, Inc., Heritage Aviation, Ltd., Iconic American Truck, LLC, Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc., Intrepid U.S.A., Inc., Jewel of Jane LLC, Libertas Copper, LLC, LVD Acquisition, LLC, MD Helicopters, Inc., Mobile Armored Vehicles, LLC, Natura Water, LLC, NetVersant Solutions, LLC, RM Acquisition, LLC, Remco Maintenance, LLC, Scan-Optics, LLC, Silverack, LLC, Snelling Staffing, LLC, Spiegel, LLC, Transcare Corporation, and Vulcan Engineering Co.

[13]  These included amendments to the credit agreements for ACME International Enterprises, Inc. (dated February 5, 2016), Best Textiles Acquisition, LLC (dated February 5, 2016), Gorham Paper and Tissue, LLC (dated February 5, 2016), Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc. (dated February 5, 2016), Jewel of Jane LLC (dated February 5, 2016), Silverack, LLC (dated February 5, 2016), and Snelling Staffing, LLC (dated February 5, 2016).

loans[14] and reducing the commitment fees being paid by many Portfolio Companies to the Zohar Funds.[15]

77.     Thus, over the life of the Zohar Funds but accelerating in 2015 and 2016, Defendants absconded with valuable interests of the Zohar Funds by amending loan agreements to reduce the value of the Zohar Funds' debt holdings through various changes in terms, and amending equity agreements to transfer any conceivable control right that the Zohar Funds might have had through their equity holdings to the Patriarch Managers or another one of the Defendants.  In doing so, as discussed above, Ms. Tilton sought to ensure that she would maintain control of the Portfolio Companies, that PPMG's lucrative contracts with the Portfolio Companies would remain in force, and that she would retain maximal control over Portfolio Company funds regardless of what happened to the Zohar Funds.

### E.     Defendants Fraudulently Conceal And Assert Ownership Over The Zohar Funds' Stolen Collateral.

78.     As described above, for years Defendants worked to conceal the extent of the Zohar Funds' equity holdings from their investors and Credit Enhancer, secretly reaping the benefits of cash dividends and distributions on that equity while allowing the Trustee to issue

---

[14]   These included amendments to the credit agreements for ACME International Enterprises, Inc. (dated February 5, 2016), Best Textiles Acquisition, LLC (dated February 5, 2016), Galey & Lord (dated February 5, 2016), Gorham Paper and Tissue, LLC (dated February 5, 2016), Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc. (dated February 5, 2016), Jewel of Jane LLC (dated February 5, 2016), Silverack, LLC (dated February 5, 2016), and Spiegel, LLC (dated February 5, 2016).

[15]   These included amendments to the credit agreements for ACME International Enterprises, Inc. (dated February 5, 2016), Best Textiles Acquisition, LLC (dated February 5, 2016), Gorham Paper and Tissue, LLC (dated February 5, 2016), Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc. (dated February 5, 2016), Jewel of Jane LLC (dated February 5, 2016), Silverack, LLC (dated February 5, 2016), and Spiegel, LLC (dated February 5, 2016).

reports month after month that failed to report (or accurately report) the equity owned by the Zohar Funds, even as Defendants touted the value of those very interests to rating agencies. Once they had sought to transfer the equity and/or equity rights from the Zohar Funds, Defendants doubled down on their efforts to hide what they had done.

79.     Following the default of Zohar I, knowing that through the Fall 2015 amendments they had plundered the Zohar Funds' valuable interests in favor of various Patriarch entities, the Patriarch Managers agreed in February 2016 to resign as collateral manager for the Zohar Funds. After managing the Zohar Funds since Zohar I's inception in 2003, the Patriarch Managers ceased to be the collateral managers as of March 2, 2016.  Alvarez & Marsal Zohar Management ("AMZM") was appointed to replace them as collateral manager for the Zohar Funds.

80.     Upon its appointment as collateral manager of the Zohar Funds, AMZM requested that Patriarch provide AMZM with the Zohar Funds' books and records that the Patriarch Managers had used to fulfill their duties as collateral managers, including, among several other categories of documents, (1) a full listing of the Zohar Funds' collateral; (2) documentation relating to the Zohar Funds' loans; (3) documentation related to the Zohar Funds' equity interests; and (4) up-to-date financial reports for each of the Portfolio Companies.

81.     While the Patriarch Managers were required to provide this information under the CMAs, Patriarch instead embarked on a course of conduct that was intended to give nothing more than the appearance of cooperation.  For example, after providing AMZM with an initial production that was comprised largely of loan agreements and amendments, Patriarch declared its production complete, and represented to AMZM and the Zohar Funds that it had provided all of the documents related to the Zohar Funds' collateral.

82.     Yet, contrary to these representations, the materials that Patriarch provided lacked the most critical information that AMZM had requested and needed in order to fulfill its duties as the Zohar Funds' collateral manager, such as a complete list of collateral owned by the Zohar Funds, or *any* documentation related to the Zohar Funds' equity ownership, such as stock certificates, LLC agreements, or stockholder agreements.

83.     As a result of Patriarch's deficient responses, AMZM was forced to initiate a lawsuit in the Delaware Court of Chancery (the "Delaware Action"), seeking the documents from the Patriarch Managers that would allow AMZM to, among other things, determine what assets the Zohar Funds own—and what rights it has in respect of those assets—so that it could attempt to recover value from these holdings.  In the course of that lawsuit, Patriarch made a series of convoluted assertions that the Zohar Funds' equity interests—which were memorialized in stock certificates and LLC Agreements naming the Zohar Funds as the holders of equity— were not actually the Zohar Funds' equity interests.  Rather, Patriarch asserted, they belonged to Ms. Tilton and entities under her control, who had simply *gifted* the upside of those equity interests to the Zohar Funds while leaving the actual ownership of them vested with Ms. Tilton.

84.     Ms. Tilton asserted in her testimony that she had created this structure because the Zohar Funds' Indentures prohibited the ownership of equity interests, and that such interests were therefore not "Collateral" of the Zohar Funds.  But, in fact, equity falls squarely within the definition of Collateral under the Indentures and the equity interests here appear to have been acquired in ways that were permitted under the Indentures.  In any event, whether or not the Indentures permitted the collateral manager to acquire certain equity interests on behalf of the Zohar Funds, there was no prohibition on owning it.  Once that equity was owned in the Zohar

Funds' name, regardless of how it was obtained, it was their property, and constituted "Collateral" under the Indentures.

85.     Patriarch also fought production of presentations it had made to rating agencies on behalf of the Zohar Funds, aware that those presentations revealed the Zohar Funds' ownership of the very valuable equity interests that Ms. Tilton was seeking to claim as hers. The presentations that Patriarch sought to conceal included the presentations discussed above in which Patriarch had represented to the ratings agencies that Zohar II owned 100% of the equity in HVEASI, even though it would receive none of the more than $300 million received when it was sold by Defendants in 2012.

86.     After a full trial on the merits, on October 26, 2016, the Delaware Court of Chancery ruled that Patriarch had breached the CMAs by failing to turn over books and records to the Zohar Funds and ordered immediate production of those documents. Patriarch responded by appealing and seeking an emergency stay to prevent the Zohar Funds from receiving *their own documents*. Patriarch's requested emergency stay was denied, and an appeal is now pending before the Delaware Supreme Court. In the interim, however, the Zohar Funds have begun to receive documents from Patriarch that have permitted them to begin to piece together the puzzle, set out here, of the Defendants' fraudulent misconduct and outright theft, although the production is far from complete.

87.     The brazen fraudulent scheme described above was, by its very nature, impossible for the Zohar Funds to discover prior to March 3, 2016, because until that time they were fully controlled by Patriarch (which was controlled by Ms. Tilton), which actively sought to conceal its wrongdoing from noteholders, the Controlling Parties, and any other interested parties. Indeed, even after appointment of a new collateral manager for the Zohar Funds, that collateral

manager could not have discovered the extent of this wrongdoing until Patriarch was finally ordered by the court in Delaware to produce the evidence of the fraudulent scheme, some of which was produced as late as December 2016, and much of which Patriarch is still withholding. As just a few examples, no documents have been turned over that relate to ownership of HVEASI, tax documents turned over have been redacted to conceal the full extent of the equity distributions and dividends stolen by Defendants, and Patriarch has refused to turn over the transaction documents for loans and equity acquisitions made by the Zohar Funds themselves, which would fully reveal the terms on which the Zohar Funds acquired those interests.

88.     Moreover, notwithstanding the Delaware Action, Defendants have adopted a litigation strategy through which they continue to affirmatively misrepresent and assert their ownership over the Zohar Funds' equity interests.  In particular, on September 12, 2016, Octaluna I and Patriarch XV brought a lawsuit challenging the procedures being used by the Zohar Funds' Trustee to auction collateral belonging to Zohar I (although the auction was being conducted pursuant to specific provisions of the Indenture).  In their briefing, Octaluna I and Patriarch XV accused MBIA of trying to "steal equity" that Octaluna I and Patriarch XV claimed belongs to Octaluna I.  Octaluna I and Patriarch XV asserted that including the equity in the auction would "put a cloud over Octaluna and its affiliates' equity holdings in the Portfolio Companies at a critical time," and contended that Defendants were the only parties entitled to sell those equity interests, or to sell the Portfolio Companies themselves by virtue of those interests.

89.     On November 14, 2016, in a filing in connection with an involuntary bankruptcy proceeding that Patriarch XV filed and later withdrew with respect to Zohar I, Patriarch XV (at Ms. Tilton's direction) objected to efforts by a Zohar III investor to obtain documents from the

proceeding related to the Zohar Funds' equity holdings, contending in support that "[c]ertain Patriarch affiliates," and not the Zohar Funds, were the "ultimate equity owner" of the Portfolio Companies.

90.     On November 23, 2016, in response to an effort by the Zohar Funds to appoint new directors for three Portfolio Companies as to which they own a majority stake, Defendants refused to recognize their slate of appointed directors, asserting in a letter and then in subsequent court filings that the Octaluna Defendants "are the owners of the equity in the Companies."

91.     Thus, years of Defendants improperly manipulating the Zohar Funds, breaching contractual and fiduciary duties to the Zohar Funds, breaching Indenture and CMA provisions to inflate payments from the Zohar Funds, and engaging in fraud and outright theft of valuable Zohar Fund assets, gives rise to a number of causes of action, as set forth below.

## CAUSES OF ACTION

### COUNT I – DECLARATORY JUDGMENT
### (Against All Defendants)

92.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

93.     The Zohar Funds are record holders and owners of equity interests that are memorialized in the form of, among other documents, stock certificates and LLC agreements. The Zohar Funds received these interests for good and valuable consideration, generally in connection with providing financing for the acquisition of Portfolio Companies, extending loans to Portfolio Companies, or in exchange for agreeing to restructure loans to Portfolio Companies.

94.     The stock certificates are valid securities issued in the names of the Zohar Funds and declare the Zohar Funds "owners" of shares of stock.

95.     The LLC agreements list the Zohar Funds as parties, include the Zohar Funds as signatories, and list the Zohar Funds as members entitled to membership interests.

96.     Nonetheless, the Defendants have repeatedly asserted, including in several court proceedings, that the Zohar Funds do not own this equity, but rather have been gifted "upside" in the equity, which, Defendants assert, is actually owned by Ms. Tilton and the Octaluna Defendants.  Indeed, Defendants have even accused the Zohar Funds of "stealing" by lawfully attempting to assert their equity ownership rights.

97.     Accordingly, a justiciable controversy exists among the parties with regard to the ownership over and rights in equity interests in Portfolio Companies.

98.     The Zohar Funds therefore seek a declaration that they are the legal owners of the equity interests issued or otherwise created in their names, with the relevant equity rights and interests to be established at trial.

### COUNT II – DECLARATORY JUDGMENT
### (Against All Defendants)

99.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

100.     As set forth above, each of the Zohar Funds is party to an Indenture, which is explicitly referenced and incorporated into the relevant CMAs for each Zohar Fund.  The Indentures are valid and enforceable contracts under which the Zohar Funds have fully performed.

101.     Section 1.1 of the Indentures ("Definitions") defines "Collateral" as "All Money, instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts, investment property and other property and rights subject or intended to be subject to the lien of this Indenture for the benefit of the Secured Parties as of any particular time."  The Granting Clause of the Indentures states, in turn, that "The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, a continuing security interest in, and lien on, all of its right, title and interest in, to and under, in

each case, whether now owned or existing, or hereafter acquired or arising, all accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, instruments, deposit accounts, investment property (each, as defined by the UCC), and **any and all other property of any type or nature owned by it** ... ."  Indentures, p. 1 (emphasis added).

102.    The Zohar Funds are record holders and owners of equity interests that are memorialized in the form of, among other documents, stock certificates and LLC agreements. The stock certificates are valid securities issued in the names of the Zohar Funds and declare the Zohar Funds "owners" of shares of stock.  The LLC agreements are valid and enforceable contracts that list the Zohar Funds as parties, include the Zohar Funds as signatories, and list the Zohar Funds as members entitled to membership interests.  Accordingly, all of these equity interests are Collateral as that term is defined under the Indentures.

103.    Nonetheless, the Defendants have asserted in several court proceedings, including in this Court, that the Zohar Funds' equity interests do not constitute Collateral under the Indentures, and for that reason cannot be owned by the Zohar Funds.

104.    Accordingly, a justiciable controversy exists among the parties regarding whether the Zohar Funds' equity interests constitute Collateral.

105.    The Zohar Funds seek a declaration that the equity interests issued or otherwise created in their names (with the relevant equity interests to be established at trial) are Collateral, as that term is defined under the Indentures.

## COUNT III – DECLARATORY JUDGMENT
### (Against All Defendants)

106.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

107.    The Zohar Funds are record holders and owners of valuable equity and loan interests that are memorialized in the form of, among other documents, stock certificates, LLC

agreements, and loan agreements.  The Zohar Funds received these interests for good and valuable consideration.

108.    The relevant agreements are valid and enforceable.

109.    Nonetheless, the Defendants have purported to execute proxies, other documents, or amendments to existing documents, in order to transfer value from the Zohar Funds to one or more of the Defendants, including by granting voting rights, transfer restriction rights, priority of payments, or the right to veto an Event of Default, as set out in more detail above.

110.    These amendments, proxies, and other documents or provisions were executed outside of the scope and authority of the Patriarch Managers' entitlement to act on behalf of the Zohar Funds, because their actions were required to be taken in good faith, at arm's length, done according to a standard of care, and comport with applicable laws and prevailing market standards.

111.    Moreover, execution of many of these amendments, proxies, and other documents or provisions breached the Indentures by purporting to transfer Collateral subject to the Indentures' lien, which secures the interests of noteholders and the Credit Enhancer.

112.    The Defendants, on information and belief, contend that each of the documents was validly enacted within the proper scope and authority of the Patriarch Managers.  Ms. Tilton purported to sign each such document on behalf of every party thereto, and has asserted in a declaration to a court of law that certain of these documents had successfully transferred the Zohar Funds' right to vote shares in certain companies and to consent to the election or removal of the directors of those companies.

113.    Accordingly, a justiciable controversy exists as to the enforceability of the amendments, proxies, and other documents or provisions.

114.    The Zohar Funds therefore seek at a minimum a declaration that these amendments, proxies, and other documents or provisions were *void ab initio* and are deemed unenforceable.

### COUNT IV – ACCOUNTING
### (Against The Patriarch Managers)

115.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

116.    Under the CMAs, the Patriarch Managers contracted to provide investment and advisory services to the Zohar Funds, were tasked with managing the Zohar Funds' investments, and were designated power to act on behalf of the Zohar Funds, including to execute all "necessary, desirable and appropriate documents and/or instruments in the name and on behalf of" the Zohar Funds.  CMAs, § 2.5.

117.    As collateral managers, the Patriarch Managers held a position of confidence and trust with respect to the Zohar Funds, which the Patriarch Managers knew of and accepted, and were obligated to act as agents on behalf of the Zohar Funds in good faith and with due regard to the Zohar Funds' interests.

118.    The Patriarch Managers owed fiduciary duties of loyalty, which obligated them to put the interests of the Zohar Funds ahead of their own self-interest, and to refrain from exploiting the relationship for their own personal benefit.  The Patriarch Managers also owed fiduciary duties prohibiting them from self-dealing and conflicts of interest, and to disclose material facts.

119.    The Patriarch Managers were obligated by the Indentures and the CMAs to supervise and account for the Zohar Funds' collateral, including money or property, but have failed and refused to account to the Zohar Funds or to the Trustee under the Indentures, despite demand for same, for equity interests owned by the Zohar Funds and equity distributions

thereon.  The Patriarch Managers have obscured these equity interests from the Zohar Funds'
investors and other interested parties and have provided incorrect and incomplete information to
the Trustee for inclusion in monthly reports.  This failure and refusal is without excuse.

120.     Accordingly, the Zohar Funds are entitled to a prompt accounting of the equity
interests owned by the Zohar Funds and the cash distributions that have been paid on that equity.
The Zohar Funds demand that the Patriarch Managers be directed to account to the Zohar Funds
for the equity interests owned by the Zohar Funds and the dividends and distributions paid
thereon.

121.     The Zohar Funds have no adequate remedy at law for the relief sought hereby.

## COUNT V – BREACH OF CONTRACT
### (Against The Patriarch Managers)

122.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

123.     As set forth above, each of the Patriarch Managers entered into a CMA by which
it agreed to act as collateral manager for the Zohar Funds.  Patriarch Partners VIII entered into a
CMA with Zohar I, Patriarch Partners XIV entered into a CMA with Zohar II, and Patriarch
Partners XV entered into a CMA with Zohar III.

124.     The CMAs provide that the Patriarch Managers:

- "shall not … direct or effect the acquisition or disposition of the Collateral
  Investments [or Collateral Debt Obligations] or any other item included in the
  Collateral except in accordance with the requirements of the Indenture …";

- "shall not take any action which it knows or should be reasonably expected to
  know in accordance with prevailing market practices would … adversely
  affect the interests of the Holders of the Securities … in any material respect
  …";

- Ensure that "all purchases, exchanges and sales of Collateral by the Collateral Manager on behalf of the Company … shall be in accordance with reasonable and customary business practices of the relevant market and in compliance with applicable laws and all purchases and sales of the Collateral will be effected on arm's-length terms …";

- "covenant[] that [they] shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture"; and

- "shall, in rendering its services as Collateral Manager, use reasonable care and the same degree of skill and attention (a) that the Collateral Manager (i) exercises with respect to comparable assets that it manages for itself and its Affiliates and (ii) exercises with respect to comparable assets that it manages for others and (b) exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions, in each case except as otherwise expressly provided in the Indenture."

Zohar I and II CMA, §§ 2.2(n), 2.4, 2.6, 2.9; Zohar III CMA, §§ 2.2(l), 2.4, 2.6, 2.9.

125.    The CMAs contain an exculpation provision, but it provides that the Patriarch Managers will be liable "by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the other Transaction Documents to which it is a party."  CMAs, § 4.4.

126.     The CMAs are valid and enforceable contracts.  The Zohar Funds have complied with all material terms of the CMAs.

127.     The Patriarch Managers have knowingly and intentionally breached the CMAs by failing to obtain for the Zohar Funds all equity interests to which they were entitled and which interests are held by other Defendants, consenting on behalf of the Zohar Funds to the transfer of debt and equity rights and holdings from the Zohar Funds to other Defendants, and reducing the Zohar Funds' priority as creditors, reducing the amount of interest owed to the Zohar Funds, and making other changes detrimental to the Zohar Funds' interests.  These self-dealing transactions adversely affected the Zohar Funds and their noteholders, violated customary business practices and applicable law, and violated the Patriarch Managers' standard of care under the CMAs.

128.     As a result of the Patriarch Managers' breaches of the CMAs, the Zohar Funds have suffered economic loss and damages in an amount to be proven at trial, and are entitled to be placed in the same situation as if the CMAs had not been violated.  The Zohar Funds seek rescission of the transactions executed by the Patriarch Managers in breach of the CMAs or, in the alternative, damages in the amount of losses caused by the Patriarch Managers' breaches of the CMAs.

## COUNT VI – BREACH OF CONTRACT
### (Against The Patriarch Managers)

129.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

130.     As set forth above, each of the Zohar Funds is party to an Indenture, which is explicitly referenced and incorporated into the relevant CMA for each Zohar Fund.  The Indentures are valid and enforceable contracts under which the Zohar Funds have fully performed.

131.     The Zohar I and II Indentures provide that:

> [u]pon the acquisition of each Collateral Debt Obligation by the Issuer, the
> Collateral Manager shall designate (in a writing delivered to the Trustee and the
> Credit Enhancer) each such Collateral Debt Obligation as falling within Category
> 1, Category 2, Category 3 or Category 4. After the acquisition of each Collateral
> Debt Obligation by the Issuer and/or the Zohar Subsidiary, to the extent that the
> characterization of such Collateral Debt Obligation shall change, the Collateral
> Manager shall redesignate (in a writing delivered to the Trustee and the Credit
> Enhancer) each such Collateral Debt Obligation as falling within Category 1,
> Category 2, Category 3 or Category 4 or as a Workout Obligation.

Zohar I and II Indentures, § 12.1(b).

132.    Section 1.1 of the Zohar I and II Indentures sets out definitions for each of these

categories, which include objective criteria for determining a particular asset's classification,

most of which are tied to the likelihood of repayment on that asset.  An asset is a Category 4

asset only if it meets the definition of "Current," meaning that it is not a "Defaulted Obligation,"

or an obligation that has "previously deferred and/or capitalized as principal any interest due."  A

Category 1 asset is a "Defaulted Obligation," "with respect to which a default as to the payment

of principal and/or interest has occurred (without regard to any applicable grace period or any

waiver of such default) but only so long as such default has not been cured."

133.    Likewise, the Zohar III Indenture provides that a "Defaulted Investment" is an

investment

> as to which the Collateral Manager believes, that (A) a default has occurred and is
> continuing with respect to such Collateral Investment that in the sole judgment of the
> Collateral manager will likely result in a default as to the payment of principal and/or
> interest on such Collateral Investment or (B) a default as to the payment of principal
> and/or interest (beyond any applicable grace period) has occurred and is continuing on
> another obligation of the same issuer that is senior or pari passu in right of payment … .

Zohar III Indenture, § 1.1.  By contrast, a Collateral Investment is an "outstanding loan or

obligation" that is not a Defaulted Investment.  *Id.*

134.    Under the Indentures, in order to calculate the Class A Overcollateralization Ratio

Test, Category 4 or Collateral Investment assets are typically valued at their principal amounts,

while Category 1 or Defaulted Investment assets are valued at a lower amount, generally either the market value of that asset, or a substantially impaired value dictated by the asset's Moody's rating.

135.    The Zohar II Indenture further provides that the Principal Balance of any Collateral Debt Obligation that was acquired at a discount, for "less than 95% of the outstanding principal amount of such obligation on such origination date," must be equal to the "outstanding principal amount thereof (*including*, for the avoidance of doubt, the discounted portion thereof) plus any unfunded commitment," (emphasis added) as long as the Discounted Loan met certain requirements.  But, in the event that Discounted Loans were more than 10% of the Maximum Investment Amount or did not meet other requirements, "the Principal Balance of such Discounted Loan shall be deemed to equal the outstanding principal amount thereof (*excluding* the discounted portion thereof) plus any unfunded commitment …" (emphasis added).  Zohar II Indenture, § 1.1.

136.    Under the Indentures, "the Collateral Manager … agrees to perform any provisions of this Indenture applicable to the Collateral Manager."  Indentures, § 14.4.

137.    The CMAs contain an exculpation provision, but it provides that the Patriarch Managers will be liable "by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the other Transaction Documents to which it is a party."  CMAs, § 4.4.

138.    The Patriarch Managers have knowingly and intentionally breached the Indentures by incorrectly categorizing the Zohar Funds' assets, and falsely inflating their assets' Principal Balances in violation of the Indentures.  By virtue of the Zohar Funds' OC Tests being

reported as passed when they were actually failing and by being calculated based on an inflated

valuation of the Zohar Funds' assets, the Patriarch Managers obtained collateral management

fees and the Octaluna Defendants obtained preference share payments to which neither were

entitled and Patriarch retained control over the Zohar Funds for longer than they would have

otherwise.

139.     As a result of the Patriarch Managers' breaches of the Indentures, the Zohar

Funds have suffered economic loss and damages in an amount to be proven at trial.  The Zohar

Funds have also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and

protect their rights under the Indentures.

## COUNT VII – CONVERSION
### (Against All Defendants)

140.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

141.     As set forth more fully above, the Zohar Funds are the owners of equity interests

issued or otherwise created in their names (with the relevant equity interests to be established at

trial), and of debt memorialized by a series of loan agreements between the Zohar Funds and

Portfolio Companies.

142.     Ms. Tilton has intentionally interfered with the property rights of the Zohar Funds

by diverting and exercising dominion and control over the dividends and distributions on these

equity interests into her own personal accounts, thereby depriving the Zohar Funds of the use of

that property.

143.     Additionally, Defendants have intentionally interfered with the Zohar Funds'

equity rights and interests by selling the companies in which the Zohar Funds owned equity

without paying the Zohar Funds any compensation.  For example, in the case of HVEASI,

Defendants represented that Zohar II owned 100% of the company, but then sold the company for more than $300 million without giving Zohar II a penny of those proceeds.

144.    Additionally, in 2015, the Defendants intentionally interfered with the property rights of the Zohar Funds by executing a series of loan agreement amendments and irrevocable proxies that were designed to strip the Zohar Funds of their valuable rights in that property and transfer them to Defendants, thereby unlawfully exercising dominion and control over the Zohar Funds' property and depriving the Zohar Funds of the use of that property.

145.    The Defendants subsequently exacerbated this interference by actively concealing the agreement amendments and irrevocable proxies from the Zohar Funds and their replacement collateral manager, AMZM, by refusing to turn over documents that would evidence these transactions.

146.    As a direct and proximate result of the conduct of the Defendants, the Zohar Funds have suffered substantial damages in an amount to be proven at trial.

## COUNT VIII – BREACH OF FIDUCIARY DUTY
### (Against The Patriarch Managers)

147.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

148.    Under the CMAs, the Patriarch Managers contracted to provide investment and advisory services to the Zohar Funds, were tasked with managing the Zohar Funds' investments, and were designated power to act on behalf of the Zohar Funds, including to execute all "necessary, desirable and appropriate documents and/or instruments in the name and on behalf of" the Zohar Funds.  CMAs, § 2.5.

149.    As collateral managers, the Patriarch Managers held a position of confidence and trust with respect to the Zohar Funds, which the Patriarch Managers knew of and accepted, and

were obligated to act as agents on behalf of the Zohar Funds in good faith and with due regard to the Zohar Funds' interests.

150.    The Patriarch Managers owed fiduciary duties of loyalty, which obligated them to put the interests of the Zohar Funds ahead of their own self-interest, and to refrain from exploiting the relationship for the benefit of themselves and other entities owned by Ms. Tilton. The Patriarch Managers also owed fiduciary duties prohibiting them from self-dealing and conflicts of interest, and to disclose material facts.

151.    The Patriarch Managers violated their fiduciary duties continually since the inception of the Zohar Funds by, among other things, failing to obtain equity interests for the Zohar Funds to which they were properly entitled and wrongfully consenting on behalf of the Zohar Funds to the purported transfer of valuable interests, including debt and equity interests owned by the Zohar Funds, to themselves or other Defendants, in acts of self-dealing and exploitation of their position of power and control with respect to the Zohar Funds.  Through this conduct, the Patriarch Managers placed the Defendants' own interests above those of the Zohar Funds, and caused economic damages to the Zohar Funds and their noteholders.

152.    As a direct and proximate result of the conduct of the Patriarch Managers, the Zohar Funds have suffered damages in an amount to be proven at trial.

### COUNT IX – FAITHLESS SERVANT
### (Against The Patriarch Managers)

153.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

154.    Since the inception of the Zohar Funds, they have paid the Patriarch Managers hundreds of millions of dollars in collateral management fees in exchange for the Patriarch Managers' services as the Zohar Funds' fiduciaries and agents.

155.    By reason of their breaches of their fiduciary duties owed to the Zohar Funds, the Patriarch Managers are faithless servants, and are required to forfeit all money that they received from the Zohar Funds as of the first day that they breached their duties.

### COUNT X – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### (Against Patriarch Partners And Tilton)

156.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

157.    At all relevant times, Patriarch Partners and Ms. Tilton owned and/or controlled the Patriarch Managers, directed their actions, and/or acted on their behalves.

158.    Under the CMAs, the Patriarch Managers contracted to provide investment and advisory services to the Zohar Funds, were tasked with managing the Zohar Funds' investments, and were designated power to execute all "necessary, desirable and appropriate documents and/or instruments in the name and on behalf of" the Zohar Funds.  CMAs, § 2.5.  As collateral managers, the Patriarch Managers held positions of confidence and trust with respect to the Zohar Funds, which the Patriarch Managers knew of and accepted, and were obligated to act in good faith and with due regard to the Zohar Funds' interests.

159.    The Patriarch Managers owed fiduciary duties of loyalty, which obligated them to put the interests of the Zohar Funds ahead of their own self-interest, and to refrain from exploiting the relationship for their own personal benefit.  The Patriarch Managers also owed fiduciary duties prohibiting them from self-dealing and conflicts of interest, and to disclose material facts.

160.    Ms. Tilton and Patriarch Partners were aware of the Patriarch Managers' fiduciary duties.

161.    The Patriarch Managers violated their fiduciary duties continually since the inception of the Zohar Funds by, among other things, failing to obtain equity interests for the

Zohar Funds to which they were properly entitled and wrongfully consenting on behalf of the Zohar Funds to the purported transfer of valuable interests including debt and equity interests owned by the Zohar Funds to themselves or other Defendants, in acts of self-dealing and exploitation of their position of power and control with respect to the Zohar Funds.  Through this conduct, the Patriarch Managers placed the Defendants' own interests above those of the Zohar Funds, and caused economic damages to the Zohar Funds and their noteholders.

162.    Patriarch Partners and Ms. Tilton induced this violation by exerting control over the Patriarch Managers and causing them to take all of the actions that violated these duties, and provided the personnel and resources that were required to violate these duties.

163.    As a direct and proximate result of the conduct of Tilton and Patriarch Partners, the Zohar Funds have suffered damages in an amount to be proven at trial.

### COUNT XI – UNJUST ENRICHMENT
### (Against ARK II, AIP II, The Octaluna Defendants, And Tilton)

164.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

165.    As a result of Defendants' misconduct, ARK II, AIP II, the Octaluna Defendants, and Ms. Tilton have been enriched at the Zohar Funds' expense.

166.    ARK II and AIP II have been enriched directly by, among other things, the granting to ARK II and AIP II of a priority over the Zohar Funds' liens on the Portfolio Companies and the transfer of valuable interests from the Zohar Funds to ARK II and AIP II.

167.    The Octaluna Defendants and Ms. Tilton have been enriched directly by, among other things, misappropriating dividends and distributions on equity interests owned by the Zohar Funds, asserting ownership over equity interests owned by the Zohar Funds, and otherwise taking valuable rights in the Portfolio Companies belonging to the Zohar Funds for themselves or companies Ms. Tilton owns and controls.

168.     Ms. Tilton, and ARK II, AIP II, and the Octaluna Defendants, through their

owner, Ms. Tilton, knew of and played an active role in the Defendants' scheme to transfer

valuable rights in the Portfolio Companies and valuable equity distributions away from the Zohar

Funds.

169.     The circumstances are such that it would be against equity and good conscience to

permit ARK II, AIP II, the Octaluna Defendants, and Ms. Tilton to retain their ill-gotten gains

from the Zohar Funds.  ARK II, AIP II, the Octaluna Defendants, and Ms. Tilton have an

obligation to the Zohar Funds to make restitution for their ill-gotten gains.  ARK II, AIP II, the

Octaluna Defendants, and Ms. Tilton have failed to make restitution to the Zohar Funds for their

ill-gotten gains.

170.     Restitution should therefore be made by ARK II, AIP II, the Octaluna Defendants,

and Ms. Tilton to the Zohar Funds in an amount to be proven at trial.

### COUNT XII – VIOLATION OF RICO, 18 U.S.C. § 1962(c)
### (Against Lynn Tilton)

171.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

172.     At all relevant times, the Zohar Funds were and are "persons" within the meaning

of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

173.     At all relevant times, Ms. Tilton was and is a "person" within the meaning of 18

U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

174.     At all relevant times, Ms. Tilton was, and is, a person that exists separate and

distinct from the RICO enterprise, described below.  Ms. Tilton is the sole owner of the other

members of the enterprise, but each member is a legally different entity from Ms. Tilton, with

different legal rights, obligations, powers, and privileges from Ms. Tilton.  Ms. Tilton

incorporated each of the other Defendants to fulfill a particular purpose, and each of the

Defendants is in a distinct line of business and plays a different role as part of the enterprise: the Patriarch Managers act as collateral managers; Patriarch Partners provides employees and services to entities within the enterprise; the Octaluna Defendants are investment vehicles that hold preference shares in the Zohar Funds; Ark II and AIP II are Ms. Tilton's personal investment funds; PPAS provides Administrative Agent services under credit agreements; and PPMG provides corporate management services to the Portfolio Companies.

175.    Ms. Tilton violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

### *The Patriarch Enterprise*

176.    Taken together, Patriarch, the Octaluna Defendants, Ark II, AIP II, PPAS, and PPMG (hereinafter, the "Patriarch Enterprise") constitute an ongoing criminal enterprise that is owned and directed by Ms. Tilton, the RICO person.  Through a pattern of fraud, theft, conversion, and breach of contractual and fiduciary duties, the members of the enterprise associated together to engage in a common scheme of fraudulent misrepresentations, self-dealing, breaches of trust and fiduciary duty, and outright theft or attempted theft for the common purpose of misusing and misappropriating hundreds of millions of dollars of the Zohar Funds' assets, seeking to benefit from and potentially transfer those assets and making it difficult or impossible for the Zohar Funds or their noteholders or other interested parties to identify and trace those assets.

177.    The Patriarch Enterprise was set up for the purpose of providing a variety of different asset management, investment, and administrative financial and investment services, and thus has an ascertainable structure separate and apart from the pattern of racketeering

activity in which the Defendants engaged.  Each of the Defendants has a distinct corporate identity and engages in a specific and distinct line of business.

178.    This association-in-fact constitutes an "enterprise" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(4), and it was or is engaged in, and/or its activities affected, interstate and/or foreign commerce.

179.    Ms. Tilton directly or indirectly benefited from the Zohar Funds' assets by, among other things: (1) exercising or asserting ownership over equity belonging to the Zohar Funds, including the ability to manage, control, or sell the Portfolio Companies in which the Zohar Funds hold equity interests; (2) misappropriating dividends or distributions on equity holdings of the Zohar Funds from those Portfolio Companies; (3) earning management fees from Portfolio Companies that are contingent upon ongoing ownership and control of Portfolio Company equity; (4) benefitting from priority as against the Zohar Funds' debt holdings in the Portfolio Companies, and as managers of the Portfolio Companies, from forgiveness or restructuring of that debt; and (5) earning inflated collateral management fees from providing hopelessly conflicted and ultimately fraudulent collateral management services.

180.    The Patriarch Enterprise's repeated, continuous, and flagrant violations of law constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.* Their racketeering activities, both individually and collectively, have been ongoing since at least 2006 and pose a serious threat of continuing criminal conduct into the foreseeable future.

181.    The Patriarch Enterprise's common purpose came into existence as early as 2006 or before, and no later than 2009, by which time the Patriarch Enterprise set up by Ms. Tilton had stolen significant equity distributions and had so thoroughly manipulated the categorizations of the Zohar Funds' assets that, absent those manipulations, control over at least Zohar I and II

would have passed to their Controlling Party.  By virtue of this ongoing control, the participants in the Patriarch Enterprise were able to extract significant benefit from the Zohar Funds, as set out above, without detection by noteholders, the Controlling Party, or others.

182.    The Patriarch Enterprise is a cohesive group with specific, distinct, and assigned responsibilities and a command structure operating in, and directed from, the United States.  The Enterprise is structured as follows:

a)    Defendant Ms. Tilton, the RICO person, is the central and controlling figure in the Patriarch Enterprise, and has been responsible for oversight of the scheme to defraud the Zohar Funds, and through her ownership of and positions of authority in the other Defendants, she has directed the other Defendants to take actions necessary to accomplish the overall aims of the Patriarch Enterprise.  She is the central participant in the orchestration, planning, and execution of the Patriarch Enterprise's scheme to defraud the Zohar Funds.  She also ultimately was a primary beneficiary of the scheme's extraction of fees and assets from the Zohar Funds.

b)    Defendants the Patriarch Managers are distinct entities that are owned and directed by Ms. Tilton.  Until March 2, 2016, the Patriarch Managers acted as collateral manager for one of the Zohar Funds.  In that capacity, the Patriarch Managers were imbued with contractual and fiduciary duties to the Zohar Funds, which they breached and abandoned by fraudulently misclassifying the Zohar Funds' assets and engaging in a series of self-dealing transactions designed to strip value from the Zohar Funds and transfer that value to members of the Patriarch Enterprise.  Directly and through their agent officers, directors, and employees, the Patriarch Managers have conducted and participated in the management and operation of the Patriarch Enterprise, including the

orchestration, planning, and execution of the scheme to defraud the Zohar Funds. The Patriarch Managers have benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by receiving valuable, fraudulently inflated collateral management fees and coordinating the transfer or purported transfer of valuable rights and interests away from the Zohar Funds.

c)      Defendant Patriarch Partners is a distinct entity that is owned and directed by Ms. Tilton. Patriarch Partners provides employees, knowledge, facilities, and other resources to the other Defendants in order to facilitate the carrying out of the Patriarch Enterprise's scheme. Directly and through its agent officers, directors, and employees, Patriarch Partners has conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds. Patriarch Partners has benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds.

d)      The Octaluna Defendants are distinct entities that are owned and directed by Ms. Tilton. The Octaluna Defendants own certain interests in the Zohar Funds and purport to hold and receive distributions on valuable equity interests in the Portfolio Companies, notwithstanding that those interests are issued in the names of the Zohar Funds. Directly and through their agent officers, directors, and employees, the Octaluna Defendants have conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds. The Octaluna Defendants have benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by

receiving purported transfers of valuable equity rights and interests and distributions thereon.

e)    Defendants ARK II and AIP II are distinct entities that are owned and directed by Ms. Tilton.  ARK II and AIP II have purportedly made certain investments in the Portfolio Companies, and now hold preferential rights in those Companies at the expense of the Zohar Funds.  Directly and through their agent officers, directors, and employees, ARK II and AIP II have conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds.  ARK II and AIP II have benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by receiving purported transfers of valuable rights from the Zohar Funds.

f)    PPAS is a distinct entity owned and directed by Ms. Tilton that played a role in the Patriarch Enterprise.  PPAS acted as Administrative Agent to the Zohar Funds under their loan agreements with Portfolio Companies, and in so doing has consented to many of the Defendants' efforts to transfer valuable rights away from the Zohar Funds. Directly and through its agent officers, directors, and employees, PPAS has conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds. PPAS has benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by receiving valuable agency fees.

g)   PPMG is a distinct entity owned and directed by Ms. Tilton that played a role in the Patriarch Enterprise.  PPMG acted as a management consultant to the Portfolio Companies, and in so doing has siphoned valuable cash and assets away from the Zohar

Funds.  Directly and through its agent officers, directors, and employees, PPMG has conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds.  PPMG has benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by receiving valuable management fees.

183.    Ms. Tilton knew of the existence of, and conducted the operation and management of the Patriarch Enterprise and its affairs.

184.    Actions taken by Ms. Tilton, acting through the Patriarch Enterprise, in furtherance of the scheme include, but are not limited to (1) exercising or asserting ownership over the Zohar Funds' equity interests; (2) stealing cash dividends and distributions on those equity interests; (3) attempting to hide the existence of the Zohar Funds' equity interests from noteholders and the Zohar Funds themselves; (4) attempting to steal the Zohar Funds' equity and debt interests; (5) modifying loan payment obligations in order to benefit Defendants at the expense of the Zohar Funds; and (6) inflating the categorization of the Zohar Funds' assets and manipulating those assets in order to pass OC Tests, retain control, and obtain inflated management fees.

185.    The Patriarch Enterprise was predominately domestic in nature, as it was conceived of and orchestrated in the United States, and carried out predominately if not entirely in the United States.

186.    At all relevant times, the Patriarch Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).  The Enterprise participated in multi-billion dollar lending to distressed companies in a variety of industries and regions, caused those loans to be made and transferred payment and debt and equity ownership

stakes and distributions across state lines, and held and transferred funds and assets using national financial institutions.

### The Pattern of Racketeering Activity

187.    The Patriarch Enterprise is a continuing enterprise engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5) and in violation of 18 U.S.C. § 1962(c), consisting of multiple acts of racketeering by members of the enterprise that are interrelated, not isolated, continued since at least 2006 and perpetrated for the same or similar purposes by the same persons on the same victims.

188.    The actions undertaken by Ms. Tilton from at least 2006 to the present were inherently unlawful, they were her regular way of operating, and the nature of her acts clearly implies a threat of continued wrongful activity.

189.    Ms. Tilton engaged in a pattern of racketeering, including, but not limited to mail, wire, and bank fraud, and receipt and transportation of stolen property across state lines, as set out below:

### Predicate Acts: Mail, Wire, and Bank Fraud, Violations of 18 U.S.C. §§ 1341, 1343, 1344, In Obtaining Inflated Management Fees

190.    The Patriarch Enterprise engaged in a massive, and egregious, scheme to defraud the Zohar Funds in order to ensure that Ms. Tilton extracted substantial management fees from the Zohar Funds through the Patriarch Managers, regardless of whether they had fulfilled their contractual and fiduciary duties to the Zohar Funds (which, as set out below, they had not).  The ultimate aim of the scheme was to defraud and deceive the Zohar Funds not only to extract substantial unearned fees, but also to retain virtually unchecked control over the Zohar Funds, when in reality the poor performance of the Zohar Funds' Collateral dictated that Ms. Tilton and the Patriarch Managers be removed from control of the Zohar Funds and the Portfolio

Companies.  Ms. Tilton achieved this goal by causing the Defendants to regularly and systematically misrepresent the performance of the Zohar Funds' Collateral, and thereby fraudulently inflating calculations based on the performance of those assets.  The Patriarch Enterprise's pattern of racketeering included mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and/or bank fraud in violation of 18 U.S.C § 1344.

191.    In furtherance of this scheme, and as described herein, Ms. Tilton transmitted, or caused to be transmitted, by means of (1) placing or causing matters and things to be placed in any post office or authorized depository, or depositing or causing to be deposited matters and things to be sent or delivered by a private or commercial interstate carrier and/or (2) wire communications in interstate or foreign commerce, emails, telephone calls, writings, signs, signals, pictures, and sounds, including, but not limited to, the following:

a)    Emails, telephone calls, and other communications by wire and mail to the Trustee of the Zohar Funds, conveying fraudulent classifications of the Zohar Funds' assets;

b)    Emails, telephone calls, and other communications by wire and mail to the Trustee of the Zohar Funds, conveying fraudulent and inflated principal balances of the Zohar Funds' assets;

c)    Emails, telephone calls, and other communications by wire and mail to the Trustee of the Zohar Funds, calculating OC Test levels based on fraudulent and inflated classifications and principal balances of the Zohar Funds' assets;

d)    Emails, telephone calls, and other communications by wire and mail to the Trustee of the Zohar Funds, calculating management fees due and owing on the basis of fraudulent and inflated classifications of the Zohar Funds' assets; and

e)      Publication in Monthly Reports and Note Valuation Reports, which were transmitted through the mail and wires to noteholders, of fraudulent and inflated classifications of the Zohar Funds' assets, and the OC Test and management fee levels based on those inflated numbers.

192.    The Zohar Funds incorporate by reference the attached Appendix A, Appendix B, and Appendix C, which set forth examples of Monthly Reports and Note Valuation Reports that report fraudulent and inflated classifications; miscalculated OC Test results; and miscalculated management fees, which were transmitted through the mail and wires to noteholders on or about the relevant publication date.  In order to produce each of the reports listed on Appendix A, Appendix B, and Appendix C, acting through the Patriarch Enterprise, Ms. Tilton communicated fraudulent classifications to the Trustee prior to publication, and at a minimum confirmed the miscalculated OC Test results and management fees, as her controlled entities were required to do by contract, if she did not provide those numbers to the Trustee directly.  These numbers were included in each respective Monthly Report or Note Valuation Report, as set out in Appendix A, Appendix B, and Appendix C.

193.    Each of the transmissions described above constitutes a separate fraudulent use of the mail or wires by Ms. Tilton.  The Zohar Funds relied on the information contained in these transmissions, and were induced thereby to permit the Patriarch Managers to continue exercising control over the Zohar Funds, and to pay copious management fees to the Patriarch Managers.

194.    The Trustee for the Zohar Funds, U.S. Bank N.A. is a financial institution as that term is defined by 18 U.S.C. § 20.

195.    Ms. Tilton also engaged in a scheme to obtain moneys, funds, credits, assets, securities or other property under the custody or control of a financial institution by means of

false or fraudulent pretenses, representations, or promises, including, but not limited to, the following:

a)      Communications to the Trustee of the Zohar Funds, conveying fraudulent and inflated classifications of the Zohar Funds' assets;

b)      Communications to the Trustee of the Zohar Funds, conveying fraudulent and inflated principal balances of the Zohar Funds' assets;

c)      Communications to the Trustee of the Zohar Funds, calculating OC Test levels based on fraudulent and inflated classifications and principal balances of the Zohar Funds' assets; and

d)      Communications to the Trustee of the Zohar Funds, calculating management fees due and owing on the basis of fraudulent and inflated classifications and principal balances of the Zohar Funds' assets.

196.    Such communications were made in connection with each of the Monthly Reports and Note Valuation Reports identified in Appendix A, Appendix B, and Appendix C.

197.    As a direct result of these efforts, Ms. Tilton, through the Patriarch Managers, was paid management fees that were not earned, based on improperly inflated asset classifications, by the Zohar Funds' Trustee, U.S. Bank, which otherwise maintained such funds under its custody and control.

198.    Each of the transmissions set out herein constitutes a separate fraudulent use of the mails and/or wires by Ms. Tilton.  The Zohar Funds reasonably relied on Ms. Tilton's false and misleading statements in agreeing to pay Defendants fraudulently inflated management fees and preference share disbursements on each pay period and in permitting U.S. Bank to pay these amounts.

199.    Ms. Tilton, through her control of the Patriarch Enterprise, sent or caused to be sent wire and/or mail communications, or acted with knowledge that wire and/or mail communications would be made in the ordinary operation of the Patriarch Enterprise, or could reasonably have foreseen that the wires or mails would be used in the ordinary course of business as a result of the Patriarch Enterprise's acts, and would be used for the purpose of extracting funds under bank custody and control in the form of collateral management fees from the Zohar Funds.  Accordingly, Ms. Tilton, acting through the Patriarch Enterprise, committed numerous acts of mail, wire, and bank fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1344.  Ms. Tilton also engaged in additional and similar acts of mail, wire, and bank fraud in furtherance of the Patriarch Enterprise's scheme, which will be proven at trial.

200.    Ms. Tilton participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud the Zohar Funds into paying exorbitant management fees, to obtain those fees from a financial institution, and to retain control over the Zohar Funds. The scheme was successful because Ms. Tilton was able to extract hundreds of millions of dollars in unearned fees and retain the role of collateral manager for years, causing the Zohar Funds substantial damages.  These damages were contemplated and intended by Ms. Tilton.

201.    Due to Ms. Tilton's fraud and concealment of her wrongdoing, the Zohar Funds could not have discovered the acts alleged herein prior to, at the earliest, March 30, 2015, when the SEC filed its Order Instituting Administrative and Cease-and-Desist Proceedings.  Moreover, no action could be taken with respect to Ms. Tilton's wrongdoing by the Zohar Funds because, due to the ongoing fraudulent scheme, Defendants retained total control over the Zohar Funds until the Patriarch Managers finally resigned their position as collateral manager, effective March 3, 2016.

***Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. §§ 1341, 1343, In Attempting To Steal Equity And Equity Distributions***

202.    Ms. Tilton, through the Patriarch Enterprise, engaged in a separate, egregious criminal scheme to defraud the Zohar Funds in order to attempt to illegally obtain their valuable equity interests and outright steal the cash distributions on those interests.  The ultimate objective of Ms. Tilton's scheme or artifice was to defraud the Zohar Funds into acquiescing to Ms. Tilton's assertion of ownership over the Zohar Funds' equity interests and theft of the distributions thereon by clouding or outright hiding the fact of the Zohar Funds' equity ownership, and Ms. Tilton's theft thereof.  Ms. Tilton achieved this goal by misrepresenting, or causing the Defendants to regularly and systematically misrepresent, the ownership of the Zohar Funds' equity interests.  Ms. Tilton's pattern of racketeering included mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C. § 1343.

203.    In furtherance of the scheme, and as described herein, Ms. Tilton transmitted, or caused be transmitted, by means of (1) placing or causing matters and things to be placed in any post office or authorized depository, or depositing or causing to be deposited matters and things to be sent or delivered by a private or commercial interstate carrier and/or (2) by means of wire communications in interstate or foreign commerce, emails, telephone calls, writings, signs, signals, pictures, and sounds, including, but not limited to, the following:

a)      Publication in Monthly Reports and financial statements, which were transmitted through the mail and wires to noteholders, of false and misleading information concerning the Zohar Funds' equity interests, wrongfully omitting many equity interests rightfully owned by the Zohar Funds, causing the Patriarch Managers to violate the requirement the requirements under the CMAs and CAAs that they monitor

and report the Zohar Funds' collateral, and ensure the accuracy and completeness of the Monthly Reports;

b)      Emails, telephone calls, and other communications by wire and mail, on April 1, 2016 and May 20, 2016 and in other instances, to the Zohar Funds, representing that Patriarch had provided the Zohar Funds with all documents relating to their Collateral, even though they had not yet produced a scrap of evidence of the Zohar Funds' equity holdings, or any related documents that the Zohar Funds were entitled to, that would have permitted them to ascertain their true ownership levels in the Portfolio Companies or the cash distributions received thereon;

c)      Court filings, transmitted by wire and mail, including:

1.      A September 12, 2016 complaint and motion for a temporary restraining order, removed to the Southern District of New York, in which Defendants asserted that the Zohar Funds were trying to "steal equity" rightfully owned by the Octaluna Defendants, and that they intended to sell those Portfolio Companies by virtue of those interests;

2.      A November 14, 2016 filing in the Bankruptcy Court for the Southern District of New York, asserting that the Octaluna Defendants are the "ultimate equity owners" of the Portfolio Companies; and

3.      A December 20, 2016 Answer and Counterclaims filed in the Delaware Court of Chancery, seeking declaratory relief and other

remedies asserting Ms. Tilton's and the Octaluna Defendants' ownership of equity in three portfolio companies.

d)    Correspondence, transmitted by wire and mail, including:

1.    A November 23, 2016 letter from Defendants to AMZM stating that the Octaluna Defendants are "the owner[] of the equity in the Companies"; and

2.    Representations by Ms. Tilton, in or about late November 2016, to a prospective purchaser of Portfolio Company MD Helicopter, that she was full and sole owner of MD Helicopter.

204.    The Zohar Funds incorporate by reference the attached Appendix A, Appendix B, and Appendix C, which set forth examples of Monthly Reports and Note Valuation Reports that report inaccurate, misleading, and fraudulent information about the Zohar Funds' equity holdings.  In order to produce each of the reports listed on Appendix A, Appendix B, and Appendix C, Ms. Tilton communicated fraudulent information to the Trustee prior to publication, and at a minimum failed to provide the Trustee with information her controlled entities were obligated to provide.  These misrepresentations were included in each respective Monthly Report or Note Valuation Report, as set out in Appendix A, Appendix B, and Appendix C.

205.    Each of the transmissions described above constitutes a separate fraudulent use of the mail or wires by Ms. Tilton.  The Zohar Funds relied on the information contained in these transmissions, and were induced thereby to permit Ms. Tilton to retain control over the Portfolio Companies and to otherwise acquiesce to her assertions of equity ownership.

206.    As a direct result of these efforts, Ms. Tilton has purported to retain valuable equity ownership interests that she does not own and is not entitled to, and to receive dividends and distributions on those interests, free from recovery efforts employed by the Zohar Funds since they had no idea of their true holdings or what was purported to have been transferred away.

207.    Each of the transmissions set out herein constitutes a separate fraudulent use of the mails and/or wires by Ms. Tilton.  The Zohar Funds reasonably relied on Ms. Tilton's false and misleading statements in delaying any recovery efforts since they had no idea of their true holdings or what was purported to have been transferred away.

208.    Ms. Tilton, through her control of the Patriarch Enterprise, sent or caused to be sent wire and/or mail communications, or acted with knowledge that wire and/or mail communications would be made in the ordinary operation of the Patriarch Enterprise, or could reasonably have foreseen that the wires or mails would be used in the ordinary course of business as a result of the Enterprise's acts.  Accordingly, Ms. Tilton, acting through the Patriarch Enterprise, committed numerous acts of mail and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.  These violations are ongoing.  Ms. Tilton also engaged in additional and similar acts of mail and wire fraud in furtherance of the Patriarch Enterprise scheme, which will be proven at trial.

209.    Ms. Tilton participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud the Zohar Funds into acquiescing to the theft of their equity interests, causing the Zohar Funds substantial damages.  These damages were contemplated and intended by Ms. Tilton.

210.    No action could be taken with respect to Ms. Tilton's wrongdoing by the Zohar

Funds because, thanks to Ms. Tilton's ongoing fraudulent scheme, she retained total control over

the Zohar Funds until the Patriarch Managers resigned their positions as collateral managers,

effective March 3, 2016.  Moreover, thanks to Ms. Tilton's fraud and concealment of her

wrongdoing, the Zohar Funds could not have discovered the acts alleged herein prior to July

2016, at the earliest, when an incomplete set of documents evidencing some of the Zohar Funds'

equity holdings were first produced by Patriarch, in connection with the Delaware Action and

under threat of a court order, or prior to December 2016, when an additional (but still

incomplete) set of documents was produced under court order.  The Zohar Funds are still seeking

additional documentation that Patriarch continues to withhold.

### Predicate Acts: Transportation And Receipt Of Stolen Property, Violations of 18 U.S.C. §§ 2314, 2315

211.    Ms. Tilton, through the Patriarch Enterprise, engaged in a separate, egregious

criminal scheme to receive and transport across state lines stolen property, in the form of cash

distributions belonging to the Zohar Funds.  An ultimate objective of Ms. Tilton's scheme or

artifice was to steal cash belonging to the Zohar Funds.  Ms. Tilton's pattern of racketeering

included receipt of stolen property in violation of 18 U.S.C. § 2315 and/or transportation of

stolen property across state lines in violation of 18 U.S.C. § 2314.

212.    Ms. Tilton, acting through the Patriarch Enterprise, devised a fraudulent scheme

(set out in more detail above), beginning at least in 2006, by which Ms. Tilton, acting as the

manager, director, and/or CEO of the Portfolio Companies, caused equity distributions to be paid

to the Zohar Funds, care of the Patriarch Managers, understanding that Ms. Tilton would be able

to fraudulently take possession of and assert ownership over those funds, which in reality

belonged to the Zohar Funds.  In so doing, Ms. Tilton caused these stolen equity distributions to

be transported across state lines, from the Portfolio Companies, which are located in a variety of different states across the United States, to Ms. Tilton and certain of her controlled entities, in New York.  Upon information and belief, Ms. Tilton then caused these funds to be transferred to other accounts also located across state lines.

213.    As a result of and through this fraudulent scheme, beginning at least in 2006, Ms. Tilton received the equity distributions on equity interests in the Portfolio Companies that were owned by, and titled in the names of, the Zohar Funds.  Those equity distributions, which were paid in cash, were documented by K-1 tax forms issued to the Zohar Funds, for whom those distributions were intended.

214.    At the time Ms. Tilton received these equity distributions, Ms. Tilton was well aware that they belonged to the Zohar Funds, and had been stolen, converted, and taken by fraud from the Zohar Funds, from whom Ms. Tilton and other entities within the Patriarch Enterprise had fraudulently hidden the Funds' own equity interests.  Indeed, in her role as manager, director, and/or CEO of the Portfolio Companies she caused the distributions to be paid out, in the names of the Zohar Funds, care of the Patriarch Managers, entities that she owned and controlled, thereby facilitating their theft.  Ms. Tilton received and took possession of these funds knowing that they were stolen property belonging to the Zohar Funds.

215.    The stolen property belonging to the Zohar Funds that was transported and received by Ms. Tilton was worth tens of millions of dollars or more.

### *Continuity of Conduct*

216.    Ms. Tilton's extensive violations of state and federal law through the Patriarch Enterprise and its members acting at her direction, each of which directly and proximately injured the Zohar Funds, constituted a continuous course of conduct in the United States beginning in at least 2006 and continuing today, which was intended to obtain money and

valuable equity and other interests through false representations, fraud, deceit, and other improper and unlawful means.  Therefore, said violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

### *The Patriarch Enterprise Caused Injury to the Zohar Funds*

217.    The Zohar Funds, as the original and rightful owners of the relevant equity interests and contract rights and the parties responsible for paying collateral management fees to the Patriarch Managers, have been injured in their business or property as a direct and proximate result of Ms. Tilton's violations, described above, of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

218.    The Zohar Funds' injuries are clear and definite and include the loss of tens of millions of dollars or more in cash, as well as the loss of $700 million in collateral management fees and preference share payouts, and the loss of other valuable rights and interests.

### *The Zohar Funds' Entitlement to Treble Damages*

219.    As a result of the violations of 18 U.S.C. § 1962(c) by Ms. Tilton, the Zohar Funds have suffered substantial damages in an amount to be proven at trial.

220.    Pursuant to 18 U.S.C. § 1964(c), the Zohar Funds are entitled to recover treble their general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Ms. Tilton's violations of 18 U.S.C. § 1962(c).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants and:

(a)      Issue declaratory judgment that the Zohar Funds are the legal owners of the equity interests issued or otherwise created in their names, with the relevant equity interests to be established at trial;

(b)      Issue declaratory judgment that the equity interests issued or otherwise created in the Zohar Funds' names (with the relevant equity rights and interests to be established at trial) are Collateral, as that term is defined under the Indentures;

(c)      Issue declaratory judgment that amendments, proxies, and other documents concerning the assets and interests of the Zohar Funds entered into by Defendants outside the scope of their authority were *void ab initio* and are deemed unenforceable;

(d)      Direct a prompt accounting of the equity interests owned by the Zohar Funds and cash distributions paid thereon and issue Declaratory Judgment as to the ownership of those amounts in favor of the Zohar Funds;

(e)      Award damages to the Zohar Funds in an amount to be determined at trial;

(f)      Award restitution to the Zohar Funds in an amount to be determined at trial;

(g)      Order forfeiture of all collateral management fees paid to Defendants since inception of the Zohar Funds;

(h)      Award treble damages pursuant to 18 U.S.C. § 1964(c);

(i)      Award the costs of this action, including the Zohar Funds' attorneys' fees; and

(j)     Grant to the Zohar Funds whatever further relief is just and proper.


Dated:          January 16, 2017                Respectfully submitted,

                                                QUINN EMANUEL URQUHART
                                                & SULLIVAN, LLP


                                                By: _____
                                                Michael Carlinsky
                                                Jonathan Pickhardt
                                                Ellison Ward Merkel
                                                Blair Adams

                                                51 Madison Avenue, 22nd Floor
                                                New York, NY 10010
                                                Telephone: (212) 849-7000

                                                *Attorneys for Plaintiffs Zohar CDO 2003-*
                                                *1, Ltd.; Zohar II 2005-1, Ltd; and Zohar*
                                                *III, Ltd.*

**Zohar 1 - Trustee Reports Database - w/ OC Ratio and Category Pages**

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Collateral Debt Obligation Report Page(s) | Defaulted Collateral Detail Report Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar I | NVR | 2004 | 08 | 8/20/2004 | US Bank | N/A - NVR only 6 pages | | | | | |
| Zohar I | Monthly | 2004 | 09 | | US Bank | 9/30/2004 | 1 | N/A | 22-24 | 47 | 48 |
| Zohar I | Monthly | 2004 | 10 | | US Bank | 10/29/2004 | 1 | N/A | 24-26 | 47 | 48 |
| Zohar I | NVR | 2004 | 11 | 11/22/2004 | US Bank | 11/9/2004 | 47 | 10 & 13 of PDF | 14-17 of PDF | 18 of PDF | No Equities Report |
| Zohar I | Monthly | 2004 | 12 | | US Bank | 12/31/2004 | 1 | N/A | 23-26 | 48 | 49 |
| Zohar I | Monthly | 2005 | 01 | | US Bank | 1/31/2005 | 1 | N/A | 22-24 | 47 | 48 |
| Zohar I | NVR | 2005 | 02 | 2/22/2005 | US Bank | N/A - NVR only 6 pages | | | | | |
| Zohar I | Monthly | 2005 | 03 | | US Bank | 3/31/2005 | 1 | N/A | 24-27 | 50 | 51 |
| Zohar I | Monthly | 2005 | 04 | | US Bank | 4/29/2005 | 1 | N/A | 22-25 | 46 | 48 |
| Zohar I | NVR | 2005 | 05 | 5/20/2005 | US Bank | 5/9/2005 | 48 | 2 & 5 | 15-18 | 19 | Equities Report not attached (as indicated on page 1) |
| Zohar I | Monthly | 2005 | 06 | | US Bank | 6/30/2005 | 1 | N/A | 22-25 | 47 | 48 |
| Zohar I | Monthly | 2005 | 07 | | US Bank | 7/29/2005 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | NVR | 2005 | 08 | 8/22/2005 | US Bank | 8/10/2005 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2005 | 09 | | US Bank | 9/30/2005 | 1 | N/A | 23-26 | 49 | 50 |
| Zohar I | Monthly | 2005 | 10 | | US Bank | 10/31/2005 | 1 | N/A | 23-26 | 49 | 50 |
| Zohar I | NVR | 2005 | 11 | 11/21/2005 | US Bank | 11/8/2005 | 46 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2005 | 12 | | US Bank | 12/30/2005 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | Monthly | 2006 | 01 | | US Bank | 1/31/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | NVR | 2006 | 02 | 2/21/2006 | US Bank | 2/8/2006 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2006 | 03 | | US Bank | 3/31/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | Monthly | 2006 | 04 | | US Bank | 4/28/2006 | 1 | N/A | 22-25 | 49 | 50 |
| Zohar I | NVR | 2006 | 05 | 5/22/2006 | US Bank | 5/9/2006 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2006 | 06 | | US Bank | 6/30/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | Monthly | 2006 | 07 | | US Bank | 7/31/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | NVR | 2006 | 08 | 8/21/2006 | US Bank | 8/9/2006 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2006 | 09 | | US Bank | 9/29/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | Monthly | 2006 | 10 | | US Bank | 10/31/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | NVR | 2006 | 11 | 11/20/2006 | US Bank | 11/8/2006 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2006 | 12 | | US Bank | 12/29/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | Monthly | 2007 | 01 | | US Bank | 1/31/2007 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | NVR | 2007 | 02 | 2/20/2007 | US Bank | 2/7/2007 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2007 | 03 | | US Bank | 3/30/2007 | 1 | N/A | 22-25 | 50 | 51 |
| Zohar I | Monthly | 2007 | 04 | | US Bank | 4/30/2007 | 1 | N/A | 23-26 | 46 | 47 |
| Zohar I | NVR | 2007 | 05 | 5/21/2007 | US Bank | 5/9/2007 | 48 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2007 | 06 | | US Bank | 6/29/2007 | 1 | N/A | 22-25 | 46 | 47 |
| Zohar I | Monthly | 2007 | 07 | | US Bank | 7/31/2007 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | NVR | 2007 | 08 | 8/20/2007 | US Bank | 8/8/2007 | 48 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2007 | 09 | | US Bank | 9/28/2007 | 1 | N/A | 22-25 | 46 | 47 |
| Zohar I | Monthly | 2007 | 10 | | US Bank | 10/31/2007 | 1 | N/A | 22-25 | 46 | 47 |
| Zohar I | NVR | 2007 | 11 | 11/20/2007 | US Bank | 11/7/2007 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2007 | 12 | | US Bank | 12/31/2007 | 1 | N/A | 22-25 | 47 | 48 |
| Zohar I | Monthly | 2008 | 01 | | US Bank | 1/31/2008 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar I | NVR | 2008 | 02 | 2/20/2008 | US Bank | 2/7/2008 | 49 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2008 | 03 | | US Bank | 3/31/2008 | 1 | N/A | 22-25 | 49 | 50 |
| Zohar I | Monthly | 2008 | 04 | | US Bank | 4/30/2008 | 1 | N/A | 22-26 | 50 | 51 |
| Zohar I | NVR | 2008 | 05 | 5/20/2008 | US Bank | 5/7/2008 | 50 | 2 & 4 | 13-17 | 18 | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2008 | 06 | | US Bank | 6/30/2008 | 1 | N/A | 22-25 | 49 | 50 |
| Zohar I | Monthly | 2008 | 07 | | US Bank | 7/31/2008 | 1 | N/A | 22-25 | 49 | 50 |

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Collateral Debt Obligation Report Page(s) | Defaulted Collateral Detail Report Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar I | NVR | 2008 | 08 | 8/20/2008 | US Bank | 8/8/2008 | 49 | 2 & 4 | 13-16 | 17 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2008 | 09 | | US Bank | 9/30/2008 | 1 | N/A | 22-25 | 50 | 51 |
| Zohar I | Monthly | 2008 | 10 | | US Bank | 10/31/2008 | 1 | N/A | 22-25 | 50 | 51 |
| Zohar I | NVR | 2008 | 11 | 11/20/2008 | US Bank | 11/6/2008 | 53 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2008 | 12 | | US Bank | 12/31/2008 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2009 | 01 | | US Bank | 1/30/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2009 | 02 | 2/20/2009 | US Bank | 2/9/2009 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2009 | 03 | | US Bank | 3/31/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2009 | 04 | | US Bank | 4/30/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2009 | 05 | 5/21/2009 | US Bank | 5/7/2009 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2009 | 06 | | US Bank | 6/30/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2009 | 07 | | US Bank | 7/31/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2009 | 08 | 8/20/2009 | US Bank | 8/10/2009 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2009 | 09 | | US Bank | 9/30/2009 | 1 | N/A | 22-24 | 46 | 48 |
| Zohar I | Monthly | 2009 | 10 | | US Bank | 10/30/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2009 | 11 | 11/20/2009 | US Bank | 11/6/2009 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2009 | 12 | | US Bank | 12/31/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2010 | 01 | | US Bank | 1/29/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2010 | 02 | 2/22/2010 | US Bank | 2/8/2010 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2010 | 03 | | US Bank | 3/31/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2010 | 04 | | US Bank | 4/30/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2010 | 05 | 5/20/2010 | US Bank | 5/7/2010 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2010 | 06 | | US Bank | 6/30/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2010 | 07 | | US Bank | 7/30/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2010 | 08 | 8/20/2010 | US Bank | 8/10/2010 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2010 | 09 | | US Bank | 9/30/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2010 | 10 | | US Bank | 10/29/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2010 | 11 | 11/22/2010 | US Bank | 11/8/2010 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2010 | 12 | | US Bank | 12/31/2010 | 4 | N/A | 10-12 | 38 | 39 |
| Zohar I | Monthly | 2011 | 01 | | US Bank | 1/31/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | NVR | 2011 | 02 | 2/22/2011 | US Bank | 2/9/2011 | 6 | 66 & 68 | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 03 | | US Bank | 3/31/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 04 | | US Bank | 4/29/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | NVR | 2011 | 05 | 5/20/2011 | US Bank | 5/9/2011 | 6 | 65 & 67 | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 06 | | US Bank | 6/30/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 07 | | US Bank | 7/29/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | NVR | 2011 | 08 | 8/22/2011 | US Bank | 8/10/2011 | 4 | 2 & 4 of PDF | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 09 | | US Bank | 9/30/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 10 | | US Bank | 10/31/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | NVR | 2011 | 11 | 11/21/2011 | US Bank | 11/7/2011 | 4 | 2 & 4 of PDF | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 12 | | US Bank | 12/30/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2012 | 01 | | US Bank | 1/31/2012 | 4 | N/A | 10-13 | 39 | 40-41 |
| Zohar I | NVR | 2012 | 02 | 2/21/2012 | US Bank | 2/8/2012 | 14 | 2 & 4 of PDF | 20-23 | 49 | 50-59 |
| Zohar I | Monthly | 2012 | 03 | | US Bank | 3/30/2012 | 4 | N/A | 10-12 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 04 | | US Bank | 4/30/2012 | 4 | N/A | 10-12 | 38 | 39-40 |
| Zohar I | NVR | 2012 | 05 | 5/22/2012 | US Bank | 5/9/2012 | 4 | 2 & 4 of PDF | 10-12 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 06 | | US Bank | 6/29/2012 | 4 | N/A | 10-12 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 07 | | US Bank | 7/31/2012 | 4 | N/A | 11-13 | 39 | 40-41 |
| Zohar I | NVR | 2012 | 08 | 8/20/2012 | US Bank | 8/8/2012 | 4 | 2 & 4 of PDF | 11-13 | 39 | 40-41 |
| Zohar I | Monthly | 2012 | 09 | | US Bank | 9/28/2012 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 10 | | US Bank | 10/31/2012 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | NVR | 2012 | 11 | 11/20/2012 | US Bank | 11/7/2012 | 4 | 2 & 4 of PDF | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 12 | | US Bank | 12/31/2012 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2013 | 01 | | US Bank | 1/31/2013 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | NVR | 2013 | 02 | 2/20/2013 | US Bank | 2/6/2013 | 4 | 2 & 4 of PDF | 11-13 | 38 | 39-40 |

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Collateral Debt Obligation Report Page(s) | Defaulted Collateral Detail Report Page(s) | Equity Securities Page(s) |
|------|-------------|-------------|--------------|--------------|---------|------------|--------------------------------------|------------------------------------------------------|-------------------------------------------|--------------------------------------------|---------------------------|
| Zohar I | Monthly | 2013 | 03 | | US Bank | 3/29/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2013 | 04 | | US Bank | 4/30/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2013 | 05 | 5/21/2013 | US Bank | 5/8/2013 | 4 | 2 & 4 of PDF | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2013 | 06 | | US Bank | 6/28/2013 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2013 | 07 | | US Bank | 7/31/2013 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | NVR | 2013 | 08 | 8/20/2013 | US Bank | 8/8/2013 | 4 | 2 & 4 of PDF | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2013 | 09 | | US Bank | 9/30/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2013 | 10 | | US Bank | 10/31/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2013 | 11 | 11/20/2013 | US Bank | 11/7/2013 | 4 | 2 & 4 of PDF | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2013 | 12 | | US Bank | 12/31/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 01 | | US Bank | 1/31/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2014 | 02 | 2/20/2014 | US Bank | 2/7/2014 | 4 | 2 & 4 of PDF | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 03 | | US Bank | 3/31/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 04 | | US Bank | 4/30/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2014 | 05 | 5/20/2014 | US Bank | 5/7/2014 | 4 | 2 & 4 of PDF | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 06 | | US Bank | 6/30/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 07 | | US Bank | 7/31/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2014 | 08 | 8/20/2014 | US Bank | 8/8/2014 | 4 | 3 & 5 of PDF | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 09 | | US Bank | 9/30/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 10 | | US Bank | 10/31/2014 | 4 | N/A | 11-13 | 36 | 37-38 |
| Zohar I | NVR | 2014 | 11 | 11/20/2014 | US Bank | 11/6/2014 | 4 | 4 & 6 of PDF | 11-13 | 36 | 37-38 |
| Zohar I | Monthly | 2014 | 12 | | US Bank | 12/31/2014 | 4 | N/A | 11-13 | 36 | 38-39 |
| Zohar I | Monthly | 2015 | 01 | | US Bank | 1/30/2015 | 4 | N/A | 11-13 | 36 | 37-38 |
| Zohar I | NVR | 2015 | 02 | 2/20/2015 | US Bank | 2/6/2015 | 4 | 4 & 6 of PDF | 11-13 | 36 | 37-38 |
| Zohar I | Monthly | 2015 | 03 | | US Bank | 3/31/2015 | 4 | N/A | 11-13 | 35 | 36-37 |
| Zohar I | Monthly | 2015 | 04 | | US Bank | 4/30/2015 | 4 | N/A | 11-13 | 35 | 36-37 |
| Zohar I | NVR | 2015 | 05 | 5/20/2015 | US Bank | 5/7/2015 | 4 | 4 & 6 of PDF | 11-13 | 35 | 36-37 |
| Zohar I | Monthly | 2015 | 06 | | US Bank | 6/30/2015 | 4 | N/A | 11-13 | 35 | 36-37 |
| Zohar I | Monthly | 2015 | 07 | | US Bank | 7/31/2015 | 4 | N/A | 11-13 | 35 | 36-37 |
| Zohar I | NVR | 2015 | 08 | 8/20/2015 | US Bank | 8/10/2015 | 4 | 4 & 6 of PDF | 11-13 | 35 | 36-37 |
| Zohar I | Monthly | 2015 | 09 | | US Bank | 9/30/2015 | 4 | N/A | 11-13 | 33 | 35-35 |
| Zohar I | Monthly | 2015 | 10 | | US Bank | 10/30/2015 | 4 | N/A | 11-13 | 33 | 34-35 |
| Zohar I | NVR | 2015 | 11 | 11/20/2015 | US Bank | 11/19/2015 | 4 | 3 & 5 of PDF | 11-13 | 33 | 34-35 |
| Zohar I | Monthly | 2015 | 12 | | US Bank | 12/31/2015 | 4 | N/A | 11-13 | 33 | 34-35 |
| Zohar I | Monthly | 2016 | 01 | | US Bank | 1/29/2016 | 4 | N/A | 11-13 | 33 | 34-35 |
| Zohar I | NVR | 2016 | 02 | 2/22/2016 | US Bank | 2/8/2016 | 4 | 3 & 5 of PDF | 11-13 | 33 | 34-35 |

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar II | NVR | 2005 | 07 | 7/20/2005 | LaSalle | 7/8/2005 | 10 | 4 | 36-41 | 12 | 5 (summary page) |
| Zohar II | Monthly | 2005 | 08 | | LaSalle | 8/31/2005 | 7 | N/A | 30-35 | 10 | 2 (summary page) |
| Zohar II | Monthly | 2005 | 09 | | LaSalle | 9/30/2005 | 7 | N/A | 31-36 | 10 | 2 (summary page) |
| Zohar II | NVR | 2005 | 10 | 10/20/2005 | LaSalle | 10/7/2005 | 11 | 4 | 36-42 | 14 | 3 (summary page) |
| Zohar II | Monthly | 2005 | 11 | | LaSalle | 11/30/2005 | 10 | N/A | 34-37 | 14 | 13 |
| Zohar II | Monthly | 2005 | 12 | | LaSalle | 12/31/2005 | 10 | N/A | 34-37 | 14 | 13 |
| Zohar II | NVR | 2006 | 01 | 1/20/2006 | LaSalle | 1/10/2006 | 15 | 9 | 40-43 | 19 | 18 |
| Zohar II | Monthly | 2006 | 01 | | LaSalle | 1/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2006 | 02 | | LaSalle | 2/28/2006 | 10 | N/A | 38-42 | 14 | 13 |
| Zohar II | Monthly | 2006 | 03 | | LaSalle | 3/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | NVR | 2006 | 04 | 4/20/2006 | LaSalle | 4/6/2006 | 15 | 9 | 42-46 | 19 | 18 |
| Zohar II | Monthly | 2006 | 05 | | LaSalle | 5/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2006 | 06 | | LaSalle | 6/30/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | NVR | 2006 | 07 | 7/20/2006 | LaSalle | 7/10/2006 | 15 | 9 | 42-46 | 19 | 18 |
| Zohar II | Monthly | 2006 | 08 | | LaSalle | 8/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2006 | 09 | | LaSalle | 9/30/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | NVR | 2006 | 10 | 10/20/2006 | LaSalle | 10/10/2006 | 15 | 9 | 42-46 | 19 | 18 |
| Zohar II | Monthly | 2006 | 11 | | LaSalle | 11/30/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2006 | 12 | | LaSalle | 12/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | NVR | 2007 | 01 | 1/22/2007 | LaSalle | 1/9/2007 | 15 | 9 | 42-46 | 19 | 18 |
| Zohar II | Monthly | 2007 | 02 | | LaSalle | 2/28/2007 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2007 | 03 | | LaSalle | 3/31/2007 | 10 | N/A | 33-37 | 14 | 13 |
| Zohar II | NVR | 2007 | 04 | 4/20/2007 | LaSalle | 4/10/2007 | 15 | 9 | 38-42 | 19 | 18 |
| Zohar II | Monthly | 2007 | 05 | | LaSalle | 5/31/2007 | 10 | N/A | 34-38 | 14 | 13 |
| Zohar II | Monthly | 2007 | 06 | | LaSalle | 6/30/2007 | 10 | N/A | 34-38 | 14 | 13 |
| Zohar II | NVR | 2007 | 07 | 7/20/2007 | LaSalle | 7/10/2007 | 15 | 9 | 39-43 | 19 | 18 |
| Zohar II | Monthly | 2007 | 08 | | LaSalle | 8/31/2007 | 10-11 | N/A | 31-34 | 15 | 14 |
| Zohar II | Monthly | 2007 | 09 | | LaSalle | 9/30/2007 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2007 | 10 | 10/22/2007 | LaSalle | 10/10/2007 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2007 | 11 | | LaSalle | 11/30/2007 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2007 | 12 | | LaSalle | 12/31/2007 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2008 | 01 | 1/22/2008 | LaSalle | 1/9/2008 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2008 | 02 | | LaSalle | 2/29/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2008 | 03 | | LaSalle | 3/31/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2008 | 04 | 4/21/2008 | LaSalle | 4/9/2008 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2008 | 05 | | LaSalle | 5/31/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2008 | 06 | | LaSalle | 6/30/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2008 | 07 | 7/21/2008 | LaSalle | 7/9/2008 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2008 | 08 | | LaSalle | 8/31/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2008 | 09 | | LaSalle | 9/30/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2008 | 10 | 10/20/2008 | LaSalle | 10/7/2008 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2008 | 11 | | LaSalle | 11/30/2008 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2008 | 12 | | LaSalle | 12/31/2008 | 10-11 | N/A | 31-34 | 15 | 14 |
| Zohar II | NVR | 2009 | 01 | 1/20/2009 | LaSalle | 1/7/2009 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2009 | 02 | | LaSalle | 2/28/2009 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2009 | 03 | | LaSalle | 3/31/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2009 | 04 | 4/20/2009 | LaSalle | 4/8/2009 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2009 | 05 | | LaSalle | 5/31/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2009 | 06 | | LaSalle | 6/30/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2009 | 07 | 7/20/2009 | LaSalle | 7/8/2009 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2009 | 08 | | LaSalle | 8/31/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2009 | 09 | | LaSalle | 9/30/2009 | 10-11 | N/A | 31-35 | 15 | 14 |

**Zohar II - Trustee Reports & Key Page Numbers**

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar II | NVR | 2009 | 10 | 10/20/2009 | LaSalle | 10/7/2009 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2009 | 11 | | LaSalle | 11/30/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2009 | 12 | | Bank of America | 12/31/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2010 | 01 | 1/20/2010 | Bank of America | 1/7/2010 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2010 | 02 | | Bank of America | 2/28/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2010 | 03 | | Bank of America | 3/31/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2010 | 04 | 4/20/2010 | Bank of America | 4/8/2010 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2010 | 05 | | Bank of America | 5/31/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2010 | 06 | | Bank of America | 6/30/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2010 | 07 | 7/20/2010 | Bank of America | 7/8/2010 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2010 | 08 | | Bank of America | 8/31/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2010 | 09 | | Bank of America | 9/30/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2010 | 10 | 10/20/2010 | Bank of America | 10/7/2010 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2010 | 11 | | Bank of America | 11/30/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2010 | 12 | | Bank of America | 12/31/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2011 | 01 | 1/20/2011 | Bank of America | 1/7/2011 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2011 | 02 | | Bank of America | 2/28/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2011 | 03 | | Bank of America | 3/31/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2011 | 04 | 4/20/2011 | Bank of America | 4/8/2011 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2011 | 05 | | Bank of America | 5/31/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2011 | 06 | | Bank of America | 6/30/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2011 | 07 | 7/20/2011 | Bank of America | 7/8/2011 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2011 | 08 | | US Bank | 8/31/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2011 | 09 | | US Bank | 9/30/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2011 | 10 | 10/20/2011 | US Bank | 10/7/2011 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2011 | 11 | | US Bank | 11/30/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2011 | 12 | | US Bank | 12/31/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2012 | 01 | 1/20/2012 | US Bank | 1/9/2012 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2012 | 02 | | US Bank | 2/29/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2012 | 03 | | US Bank | 3/31/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2012 | 04 | 4/20/2012 | US Bank | 4/10/2012 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2012 | 05 | | US Bank | 5/31/2012 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2012 | 06 | | US Bank | 6/30/2012 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2012 | 07 | 7/20/2012 | US Bank | 7/10/2012 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2012 | 08 | | US Bank | 8/31/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2012 | 09 | | US Bank | 9/30/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2012 | 10 | 10/22/2012 | US Bank | 10/10/2012 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2012 | 11 | | US Bank | 11/30/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2012 | 12 | | US Bank | 12/31/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2013 | 01 | 1/22/2013 | US Bank | 1/9/2013 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2013 | 02 | | US Bank | 2/28/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2013 | 03 | | US Bank | 3/31/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2013 | 04 | 4/22/2013 | US Bank | 4/10/2013 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2013 | 05 | | US Bank | 5/31/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2013 | 06 | | US Bank | 6/30/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2013 | 07 | 7/22/2013 | US Bank | 7/10/2013 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2013 | 08 | | US Bank | 8/31/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2013 | 09 | | US Bank | 9/30/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2013 | 10 | 10/21/2013 | US Bank | 10/8/2013 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2013 | 11 | | US Bank | 11/30/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2013 | 12 | | US Bank | 12/31/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2014 | 01 | 1/21/2014 | US Bank | 1/8/2014 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2014 | 02 | | US Bank | 2/28/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | Monthly | 2014 | 03 | | US Bank | 3/31/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | NVR | 2014 | 04 | 4/22/2014 | US Bank | 4/8/2014 | 17-18 | 11 | 38-42 | 22 | 21 |

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar II | Monthly | 2014 | 05 | | US Bank | 5/31/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | Monthly | 2014 | 06 | | US Bank | 6/30/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | NVR | 2014 | 07 | 7/21/2014 | US Bank | 7/9/2014 | 17-18 | 11 | 38-42 | 22 | 21 |
| Zohar II | Monthly | 2014 | 08 | | US Bank | 8/31/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | Monthly | 2014 | 09 | | US Bank | 9/30/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | NVR | 2014 | 10 | 10/20/2014 | US Bank | 10/7/2014 | 17-18 | 11 | 38-42 | 22 | 21 |
| Zohar II | Monthly | 2014 | 11 | | US Bank | 11/30/2014 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | Monthly | 2014 | 12 | | US Bank | 12/31/2014 | 12-13 | N/A | 32-34 | 17 | 16 |
| Zohar II | NVR | 2015 | 01 | 1/20/2015 | US Bank | 1/7/2015 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2015 | 02 | | US Bank | 2/28/2015 | 12-13 | N/A | 32-34 | 17 | 16 |
| Zohar II | Monthly | 2015 | 03 | | US Bank | 3/31/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | NVR | 2015 | 04 | 4/20/2015 | US Bank | 4/8/2015 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2015 | 05 | | US Bank | 5/31/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | Monthly | 2015 | 06 | | US Bank | 6/30/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | NVR | 2015 | 07 | 7/20/2015 | US Bank | 7/8/2015 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2015 | 08 | | US Bank | 8/31/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | Monthly | 2015 | 09 | | US Bank | 9/30/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | NVR | 2015 | 10 | 10/20/2015 | US Bank | 10/7/2015 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2015 | 11 | | US Bank | 11/30/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | Monthly | 2015 | 12 | | US Bank | 12/31/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | NVR | 2016 | 01 | 1/20/2016 | US Bank | 1/7/2016 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2016 | 02 | | US Bank | 2/29/2016 | 12-13 | N/A | 32-35 | 17 | 16 |

## Zohar III - Trustee Reports & Key Page Numbers

| Deal | Read Only | Report Type | Report Month | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar III | No | Monthly | 200608 | 2006 | 08 | | LaSalle | 8/31/2006 | 7 | N/A | 23 | 13 | Equities Report not mentioned in Trustee Report |
| Zohar III | No | NVR | 200709 | 2007 | 09 | 9/18/2007 | LaSalle | 9/6/2007 | N/A | 9 | 24-25 | 28 | 29 |
| Zohar III | No | Monthly | 200709 | 2007 | 09 | | LaSalle | 9/30/2007 | N/A | N/A | 17-18 | 21 | 22 |
| Zohar III | No | Monthly | 200710 | 2007 | 10 | | LaSalle | 10/31/2007 | N/A | N/A | 18-20 | 23 | 24 |
| Zohar III | No | Monthly | 200711 | 2007 | 11 | | LaSalle | 11/30/2007 | N/A | N/A | 18-20 | 23 | 24 |
| Zohar III | No | NVR | 200712 | 2007 | 12 | 12/18/2007 | LaSalle | 12/6/2007 | N/A | 9 | 23-25 | 28 | 29 |
| Zohar III | No | Monthly | 200801 | 2008 | 01 | | LaSalle | 1/31/2008 | N/A | N/A | 19-21 | 29 | 24 |
| Zohar III | No | Monthly | 200802 | 2008 | 02 | | LaSalle | 2/29/2008 | N/A | N/A | 19-21 | 29 | 24 |
| Zohar III | No | NVR | 200803 | 2008 | 03 | 3/18/2008 | LaSalle | 3/6/2008 | N/A | 9 | 24-26 | 28 | 29 |
| Zohar III | No | Monthly | 200804 | 2008 | 04 | | LaSalle | 4/30/2008 | 11 | N/A | 22-24 | 32 | 27 |
| Zohar III | No | Monthly | 200805 | 2008 | 05 | | LaSalle | 5/31/2008 | 11 | N/A | 22-25 | 33 | 28 |
| Zohar III | No | NVR | 200806 | 2008 | 06 | 6/18/2008 | LaSalle | 6/6/2008 | 16 | 9 | 26-28 | 30 | 31 |
| Zohar III | No | Monthly | 200807 | 2008 | 07 | | LaSalle | 7/31/2008 | 11 | N/A | 26-30 | 38 | 32 |
| Zohar III | No | Monthly | 200808 | 2008 | 08 | | LaSalle | 8/31/2008 | 11 | N/A | 26-30 | 38 | 32 |
| Zohar III | No | NVR | 200809 | 2008 | 09 | 9/18/2008 | LaSalle | 9/8/2008 | 16 | 9 | 30-33 | 35 | 36 |
| Zohar III | No | Monthly | 200810 | 2008 | 10 | | LaSalle | 10/31/2008 | 11 | N/A | 23-26 | 34 | 28 |
| Zohar III | No | Monthly | 200811 | 2008 | 11 | | LaSalle | 11/30/2008 | 11 | N/A | 25-28 | 36 | 30 |
| Zohar III | No | NVR | 200812 | 2008 | 12 | 12/18/2008 | LaSalle | 12/8/2008 | 16 | 9 | 29-32 | 34 | 35 |
| Zohar III | No | Monthly | 200901 | 2009 | 01 | | LaSalle | 1/31/2009 | 11 | N/A | 35-40 | 48 | 42 |
| Zohar III | No | Monthly | 200902 | 2009 | 02 | | LaSalle | 2/28/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 200903 | 2009 | 03 | 3/18/2009 | LaSalle | 3/6/2009 | 16 | 9 | 31-35 | 37 | 38 |
| Zohar III | No | Monthly | 200904 | 2009 | 04 | | LaSalle | 4/30/2009 | 11 | N/A | 28-33 | 41 | 35 |
| Zohar III | No | Monthly | 200905 | 2009 | 05 | | LaSalle | 5/31/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 200906 | 2009 | 06 | 6/18/2009 | LaSalle | 6/8/2009 | 16 | 9 | 31-35 | 37 | 38 |
| Zohar III | No | Monthly | 200907 | 2009 | 07 | | LaSalle | 7/31/2009 | 11 | N/A | 29-34 | 42 | 36 |
| Zohar III | No | Monthly | 200908 | 2009 | 08 | | LaSalle | 8/31/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 200909 | 2009 | 09 | 9/18/2009 | LaSalle | 9/8/2009 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 200910 | 2009 | 10 | | Bank of America | 10/31/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 200911 | 2009 | 11 | | Bank of America | 11/30/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 200912 | 2009 | 12 | 12/18/2009 | Bank of America | 12/8/2009 | 16 | 9 | 31-35 | 37 | 38 |
| Zohar III | No | Monthly | 201001 | 2010 | 01 | | Bank of America | 1/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201002 | 2010 | 02 | | Bank of America | 2/28/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201003 | 2010 | 03 | 3/18/2010 | Bank of America | 3/8/2010 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201004 | 2010 | 04 | | Bank of America | 4/30/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201005 | 2010 | 05 | | Bank of America | 5/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201006 | 2010 | 06 | 6/18/2010 | Bank of America | 6/8/2010 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201007 | 2010 | 07 | | Bank of America | 7/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201008 | 2010 | 08 | | Bank of America | 8/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201009 | 2010 | 09 | 9/20/2010 | Bank of America | 9/8/2010 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201010 | 2010 | 10 | | Bank of America | 10/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201011 | 2010 | 11 | | Bank of America | 11/30/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201012 | 2010 | 12 | 12/20/2010 | Bank of America | 12/8/2010 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201101 | 2011 | 01 | | Bank of America | 1/31/2011 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201102 | 2011 | 02 | | Bank of America | 2/28/2011 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201103 | 2011 | 03 | 3/18/2011 | Bank of America | 3/8/2011 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201104 | 2011 | 04 | | Bank of America | 4/30/2011 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201105 | 2011 | 05 | | Bank of America | 5/31/2011 | 11 | N/A | 27-32 | 41 | 35 |
| Zohar III | No | NVR | 201106 | 2011 | 06 | 6/20/2011 | Bank of America | 6/8/2011 | 16 | 9 | 32-37 | 40 | 41 |
| Zohar III | No | Monthly | 201107 | 2011 | 07 | | Bank of America | 7/31/2011 | 11 | N/A | 27-32 | 41 | 35 |
| Zohar III | No | Monthly | 201108 | 2011 | 08 | | US Bank | 8/31/2011 | 11 | N/A | 27-32 | 41 | 35 |
| Zohar III | No | NVR | 201109 | 2011 | 09 | 9/19/2011 | US Bank | 9/7/2011 | 16 | 9 | 32-37 | 40 | 41 |
| Zohar III | No | Monthly | 201110 | 2011 | 10 | | US Bank | 10/31/2011 | 11 | N/A | 27-33 | 42 | 36 |
| Zohar III | No | Monthly | 201111 | 2011 | 11 | | US Bank | 11/30/2011 | 11 | N/A | 27-33 | 42 | 36 |
| Zohar III | No | NVR | 201112 | 2011 | 12 | 12/19/2011 | US Bank | 12/7/2011 | 16 | 9 | 33-38 | 41 | 42 |
| Zohar III | No | Monthly | 201201 | 2012 | 01 | | US Bank | 1/31/2012 | 11 | N/A | 29-35 | 44 | 38 |

| Deal | Read Only | Report Type | Report Month | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar III | No | Monthly | 201202 | 2012 | 02 | | US Bank | 2/29/2012 | 11 | N/A | 28-34 | 43 | 37 |
| Zohar III | No | NVR | 201203 | 2012 | 03 | 3/19/2012 | US Bank | 3/7/2012 | 16 | 9 | 33-38 | 41 | 42 |
| Zohar III | No | Monthly | 201204 | 2012 | 04 | | US Bank | 4/30/2012 | 11 | N/A | 30-36 | 45 | 39 |
| Zohar III | No | Monthly | 201205 | 2012 | 05 | | US Bank | 5/31/2012 | 11 | N/A | 29-35 | 44 | 38 |
| Zohar III | No | NVR | 201206 | 2012 | 06 | 6/18/2012 | US Bank | 6/6/2012 | 16 | 9 | 34-40 | 44 | 45 |
| Zohar III | No | Monthly | 201207 | 2012 | 07 | | US Bank | 7/31/2012 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201208 | 2012 | 08 | | US Bank | 8/31/2012 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201209 | 2012 | 09 | 9/18/2012 | US Bank | 9/6/2012 | 16 | 9 | 32-38 | 42 | 43 |
| Zohar III | No | Monthly | 201210 | 2012 | 10 | | US Bank | 10/31/2012 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201211 | 2012 | 11 | | US Bank | 11/30/2012 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201212 | 2012 | 12 | 12/18/2012 | US Bank | 12/6/2012 | 16 | 9 | 32-38 | 42 | 43 |
| Zohar III | No | Monthly | 201301 | 2013 | 01 | | US Bank | 1/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201302 | 2013 | 02 | | US Bank | 2/28/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201303 | 2013 | 03 | 3/18/2013 | US Bank | 3/6/2013 | 16 | 9 | 32-37 | 41 | 42 |
| Zohar III | No | Monthly | 201304 | 2013 | 04 | | US Bank | 4/30/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201305 | 2013 | 05 | | US Bank | 5/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201306 | 2013 | 06 | 6/18/2013 | US Bank | 6/6/2013 | 16 | 9 | 32-37 | 41 | 42 |
| Zohar III | No | Monthly | 201307 | 2013 | 07 | | US Bank | 7/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201308 | 2013 | 08 | | US Bank | 8/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201309 | 2013 | 09 | 9/18/2013 | US Bank | 9/6/2013 | 16 | 9 | 32-37 | 41 | 42 |
| Zohar III | No | Monthly | 201310 | 2013 | 10 | | US Bank | 10/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201311 | 2013 | 11 | | US Bank | 11/30/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201312 | 2013 | 12 | 12/18/2013 | US Bank | 12/6/2013 | 16 | 9 | 32-37 | 41 | 42 |
| Zohar III | No | Monthly | 201401 | 2014 | 01 | | US Bank | 1/31/2014 | 12 | N/A | 29-35 | 45 | 39 |
| Zohar III | No | Monthly | 201402 | 2014 | 02 | | US Bank | 2/28/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | NVR | 201403 | 2014 | 03 | 3/18/2014 | US Bank | 3/6/2014 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201404 | 2014 | 04 | | US Bank | 4/30/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | Monthly | 201405 | 2014 | 05 | | US Bank | 5/31/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | NVR | 201406 | 2014 | 06 | 6/18/2014 | US Bank | 6/6/2014 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201407 | 2014 | 07 | | US Bank | 7/31/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | Monthly | 201408 | 2014 | 08 | | US Bank | 8/31/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | NVR | 201409 | 2014 | 09 | 9/18/2014 | US Bank | 9/8/2014 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201410 | 2014 | 10 | | US Bank | 10/31/2014 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | Monthly | 201411 | 2014 | 11 | | US Bank | 11/30/2014 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | NVR | 201412 | 2014 | 12 | 12/18/2014 | US Bank | 12/8/2014 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201501 | 2015 | 01 | | US Bank | 1/31/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | Monthly | 201502 | 2015 | 02 | | US Bank | 2/28/2015 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | NVR | 201503 | 2015 | 03 | 3/18/2015 | US Bank | 3/6/2015 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201504 | 2015 | 04 | | US Bank | 4/30/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | Monthly | 201505 | 2015 | 05 | | US Bank | 5/31/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | NVR | 201506 | 2015 | 06 | 6/18/2015 | US Bank | 6/8/2015 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201507 | 2015 | 07 | | US Bank | 7/31/2015 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | Monthly | 201508 | 2015 | 08 | | US Bank | 8/31/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | NVR | 201509 | 2015 | 09 | 9/18/2015 | US Bank | 9/8/2015 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201510 | 2015 | 10 | | US Bank | 10/31/2015 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | Monthly | 201511 | 2015 | 11 | | US Bank | 11/30/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | NVR | 201512 | 2015 | 12 | 12/18/2015 | US Bank | 12/8/2015 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201601 | 2016 | 01 | | US Bank | 1/31/2016 | 13 | N/A | 29-34 | 44 | 38 |
| Zohar III | No | Monthly | 201602 | 2016 | 02 | | US Bank | 2/29/2016 | 13 | N/A | 29-34 | 44 | 38 |