UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------
:
ZOHAR CDO 2003-1, LTD., *et al.*,     :
:      17cv307
*Plaintiffs*,      :
:      <u>OPINION & ORDER</u>
-against-      :
:
PATRIARCH PARTNERS, LLC, *et al*.,      :
:
*Defendants*.      :
:
------------------------------------------

WILLIAM H. PAULEY III, United States District Judge:

        Defendants Patriarch Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC (together, "Patriarch"), Octaluna LLC, Octaluna II LLC, Octaluna III LLC (together, "Octaluna"), Ark II CLO 2001-1, LLC, Ark Investment Partners II, L.P. (together, "Ark"), and Lynn Tilton ("Tilton") move to dismiss Plaintiffs Zohar CDO 2003-1, Ltd. ("Zohar I"), Zohar II 2005-1 Ltd. ("Zohar II"), and Zohar III, Ltd.'s ("Zohar III") (together, "Zohar") complaint.

        Zohar asserts a dozen claims against Defendants predicated on a massive racketeering conspiracy involving the investment and management of Zohar's assets. The remedies that Zohar seeks through its common law claims include compensatory damages, declaratory relief, an accounting, and restitution. But all such relief is eclipsed by Zohar's request for treble damages under the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1964(c). Defendants seek dismissal of this action in its entirety, both for failure to state a claim under Rule 12(b)(6) and lack of subject matter jurisdiction under Rule 12(b)(1). For the reasons that follow, Defendants' motion to dismiss is granted.

<u>BACKGROUND</u>

This civil RICO action arises from an alleged fraudulent investment scheme orchestrated by Tilton and her firms. At bottom, Zohar alleges that Defendants engaged in a wide-ranging conspiracy to enrich themselves by pillaging Zohar's funds and impairing its assets, ultimately rendering it unable to repay investors. Over the course of five years, Defendants created three special purpose vehicles—Zohar I, Zohar II, and Zohar III—that raised and invested more than $2.5 billion dollars in an assortment of distressed companies. Imbued with the authority to act on Zohar's behalf, Defendants made virtually every investment decision—they chose the companies to whom Zohar would lend, monitored the collateral underlying the loans, and provided the companies with consulting and management services. But instead of acting in Zohar's interest—to maximize repayment to noteholders—Defendants exploited their fiduciary status to expropriate Zohar's equity in its portfolio companies, pay themselves dividends, and deceive Zohar and its investors into paying exorbitant fees by misreporting the value of Zohar's collateral.

Because Zohar's complaint (the "Complaint") focuses on the predicate acts alleged in support of its civil RICO claim, the threshold issue in Defendants' motion to dismiss is whether the alleged scheme is actionable as fraud in the purchase or sale of securities. Indeed, if any one of the predicate acts involves the purchase or sale of securities, the entire claim is foreclosed by the securities fraud bar codified in the RICO statute. Resolving this question requires a more detailed recitation of the Complaint's allegations, which are presumed true on a motion to dismiss.

## I. Zohar's Creation and Purpose

Zohar—three special purpose vehicles created by Tilton—raised over $2.5 billion dollars[1] from the sale of collateralized loan obligations ("CLOs"), which are essentially investment notes backed by a pool of loans. Zohar used the offering proceeds to make loans to dozens of distressed companies with the aim of rehabilitating their businesses and maximizing profits. (Complaint ("Compl."), ECF No. 1, ¶¶ 40–41.) Zohar loaned money under various arrangements. Some involved standard repayment of principal and interest while others included equity investments in portfolio companies. The latter arrangement—obtaining equity in exchange for a loan—was of paramount importance to Zohar because it offset losses arising from a defaulted loan and offered enormous upside if a portfolio company turned profitable. (Compl. ¶ 41.)

## II. Defendants' Roles

Tilton's role in the CLO transactions extended well beyond creating Zohar. She and her investment companies—namely, Patriarch—assumed a panoply of roles in overseeing Zohar's investments. Patriarch's chief task was to manage Zohar's collateral. (Compl. ¶¶ 30–31.) As collateral manager, Patriarch selected loans and other investments making up the collateral pool. (Compl. ¶ 28.) Patriarch also assigned some of its affiliates to oversee Zohar's assets—Patriarch Partners Agency Services collected and processed loan payments, and Patriarch Partners Management Group provided management and consulting services to the portfolio companies. (Compl. ¶ 37.)

---

[1]  Zohar I raised approximately $530 million after launching in November 2003; Zohar II raised approximately $1 billion after launching in January 2005; and Zohar III raised approximately $1 billion after launching in April 2007. All of the Zohar funds are exempted companies registered in the Cayman Islands. (Compl. ¶¶ 9–11, 29.)

Tilton's other entities played pivotal roles in perpetrating the fraudulent scheme. Ark assumed debt or equity positions in portfolio companies alongside Zohar, and Octaluna held preference share rights or interests in Zohar's assets. (Compl. ¶ 38.) As the conspiracy unfolded, Ark and Octaluna were instrumental in expropriating and obscuring Zohar's ownership interests in portfolio companies.

Despite the amalgam of entities involved, Tilton exercised unchecked authority and control over all of them as sole director or managing member. As a practical matter, Tilton made virtually every single investment decision for Zohar. (Compl. ¶¶ 12–20, 37–38.)

III.    Collateral Management

As with most secured transactions, the parties' activities were governed by a key set of operative documents: the (i) Indenture governed the rights and obligations of the Zohar Fund vis-à-vis the noteholders, credit enhancer, and controlling party; and (ii) the Collateral Administration Agreement memorialized an agreement between Zohar, Patriarch, and a national bank, as collateral administrator, to provide administrative services concerning the collateral. (See Compl. ¶ 31; see, e.g., Declaration of Akiva Shapiro in Support of Motion to Dismiss ("Shapiro Decl."), ECF No. 55, Exs. 1, 3.)

A third document—the Collateral Management Agreement—enumerated Patriarch's duties, responsibilities, and privileges as collateral manager. (Compl. ¶¶ 31–33.) Chief among Patriarch's duties was the covenant "not [to] take any action which [it] knows or should be reasonably expected to know in accordance with prevailing market practices [that] would . . . adversely affect the interests" of the noteholders. (Compl. ¶ 33 (internal citation omitted).) And like all investment advisors, Patriarch owed a number of implied fiduciary duties to Zohar, including the duties of care and loyalty. (Compl. ¶ 34.)

One of Patriarch's most important duties as collateral manager was to report Zohar's financial condition and performance through monthly reports and quarterly note valuation reports ("Monthly Reports") to stakeholders, including rating agencies and Zohar's noteholders. (Compl. ¶ 36.) The purpose of these communications, prepared by the collateral administrator, was to apprise noteholders about the condition of the collateral underlying the CLOs. (Compl. ¶¶ 36, 56.)

To ascertain this information, Patriarch performed an Overcollateralization Test ("OC Test"), which was designed to calculate the ratio between the outstanding amounts due on the loans in Zohar's portfolio and the principal balances on the senior notes. (Compl. ¶ 56.) The OC Test results were a barometer of Zohar's ability to collect sufficient amounts on outstanding loans to meet its obligations to senior noteholders. (Compl. ¶ 56.) Thus, a passing OC Test signaled that the value of the underlying collateral exceeded the balance of the outstanding senior notes, and could be used to satisfy those notes if one of Zohar's loans defaulted. Conversely, a failing OC Test triggered a number of consequences designed to conserve funds, such as suspending payments to certain classes of noteholders and reducing the collateral management fee. (Compl. ¶¶ 56–57.) The OC Test results constituted a key component of the Monthly Reports.

As a collateral manager, Patriarch charged a fee to select and monitor the collateral, and replace any deficient assets. Under the operative Indenture agreements, Patriarch charged a senior management fee and a subordinated management fee, each calculated as 1% of the outstanding principal amount of assets held by Zohar. (Compl. ¶ 57.) Thus, Patriarch received a 2% management fee, which could be halved if the OC Test produced failing results. (Compl. ¶ 57.) A severe failure of the OC Test, which the Indenture categorized as an "Event of

Default," resulted in even more devastating consequences to Patriarch—the controlling parties[2] were entitled to terminate Patriarch and step in to control Zohar's assets, thus jeopardizing Patriarch's lucrative position to collect "hundreds of millions of dollars in management fees and preference share distributions." (Compl. ¶¶ 57, 65–66.)

Beginning in 2009, Zohar alleges that the OC Test should have produced failing results in view of the "significant deterioration" of the loans in its portfolio. (Compl. ¶ 58.) Rather than reporting those dismal results, Patriarch and Tilton manipulated the OC Test to yield passing results in the Monthly Reports. (Compl. ¶ 58.) Patriarch inflated the value of the collateral in two ways. First, based on Tilton's subjective and biased judgment, Patriarch routinely misclassified certain portfolio companies as posing a low credit risk when, in reality, many were on the verge of default. (Compl. ¶¶ 59–60.)

Second, Patriarch fraudulently valued Zohar's debt at par even though Zohar had previously purchased the debt at a significant discount. (Compl. ¶ 63.) For example, Zohar once purchased a portfolio company's debt originally valued at $29 million for only $5.3 million, reflecting an 82% discount. (Compl. ¶ 64.) But when calculating the OC Test, Patriarch valued the company's debt at the full $29 million while also rating the distressed company as a low credit risk. (Compl. ¶ 64.) Patriarch also gave that company a more favorable credit risk rating after restructuring its loans despite the company's inability to make interest payments. Unsurprisingly, that company defaulted seven months after restructuring its debt. (Compl. ¶ 64.)

Zohar alleges that Patriarch manipulated the results of the OC Test to facilitate the payment of more than $700 million in fees over the life of the Zohar funds and to preserve its

---

[2] Such parties include MBIA, the Credit Enhancer and Controlling Party for Zohar I and Zohar II, and a group of investors holding at least 25% of the aggregate outstanding amount of Class A-1 notes designated as the Controlling Class for Zohar III. (See Compl. ¶¶ 39, 66; Akiva Decl. Ex. 7.)

position as collateral manager. (Compl. ¶ 65.) To that end, a successful OC Test kept other stakeholders—namely the Controlling Party and Controlling Class—at bay.

IV.  Equity Interests and Equity Distributions

The second component of Defendants' alleged scheme involved misappropriating Zohar's equity in its portfolio companies to reap the benefits of equity ownership, such as receiving "tens of millions of dollars or more" in dividend and equity distributions. (Compl. ¶ 50.) Because of their fiduciary position, Defendants played both sides of Zohar's investment decisions—they selected the company which Zohar invested in and then installed Tilton as the company's officer or director to facilitate the exchange of equity for Defendants' benefit.

Capitalizing on a ploy rife with self-dealing, Defendants executed their equity misappropriation scheme in four different ways. First, Defendants used Zohar's funds to obtain equity positions in their name. (Compl. ¶ 49.) In other words, instead of giving Zohar the equity it should have received in exchange for its loan, Defendants took a slice of the equity for themselves "without making any contributions, or with only disproportionate or minimal contributions." (Compl. ¶ 49.)

Second, as their equity holdings grew, Defendants siphoned dividends and other distributions that the companies made to their shareholders instead of re-directing those funds to Zohar "for ultimate distribution to the Zohar Funds' noteholders." (Compl. ¶ 50.) As a result, Defendants reaped an unearned profit estimated in the tens of millions of dollars. (Compl. ¶ 50.)

Third, in some instances, Defendants simply re-assigned Zohar's equity holdings to themselves. By way of example, in 2009, Patriarch reported that Zohar owned 100% of a certain portfolio company. Three years later, however, after the company was sold for $199

million, Zohar was left empty-handed. To justify this outcome, Patriarch disavowed its previous representations that Zohar ever had an interest in the company and maintained that Defendants were its rightful owners all along. (Compl. ¶ 51.)

Finally, Defendants stole voting and other rights associated with Zohar's equity interests. (Compl. ¶ 52.) Although they kept the equity in Zohar's name, Defendants essentially deprived Zohar of its ability to control its companies by agreeing to contract provisions, on Zohar's behalf, that gave Defendants "control over the Zohar Funds' assets without any apparent benefit provided to the Zohar Funds." (Compl. ¶ 70.) For example, Defendants required Zohar to obtain the consent of Patriarch Partners Agency Services—Zohar's agent under its loan agreements—before making any loan assignments, a condition that effectively robbed Zohar of the ability to unilaterally sell its loans. (Compl. ¶ 70.) Patriarch also amended dozens of loan agreements between Zohar and its portfolio companies which had adverse consequences for Zohar, like subordinating its loans to Ark's loans and reducing the interest that borrowers paid on Zohar's loans. (Compl. ¶ 73.)

Beginning in September 2015, Tilton executed a series of legal documents transferring Zohar's voting and other rights in its equity to Tilton's entities. These valuable rights were transferred by way of irrevocable proxies or amendments to the LLC or stockholder agreements. Thus, Zohar was forced to relinquish a bevy of rights normally conferred through ownership—the right to change directors or managing members, the right to effect a sale of a company, or the right to veto another party's attempt to exercise equity rights. (Compl. ¶ 74.)

In November 2015, Tilton entered into another round of amendments depriving Zohar of its ability to declare an event of default against a portfolio company, and instead conferred that privilege on herself and her companies. (Compl. ¶ 75.) And in February 2016,

Tilton, by way of amendments to the operative agreements, conferred discretion on Ark to make revolving credit loans and reduced commitment fees that portfolio companies were obligated to pay Zohar.  (Compl. ¶ 76.)

After resigning its post as collateral manager in February 2016, Patriarch aggressively laid claim to Zohar's assets.  Rather than stealing equity outright, Patriarch began obscuring and concealing the true extent of Zohar's ownership in its companies.  When the replacement collateral manager requested Zohar's books and records, Patriarch produced an incomplete set of documents that muddled Zohar's claim over its assets.  When the replacement collateral manager confronted Patriarch about these issues, Patriarch continued to obfuscate Zohar's equity holdings.  And once the replacement collateral manager commenced a lawsuit to obtain the relevant books and records, Patriarch and Tilton steadfastly maintained that they owned the companies, further clouding Zohar's title.  (Compl. ¶¶ 81–83.)

V.    SEC Enforcement Action

In March 2015, the Securities and Exchange Commission (the "SEC") commenced an enforcement action against Tilton and Patriarch, alleging violations of the Investment Advisers Act ("IAA").  In essence, the SEC's action presaged many of the allegations in this action, but focused principally on the "categorization" issue—namely, Patriarch's misrepresentations concerning the value and quality of Zohar's collateral.  Under the SEC's theory of liability, although Defendants were required to provide "valuation categorizations of [Zohar's] assets and financial statements purportedly reflecting the financial position of each" of Zohar's funds, they instead "directed that nearly all valuations of these assets be reported as unchanged from their valuations at the time the assets were originated."  (In re Lynn Tilton, et al., Order Instituting Administrative and Cease-and-Desist Proceedings

Pursuant to Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940, and Notice of Hearing, Release No. 4053, dated Mar. 30, 2015 ("SEC Order"), at ¶¶ 3–4.)  By miscategorizing Zohar's investments, flouting the categorization methodology set forth in Zohar's governing documents, and misleading investors, the SEC alleges that Defendants reaped "almost $200 million" in management fees and retained their control over Zohar's activities.  (SEC Order at ¶ 6.)

DISCUSSION

## I.    Standard

On a motion to dismiss, a court must take "factual allegations [in the complaint] to be true and draw[ ] all reasonable inferences in the plaintiff's favor."  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted).  To state a legally sufficient claim, the complaint must allege "enough facts to state a claim for relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  A pleading that offers only "labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).  If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."[3]  Twombly, 550 U.S. at 570.

---

[3]    Defendants bring their motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6), but do not specify which rule applies to Zohar's RICO claim.  (See Def. Memo. of Law in Support of Motion to Dismiss ("Mot."), ECF No. 54, at 9.)  Notwithstanding that, the "standards for dismissal under Rule 12(b)(6) and 12(b)(1) are substantively identical."  Porghavami v. Aerolinea Principal Chile S.A., 2015 WL 1206493, at *2 (S.D.N.Y. Mar. 17, 2015) (internal citations, quotation marks, and alterations omitted).  "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff."  Kacocha v. Nestle Purina Petcare Co., 2016 WL 4367991, at *3 (S.D.N.Y. Aug. 12, 2016).  "The only substantive difference is that the party invoking the jurisdiction of the court has the

In determining the sufficiency of a complaint, a court may consider the factual allegations in the complaint, "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

## II.   RICO Claim

### A.   The RICO Amendment

This motion hinges on whether Zohar may assert a civil RICO claim against Defendants notwithstanding Section 107 of the Private Securities Litigation Reform Act— dubbed the "RICO Amendment"—which bars any RICO action predicated on the purchase or sale of securities.  Specifically, the RICO Amendment provides that:

> Any person injured in his business or property by reason of a violation of section 1962 of [the RICO statute] may sue therefor in any appropriate United States district court and shall recover threefold damages he sustains and the cost of the suit . . . except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. § 1964(c).  Prior to the RICO Amendment, a plaintiff "could allege a private civil RICO claim for securities laws violations sounding in fraud because 'fraud in the sale of securities' was listed as a predicate offense."  In re Enron Corp. Sec., Derivatives & ERISA Litig., 284 F. Supp. 2d 511, 618 (S.D. Tex. 2003) (internal citation omitted).  But that created a perverse incentive in which plaintiffs "regularly elevated fraud to RICO violations because RICO offered the potential bonanza of recovering treble damages."  Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1999).  The bar was therefore designed to

---

burden of proof in a 12(b)(1) motion, in contrast to a 12(b)(6) motion, in which the defendant has the burden of proof."  Porghavami, 2015 WL 1206493, at *2.

"eliminat[e] the so-called 'treble damage blunderbuss of RICO' in securities fraud cases," Mathews v. Kidder, Peabody & Co., Inc., 161 F.3d 156, 164 (3d Cir. 1998), and prevent "litigants from using artful pleading to boot-strap securities fraud cases into RICO cases." MLSMK Inv. Co. v. JPMorgan Chase & Co., 651 F.3d 268, 274 (2d Cir. 2011) (internal citation omitted); Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP, 612 F. Supp. 2d 267, 281 (S.D.N.Y. 2009).

The scope of the RICO Amendment is broad. It bars any claim that is actionable as fraud in the purchase or sale of securities, even in situations where a plaintiff lacks standing or is otherwise precluded from asserting a valid claim under the securities laws. By its very terms, the RICO Amendment bars claims based on conduct that "would have been actionable" under 18 U.S.C. 1964(c) in the purchase or sale of securities "even when the plaintiff, himself, cannot bring a cause of action under the securities laws." Thomas H. Lee Equity Fund, 612 F. Supp. 2d at 283.

Thus, a plaintiff may not circumvent the RICO Amendment's reach on the basis that the alleged conduct—like aiding and abetting another party's securities fraud—is not formally recognized by the securities laws. If that were so, "plaintiffs would then have the incentive to present only those facts that, if taken as true . . . , would not form the basis of a securities-fraud claim," and "reap the benefits of a RICO claim complete with the threat of treble damages by merely failing to state a cause of action for securities fraud against a particular defendant while relying on others' securities fraud to establish a RICO claim." Fezzani v. Bear, Stearns & Co., 2005 WL 500377, at *4 (S.D.N.Y. Mar. 2, 2005). Put differently, if the alleged conduct could form the basis of a securities fraud claim against any party—be it against, or on

behalf of, the plaintiff, defendants or a non-party—it may not be fashioned as a civil RICO claim.

To best define what constitutes conduct actionable as fraud in the purchase or sale of securities, courts have consulted an obvious source in Section 10(b) of the Securities Exchange Act of 1934, which—while not identical to the language of the RICO Amendment—covers a broad range of securities fraud.  Compare 18 U.S.C. § 1964(c) ("conduct . . . actionable as fraud in the purchase or sale of securities"), with 15 U.S.C. § 78j (barring use of a deceptive device "in connection with the purchase or sale of any security").  Thus, "[t]o determine whether an alleged predicate act in a civil RICO claim is in connection with the purchase or sale of securities and is therefore barred by [the RICO Amendment], the Court must focus its analysis on whether the conduct pled as the predicate offenses is 'actionable' as securities fraud."  Ling v. Deutsche Bank AG, 2005 WL 1244689, at *3 (S.D.N.Y. May 26, 2005).

Section 10(b) makes it unlawful for any person to employ a deceptive device "in connection with the purchase or sale of any security."  15 U.S.C. § 78j.  But even that phrase—"in connection with the purchase or sale"—has invoked a great deal of discussion among courts grappling with when a fraud alleged by a plaintiff could relate to, arise out of, or bear some nexus to the purchase or sale of a security, "especially so in a transaction . . . where there are obviously non-securities components."  Ling, 2005 WL 1244689, at *3.

The Supreme Court in SEC v. Zandford, 535 U.S. 813 (2002), clarified the contours of the phrase "in connection with the purchase or sale," first directing courts to construe Section 10(b)'s language "not technically and restrictively, but flexibly to effectuate its remedial purposes."  535 U.S. at 825.  At the same time, however, the Court warned that "the statute must not be construed so broadly as to convert every common-law fraud that happens to involve

securities into a violation of § 10(b)." Zandford, 535 U.S. at 820 (citing Marine Bank v. Weaver, 455 U.S. 551, 556 (1982)). In Zandford, the Court determined that a stockbroker's unauthorized use of proceeds arising from stock sales in his client's account constituted a fraud under Section 10(b) because the "scheme to defraud and the sale of securities coincide[d]." Zandford, 535 U.S. at 822. Even though the respondent in Zandford characterized his scheme as a simple theft of cash in an investment account, the Court concluded that the "securities sales and respondent's fraudulent practices were not independent events"—in other words, "each sale was made to further respondent's fraudulent scheme" without his client's knowledge or permission, thus amounting to a violation of the securities laws. Zandford, 535 U.S. at 820–21.

Three years after Zandford, the Supreme Court opined further on what it means for certain deceptive conduct to be "in connection with" a securities transaction. In analyzing the Securities Litigation Uniform Standards Act, the Court reiterated that the "fraud alleged [must] 'coincide' with a securities transaction—whether by the plaintiff or by someone else." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit ("Dabit II"), 547 U.S. 71, 85 (2006). Consistent with Zandford's broad mandate, the "requisite showing . . . is deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller." Dabit II, 547 U.S. at 85. Thus, a fraud "'coincid[ing]' with a securities transaction—whether by the plaintiff or by someone else," runs afoul of the securities laws. Dabit II, 547 U.S. at 85

B. RICO Predicate Acts

Zohar's complaint broadly alleges three discrete categories of misconduct—misrepresenting collateral value in Monthly Reports, expropriating and obscuring Zohar's equity interests, and converting equity distributions intended for Zohar. The first category pertains to Defendants' attempts to inflate the quality of Zohar's collateral to preserve a continuous stream

of "hundreds of millions of dollars in management fees and preference share distributions to which they were not entitled and would not have otherwise received," and to "prevent[ ] the Controlling Party from gaining control over the Zohar Funds' Collateral." (Compl. ¶ 65.) The latter two categories relate to each other—Defendants denied Zohar "the proper benefit of their equity investments, either by attempting to abscond with the equity investments themselves, by improperly diverting the benefit of those equity holdings for their own use, or by outright stealing the distributions on the equity." (Compl. ¶ 41.)

"In determining whether misrepresentations coincided with the purchase or sale of securities, courts consider the allegedly fraudulent scheme as a whole." Levinson v. PSCC Servs., Inc., 2009 WL 5184363, at *7 (D. Conn. Dec. 23, 2009); see also Stechler v. Sidley, Austin Brown & Wood, LLP, 382 F. Supp. 2d 580, 597–98 (S.D.N.Y. 2005) (considering tax strategy as a whole to ascertain whether it involved purchase and sale of securities). If even "one predicate act alleges breaches of duty coincident with securities transactions then the whole scheme is subject to the [RICO Amendment]." Ling, 2005 WL 1244689, at *4. Thus, this Court must analyze each category of alleged misconduct in turn to assess whether the RICO Amendment bars Zohar's RICO claim.

### i. OC Test Manipulation and Monthly Report Misrepresentations

Defendants contend that the allegations regarding Patriarch's manipulation of the OC Test are fatal to Zohar's RICO claim because they relate to the purchase or sale of CLOs. According to Defendants, Zohar's sale of CLOs and Defendants' misrepresentations regarding the OC Test results constitute securities fraud. To bolster this argument, Defendants assert that the Complaint imports many of the allegations from the SEC's enforcement action, which involved miscategorizing loan performance, manipulating OC Test results, and misleading

investors.  Defendants argue that Zohar's pleading "expressly relies on the same fraud allegations made by the SEC . . . so, of course, it could have been actionable as securities fraud." (Mot. at 12.)  And despite the SEC's decision to bring a claim under the IAA—instead of Section 10(b) of the Exchange Act—Defendants contend that the IAA "expressly regulates conduct that 'relate[s] to the purchase and sale of securities,' including the issuance of 'reports' to investors on which they rely in making investment decisions."  (Defendants' Reply in Support of Motion to Dismiss ("Reply"), ECF No. 60, at 3–4 (internal alteration and citation omitted).)  Thus, Defendants claim that because the SEC and investors "<u>could have</u> brought a securities fraud action based on the conduct alleged in the Complaint, the RICO claim is barred."  (Reply at 3 (emphasis original).)

Defendants are correct that the RICO Amendment extends to allegations supporting any claim brought by any person, but the claim must involve an actionable fraud in the <u>purchase or sale</u> of securities.  Equally true is that a civil RICO claim derived from the same allegations as an SEC enforcement action is vulnerable to dismissal under the RICO Amendment since the SEC is the regulatory agency principally tasked with rooting out securities fraud.  <u>Bald Eagle</u>, 189 F.3d at 328 (SEC's complaint alleged the same scheme which "is at the heart of this RICO action"); <u>Eagletech Comm'cns Inc. v. Citigroup, Inc.</u>, 2008 WL 3166533, at *14 (S.D. Fla. June 27, 2008) ("[T]he predicate acts are actionable as securities fraud and may be prosecuted by the SEC.").  But the simple fact of a parallel SEC action predicated on the same subject matter as this action, by itself, is insufficient to invoke the RICO Amendment if the claims in the former action do not involve a fraud in the purchase or sale of securities.

Here, Defendants seek to apply the patina of an SEC enforcement action to Zohar's claims and argue that the SEC's prosecution of an IAA claim is tantamount to securities

fraud.  But that overlooks the substance of the SEC's claims, which allege that Tilton and

Patriarch's misrepresentations to investors about the value of Zohar's assets and their decision to

enter into fundamentally conflicted positions to enrich themselves violated their fiduciary duties.

Obviously, securities are involved here because Zohar's existence arises from the sale of CLOs,

but the "incidental involvement of securities do[es] not implicate the anti-fraud provisions of the

federal securities laws."  Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Dabit I"), 395

F.3d 25, 37 (2d Cir. 2005), rev'd on other grounds, 547 U.S. 71 (2006).  The SEC Order makes

no reference to the purchase or sale of a security, nor does it allege that Defendants' breach of

fiduciary duty coincided with Zohar's sale, or its investors' purchase, of the CLOs.

Turning to Zohar's allegations in this action, this Court concludes that

Defendants' decision to manipulate the OC Test and issue false Monthly Reports do not coincide

with the purchase or sale of securities.  Rather, the Complaint depicts a situation in which this

particular aspect of the fraud was perpetrated to retain Defendants' ability to collect management

fees in their capacity as collateral manager.  (Compl. ¶ 56.)  Defendants' misrepresentations in

the Monthly Reports bear an attenuated nexus to the purchase or sale of Zohar's notes because

such reports were issued only to investors who had purchased the CLOs long ago.  And there is

no indication from the face of the Complaint that the OC Test results or the Monthly Reports

were disseminated in connection with the purchase or sale of a CLO, or had any bearing on an

investor's decision to purchase the notes.[4]  Rather, the terms of the Indenture contemplate

---

[4]        Defendants reference investor testimony from the SEC enforcement action regarding the purchase and sale
of CLOs and their decision to invest in Zohar.  (Mot. at 12 n.7.)  While this Court may consider materials external to
the pleadings, there is a limit.  "A complaint that alleges facts related to or gathered during a separate litigation does
not open the door to consideration, on a motion to dismiss, of any and all documents filed in connection with that
litigation."  Goel v. Bunge, Ltd., 820 F.3d 554, 560 (2d Cir. 2016).  Thus, "a court may take judicial notice of a
document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish
the fact of such litigation and related filings."  Global Network Commc'ns, Inc. v. City of N.Y., 458 F.3d 150, 157
(2d Cir. 2006).  To consider detailed testimony from an SEC proceeding involving related claims would "permit the

disclosure of the OC Test results and Monthly Reports to existing investors <u>after</u> they have purchased the notes.  (<u>See</u> Shapiro Decl., Ex. 1, § 10.13.)

In "look[ing] beyond the face of the complaint to analyze the substance of the allegations made," the OC Test allegations fall outside the ambit of the RICO Amendment. <u>Dabit I</u>, 395 F.3d at 34.  Zohar sets forth a series of detailed allegations to make out what appears to be a veritable scheme to defraud, but that scheme existed independent of the securities transactions.  The OC Test and Monthly Report allegations, like those referenced in the SEC action, appear more akin to a scenario that <u>Zanford</u> exempted from the scope of a securities fraud claim: "after a lawful transaction had been consummated, a broker decided to steal the proceeds and did so."  <u>Zandford</u>, 535 U.S. at 820.

Applied here, the purchase and sale of Zohar's CLOs in 2003, 2005, and 2007 were entirely lawful transactions.  Nothing in the Complaint suggests that Defendants "secretly intend[ed] from the very beginning to keep the proceeds" of the note offerings.  <u>Zandford</u>, 535 U.S. at 824; <u>Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.</u>, 532 U.S. 588, 596–97 (2001). Rather, the fraud appears to have arisen "well after the creation of the Zohar Funds," since "2009 at the very latest, [when] the OC Test under the Zohar Funds' Indentures should have been failing due to significant deterioration in the Funds' loan portfolios."  (Pl. Memo. of Law in Opposition to Motion to Dismiss ("Opp."), ECF No. 58, at 10; Compl. ¶ 58.)  The incentive to fraudulently inflate collateral value appears only to have arisen when things went awry—with the collateral underperforming and in danger of failing the OC Test, Defendants were in danger of losing their fees and control over Zohar's assets.  But that fraud occurred separate and apart from the sale of Zohar's CLOs.  <u>See</u> <u>Leykin v. AT&T Corp.</u>, 423 F. Supp. 2d 229, 242 (S.D.N.Y.

improper transformation of the Rule 12(b)(6) inquiry into a summary-judgment proceeding—one featuring a bespoke factual record, tailor-made to suit the needs of defendants."  <u>Goel</u>, 820 F.3d at 560.

2006) ("[A]n otherwise legitimate stock transaction that is antecedent, but not integral, to the alleged fraud does not meet the 'in connection with' requirement.").

Defendants nevertheless attempt to burnish the purported link between the CLO transactions and the OC Test allegations by citing investor testimony from the SEC action that the decision to purchase, sell, or hold the notes would have changed if the collateral were categorized accurately. (Mot. at 12 n.7, 13 n.9.) Plaintiffs counter that the notes did "not trade in a public market[5] and the [Monthly] Reports are disseminated only to existing investors, unlike reports filed with the SEC by corporate issuers of publicly traded securities." (Opp. at 11 (internal quotation marks omitted).) Thus, Plaintiffs argue, it is "rank speculation that some theoretical investor in the Zohar Funds' notes may have made some investment decision based on misrepresentations" in the Monthly Reports. (Opp. at 11–12.)

At this juncture in the litigation, the Complaint sheds no light on whether there was a market for the CLOs, or the type of information prospective purchasers possessed (if any), during the period in which Defendants issued false Monthly Reports. Nor does the Complaint suggest that the original investors purchased or sold CLOs in a secondary market after Defendants' scheme to defraud had been hatched. Even if CLOs were traded during the life of Zohar's funds, "incidental purchases and sales" of the notes, without more, would "not implicate the anti-fraud provisions of the federal securities laws." SEC v. Northshore Asset Mgmt., 2008 WL 1968299, at *7 (S.D.N.Y. May 5, 2008). These apparent omissions may be the kind of artful pleading that the RICO Amendment is designed to bar. But the Complaint is otherwise

---

[5] Though a public market for the notes is not required to establish a Section 10(b) claim, the Complaint makes no reference to whether there was any market for the notes, let alone disclosures of information from which potential buyers in that market could have based their decision to purchase the security. See Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971) (rejecting argument that Section 10(b) applied only to fraudulent transactions in the context of a securities exchange, instead reading the statute "flexibly" to "bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face.").

sufficiently detailed that discovery on such issues would be appropriate assuming the rest of the alleged scheme is not barred by the RICO Amendment.  (See Hearing Tr. dated Apr. 4, 2017, ECF No. 63, at 24:21–25 ("If at some point further down the road there is discovery taken and they are able to show that, in fact, there were investors who were out there who were actually engaging in a purchase or sale based upon this false information, then they can come back to you with that evidence.").)

ii.  Misappropriation of Equity and Equity Distributions

Because the Complaint alleges a single, ongoing fraudulent scheme, all of Defendants' alleged acts must be considered together.  Levinson, 2009 WL 5184363, at *7. (See, e.g., Compl. ¶ 176 ("Defendants "engage[d] in a common scheme of fraudulent misrepresentations, self-dealing, breaches of trust and fiduciary duty, and outright theft or attempted theft for [a] common purpose.").)  While the OC Test and Monthly Report allegations escape the RICO bar, the allegations relating to Defendants' theft of Zohar's equity interests and distributions are fatal to the RICO claim.[6]

Zohar characterizes the alleged scheme as a "classic example of a case of post-investment looting and the concealment thereof that is not actionable under the securities laws," but that overlooks the granular mechanics of executing the fraud.  (Opp. at 12 (internal quotation marks omitted).)  While the sale of the CLO notes may have been incidental to the fraudulent scheme, other securities—namely portfolio company equity—were acquired in connection with the underlying fraud.  Indeed, as Zohar alleges, one of Tilton's key objectives in managing the

---

[6]        This set of allegations concerning Zohar's equity does not appear to have been a part of the SEC's case. (See Plaintiffs' Ltr. dated Sept. 29, 2017, ECF No. 72, at 1 ("[T]he SEC decision has no relevance to this case.  It does not even address, let alone undermine, the core of the Zohar Funds' allegations."); see also Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc., No. 12946-VCS (Del. Ch. Ct. Nov. 30, 2017), slip op. at 93 ("Insofar as [the SEC administrative law judge's] Initial Decision considered whether the Zohar Funds own equity in their portfolio companies, that issue—equity ownership—was not case-dispositive.").)

funds was "loan-to-own or [] own-to-loan" because, according to her, "the only way to get beyond the face value of the loan is to have that equity upside." (Compl. ¶ 46.) Despite Tilton's apparent confusion over her own investment strategy, Zohar's aim was not only to extend loans to repay its noteholders, but to secure interests in portfolio companies whose equity could later be monetized at a substantial profit.

Zohar authorized Defendants to loan and invest its funds in portfolio companies, knowing full well that Defendants were bound by express and implied fiduciary duties to utilize the money in Zohar's interests. Zohar was "sometimes provided with equity interests in the company in recognition of the distressed nature of loans," or in "connection with restructurings of existing loans to Portfolio Companies." (Compl. ¶¶ 43–45, 49.) That equity came in the form of common stock, preferred stock, or LLC membership interests. (Compl. ¶¶ 43–45.) As a result, Zohar (along with Defendants) at one point in 2007 held a majority interest in 23 portfolio companies, including 100% in seven of those companies. (Compl. ¶ 46.) And in 2009, Patriarch boasted equity ownership by Zohar in 43 portfolio companies, of which 14 were completely owned by Zohar. (Compl. ¶ 46.)

But instead of using Zohar's funds to transfer all equity interests to Zohar, Defendants often misused the money to acquire equity for themselves. This is a clear example in which a breach of fiduciary duty and a securities transaction coincide. Tilton and Patriarch, authorized to act on Zohar's behalf, were bound to express and implied fiduciary duties. Most sacred of those duties is the duty of loyalty—Zohar trusted Tilton and Patriarch to invest its funds for its benefit and entirely in its own interests. Defendants ignored that duty, instead entering into many transactions involving the extension of a loan and the transfer of equity that were "made to further [Defendants'] fraudulent scheme; each [transaction] was deceptive

because it was neither authorized by, nor disclosed to" Zohar. <u>Zandford</u>, 535 U.S. at 820–21.

Put another way, Defendants were "only able to carry out [their] fraudulent scheme . . . because [Zohar and the noteholders] trusted [them] to make transactions in their best interest." <u>Zandford</u>, 535 U.S. at 822. And these equity transactions, tendered as common stock, preferred stock, and LLC membership interests,[7] were governed by the federal securities laws. <u>Nelson v. Stahl</u>, 173 F. Supp. 2d 153, 164 (S.D.N.Y. 2001) ("[S]tock, whether in a publicly held company or [ ] in a closely held corporation, constitutes a security governed by the federal securities laws."); <u>Reves v. Ernst & Young</u>, 494 U.S. 56, 62 (1990) ("[C]ommon stock is the quintessence of a security."); <u>Sobek v. Quattrochi</u>, 2004 WL 2809989, at *4 (S.D.N.Y. Dec. 8, 2004).

The purchase of stock was integral to the scheme to defraud since, without it, Defendants would have lacked the position to claim dividends and exercise control over the portfolio companies. <u>Seippel v. Jenkens & Gilchrist, P.C.</u>, 341 F. Supp. 2d 363, 374 (S.D.N.Y. 2004) ("[S]ale of that stock was an integral part of the scheme, as without it there would have been no gain" for the tax fraud.); <u>Levinson</u>, 2009 WL 5184363, at *7. Defendants, in essence, "accepted and deposited [Zohar's] monies as payment for securities with no intent to deliver them" to Zohar. <u>Instituto De Prevision Militar v. Merrill Lynch</u>, 546 F.3d 1340, 1349 (11th Cir. 2008). Thus, after claiming Zohar's equity for themselves, Defendants "absconded with [dividend payments] rather than allowing them to properly be paid to the Zohar Funds' trustee for ultimate distribution to the Zohar Funds' noteholders." (Compl. ¶ 50.)

---

[7]    This Court recognizes that "membership interests in LLCs resist categorical classification . . . [and a] case-by-case analysis into the economic realities of the underlying transactions is required." <u>United States v. Leonard</u>, 529 F.3d 83, 89 (2d Cir. 2008). Defendants' purported investment strategy—loaning to own with the expectation that rehabilitating a distressed company would maximize their equity—suggests that at least some of the LLC membership interests Defendants obtained would qualify as a security under the Supreme Court's test in <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293 (1946) (an investment of money into a common enterprise with the expectation of profits derived from the efforts of others).

The two cases cited by Zohar in support of its view that Defendants engaged in post-investment looting are unpersuasive. In <u>Mezzonen S.A. v. Wright</u>, 1999 WL 1037866 (S.D.N.Y. Nov. 16, 1999)—a case decided well before <u>Zandford</u>—the court found that post-investment activity involving the issuance of "fraudulent earnings and activities reports, false valuations, and money transfers" to prevent investors from withdrawing their investment was not actionable as a claim under the securities laws. While the <u>Mezzonen</u> defendants sought dismissal under the RICO Amendment by advancing what was in essence a holder claim, the court found that the securities laws "do [ ] not afford relief to those who forego . . . a sale and instead merely hold in reliance of a nondisclosure or misrepresentation." <u>Mezzonen</u>, 1999 WL 1037866, at *4 (internal citations omitted). While certain allegations here may fall into that category of exempted conduct, there was clearly another component to Defendants' overarching scheme that involved activity forming the basis for an actionable claim under the securities laws. Here, the post-investment looting involved the purchase and sale of securities.

Moreover, <u>Mezzonen</u>'s rationale underscores just how dated and unavailing it is today, in view of the Second Circuit's decisive holding that the RICO Amendment "bars civil RICO claims alleging predicate acts of securities fraud, <u>even where</u> a plaintiff cannot itself pursue a securities fraud action against the defendant." <u>MLSMK</u>, 651 F.3d at 277; <u>see also</u> <u>Thomas H. Lee Equity Fund</u>, 612 F. Supp. 2d at 283. <u>Mezzonen</u> held, in part, that the <u>plaintiff</u> could not "base a securities fraud claim on Defendants' post-investment conduct." 1999 WL 1037866, at *5. Even the single transaction that the <u>Mezzonen</u> defendants offered as evidence of actionable securities fraud was rejected on the basis that it "did not involve [the plaintiff] Mezzonen as a purchaser or seller of the debentures." <u>Mezzonen</u>, 1999 WL 1037866, at *5.

Today, however, a single securities transaction that coincides with the fraudulent scheme can be the death knell of a RICO claim.

Further, Zohar cites Leykin, for the proposition that "an otherwise legitimate stock transaction that is antecedent, but not integral, to the alleged fraud does not meet the 'in connection with' requirement." Leykin, 423 F. Supp. at 242. That may hold true for Zohar's CLO note offerings to its investors, which this Court has already concluded were legitimate stock transactions antecedent to Defendants' fraud. But the other predicate acts giving rise to Zohar's RICO claim existed part and parcel of the purchase or sale of securities—the acquisition of equity (in the form of common stock, preferred stock, or LLC interests) in portfolio companies.

Zohar takes pains to avoid using the term "securities" in the Complaint, and to the extent securities are involved, paints a picture in which they are tangentially involved in the scheme to defraud. But taking Zohar at its word is tantamount to crediting a "surgical presentation" of the claims and "undermine[s] the congressional intent behind the RICO Amendment," which is to strike artful pleadings that attempt to mask any actionable securities fraud claim as wire or mail fraud. Bald Eagle, 189 F.3d at 329–30; Burton v. Ken–Crest Servs., Inc., 127 F. Supp. 2d 673, 677 (E.D. Pa. 2001) ("Plaintiff cannot magically revive his claim by picking out discreet details of his allegations and then claiming that they are not actionable as securities fraud."). Much of the Complaint alleges a complex scheme to abscond with millions of dollars in fees, obfuscate title to assets, or simply loot the assets of a portfolio company, which all appear, at least superficially, like non-securities conduct. But this Court cannot ignore allegations that an integral component of that scheme to loot included pillaging portfolio companies of their equity, re-directing Zohar's equity interests for Defendants' benefit, and

diverting the equity distributions into Defendants' coffers—all actions coinciding with the purchase or sale of securities. See Gilmore v. Gilmore, 2011 WL 3874880, at *6 (S.D.N.Y. Sept. 1, 2011) ("Plaintiff's over-arching theory of this case is that [Defendants] engaged in various plots to loot Covington and other family corporations. That conduct counts as a single scheme, and the securities aspects of the fraud must be aggregated with the non-securities aspects."); Hollinger Int'l, Inc. v. Hollinger Inc., 2004 WL 2278545, at *8–9 (N.D. Ill. Oct. 8, 2004) (while predicate acts of "fraudulently convert[ing] $380.6 million in assets from the Company . . . and [taking] inflated and unearned management fees," were not "per se violations of securities law, they were an integral part of Defendants' scheme to loot" and coincided with shareholders' purchase and sale of securities).

Accordingly, because this aspect of Defendants' scheme runs headlong into the heart of the RICO Amendment, Zohar's civil RICO claim is dismissed.

III. Remaining Causes of Action

This Court's subject matter jurisdiction arises principally from federal question jurisdiction under 28 U.S.C. § 1331 and the RICO statute under 18 U.S.C. §§ 1964, 1965. (Compl. ¶ 22.) While the Complaint also alleges that subject matter jurisdiction exists under the parties' diversity of citizenship, 28 U.S.C. § 1332, Zohar has conceded that no such basis exists. (Opp. at 25 ("Plaintiffs concede there is no diversity jurisdiction on the present pleading.").)

With the RICO claim dismissed, this Court must consider whether it is appropriate to exercise supplemental jurisdiction over the remaining 11 common law claims.[8] While a district court may, "at its discretion, exercise supplemental jurisdiction over state law

---

[8]     The other causes of action seek remedies pertaining to three counts for declaratory judgment, an accounting, breach of contract, conversion, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, faithless servant, and unjust enrichment.

claims even where it has dismissed all claims over which it had original jurisdiction, see 28

U.S.C. § 1367(c)(3), it cannot exercise supplemental jurisdiction unless there is first a proper

basis for original jurisdiction." Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182,

1187 (2d Cir. 1996).

"In most circumstances, it makes little practical difference whether the district

court labels its dismissal of an action as one for lack of subject matter jurisdiction under Rule

12(b)(1) or for failure to state a claim under Rule 12(b)(6)." Nowak, 81 F.3d at 1188. But

because "a court must have original jurisdiction in order to exercise supplemental jurisdiction, a

dismissal pursuant to Rule 12(b)(1) precludes a district court from exercising supplemental

jurisdiction over related state claims." Nowak, 81 F.3d at 1188. Whether a "federal court

possesses federal-question subject matter jurisdiction and whether a plaintiff can state a claim for

relief under a federal statute are two questions that are easily, and often, confused." Carlson v.

Principal Fin. Grp., 320 F.3d 301, 305–06 (2d Cir. 2003). In federal question cases, like this one,

the "very statute that creates the cause of action often confers jurisdiction as well—that is, the

claim 'arises under' the same federal law that gives the plaintiff a cause of action." Nowak, 81

F.3d at 1187.

Adding to the confusion, Defendants' motion seeks dismissal under both Rules

12(b)(1) and 12(b)(6), but does not appear to distinguish which of Zohar's claims should be

dismissed under one or both of the rules. (See Mot. at 9; Defendants' Notice of Motion, ECF

No. 53, at 1.) In their Answer, however—filed during the pendency of the motion to dismiss—

Defendants specify that the "RICO claim should be dismissed under Federal Rule of Civil

Procedure 12(b)(6) for failure to state a cognizable claim." (Answer, Counterclaims, and Third-

Party Complaint ("Third Party Compl."), ECF No. 79, ¶ 26.)

Nevertheless, the "jurisdictional inquiry is rather straightforward and depends entirely upon the allegations in the complaint: where the complaint is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions[9] . . . must entertain the suit." Carlson, 320 F.3d at 306 (citing Bell v. Hood, 327 U.S. 678, 681–82 (1946)) (internal quotation marks and alterations omitted). Indeed, this Court need only ask whether the "complaint is drawn so as to seek recovery under federal law or the Constitution. If so, then [the court must] assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits." Nowak, 81 F.3d at 1189. And standing under RICO, in particular, "for purposes of a motion to dismiss, is not a jurisdictional concept, but instead is analyzed as a merits issue under" Rule 12(b)(6). Brookhaven Town Conservative Committee v. Walsh, 2016 WL 1171583, at *4 (E.D.N.Y. Mar. 23, 2016); Alphas Co. of N.Y. Inc. v. Hunts Point Terminal Produce Cooperative, Inc., 2017 WL 1929506, at *3 (S.D.N.Y. May 9, 2017) ("Supreme Court clarified that standing under a statute is not in fact a standing issue that implicates subject matter jurisdiction but rather the issue of whether a particular plaintiff has a cause of action under the statute.") (citation omitted).

Here, Zohar clearly seeks relief under the federal RICO statute. (Compl. ¶¶ 22, 219–220.) While Defendants raise a threshold argument in their motion to dismiss—whether the RICO Amendment forecloses the RICO claim as a matter of law—that is an attack on the sufficiency of the RICO-specific allegations in Zohar's complaint. See Crawford & Sons, Ltd.

_____

[9] The two exceptions do not apply here. They arise "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." Bell, 327 U.S. 682–83. While Zohar's RICO claim is the only basis on which federal subject matter jurisdiction exists (absent diversity of citizenship), it is neither "immaterial" nor "wholly insubstantial and frivolous." Rather, the Complaint specifically and thoroughly alleges a number of predicate acts to support Zohar's theory of liability under RICO. And though this Court has concluded that some of those predicate acts run afoul of the RICO Amendment, such a determination does not render the claim immaterial, insubstantial, or frivolous.

Profit Sharing Plan v. Besser, 216 F.R.D. 228, 233 (E.D.N.Y. 2003). In other words, the "jurisdictional question (whether [Zohar's] claim 'arose under' [RICO]) and the question on the merits (whether [Zohar] stated a claim upon which relief could be granted) were inextricably bound together, and required the court to make a substantial inquiry into the statute's applicability." Nowak, 81 F.3d at 1190. Thus, this Court was vested with subject matter jurisdiction to evaluate the merits of the RICO claim. It examined the sufficiency of the allegations in the Complaint to determine that Zohar's claim was foreclosed by the RICO Amendment. Therefore, this Court's dismissal of the RICO claim is founded on Zohar's failure to state a claim under Rule 12(b)(6).

Because this Court had original jurisdiction over the RICO claim, it may now consider, in its discretion, whether to exercise supplemental jurisdiction over the remaining common law claims. Under 28 U.S.C. § 1367(a), district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Claims "form a part of the same case or controversy" if they "derive from a common nucleus of operative fact." Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004). Here, Zohar's common law claims and RICO claim arise from a common nucleus of operative facts regarding Defendants' wide-ranging, ongoing scheme to deceive investors and pilfer Zohar's assets.

Where Section 1367(a) is satisfied, however, the "discretion to decline supplemental jurisdiction is available only if founded upon an enumerated category of subsection 1367(c)." Itar–Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 448 (2d Cir. 1998). In this case, section 1367(c)(3) applies—this Court "dismissed all claims over which it

has original jurisdiction."  Even so, "where at least one of the subsection 1367(c) factors is applicable," a court should also determine whether exercising supplemental jurisdiction would promote economy, convenience, fairness, and comity.  Jones v. Ford Motor Credit Co., 358 F.3d 205, 214 (2d Cir. 2004).

In "the usual case [where] all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003).  Several of the discretionary factors here militate against exercising supplemental jurisdiction.  Despite the torrent of letters the parties filed during the pendency of the motion to dismiss—and the unhelpful rhetoric undergirding each of them—this case is in the early stages of litigation.  Discovery has not begun in earnest, and Defendants' Answer to the Complaint was recently filed.  Certilman v. Becker, 807 F. Supp. 307, 310 (S.D.N.Y. 1992) (declining to exercise jurisdiction where "the complaint was amended to omit all federal-law claims before the parties engaged in any discovery"); Torre v. Town of Tioga, 2015 WL 1524421, at *2 (N.D.N.Y. Apr. 2, 2015) (remand action to state court is "appropriate [ ] where discovery had not even begun").

Dismissal at this stage would not amount to a waste of this Court's resources or inconvenience the parties in bringing their claims in state court.  In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 613 F. Supp. 2d 437, 445 (S.D.N.Y. 2009) ("Because no judicial resources have been invested in these matters, the interest of economy and convenience in retaining supplemental jurisdiction are modest."); Cedar Swamp Holdings, Inc. v. Zaman, 487 F. Supp. 2d 444, 453 n.63 (S.D.N.Y. 2007) ("[A]t early stages in the proceedings, [there is] little to be gained by way of judicial economy from retaining jurisdiction.").  Further, while federal

courts are equipped to examine common law claims such as breach of contract and breach of fiduciary duty, comity dictates that these causes of action are predominantly issues of state law better suited for resolution in state court.

Finally, it would not be unfair to any of the parties if this Court declined supplemental jurisdiction. During the pendency of the motion to dismiss, Zohar apparently filed a "new, and entirely duplicative, omnibus action in Delaware involving 11 of the same portfolio companies that [Zohar] long ago put at issue here," (the "November 2017 Delaware Action") and designated that action as "related" to a case Zohar filed in November 2016 before the Delaware Chancery Court regarding Zohar's control over three other portfolio companies (the "November 2016 Delaware Action").[10] (Defendants' Ltr. dated Nov. 16, 2017 ("Def. Nov. 16 Ltr."), ECF No. 78, at 2.) Defendants characterize the move as "blatant forum shopping" that seeks "verbatim the relief" sought in this action. (Def. Nov. 16 Ltr. at 1, 2.) Thus, to prevent the "procedural gamesmanship" that Zohar has ostensibly engaged in, Defendants withdrew their initial request for this Court to decline supplemental jurisdiction so that "the issues already raised in this case concerning ownership and control of all of these portfolio companies can be litigated and resolved here." (Compare Mot. at 1, 25 n.20, with Def. Nov. 16 Ltr., at 1.)

But the simple fact that Zohar filed an action in Delaware Chancery Court similar to the one here does not militate in favor of this Court's exercise of supplemental jurisdiction. If anything, permitting the state law claims here to proceed in a Delaware state court would uphold values of comity and fairness. The Delaware Chancery Court seems best positioned to adjudicate the remaining state law claims since an action predating this case—the November

---

[10]     On November 30, 2017, the Delaware court issued an omnibus decision addressing Zohar's claims in the November 2016 Delaware Action. (See Plaintiffs' Ltr. dated Dec. 2, 2017 ("Plaintiffs' Dec. 2 Ltr."), ECF No. 97, at 1.) But the counterclaims asserted by Defendants remain under review in that action. (See Plaintiffs' Dec. 2 Ltr. at 4.)

2016 Delaware Action—already raised issues pertaining to Zohar's ownership and control over three portfolio companies,[11] and the latest November 2017 Delaware Action implicates "purported ownership and control of 11 of the portfolio companies."  (Def. Nov. 16 Ltr. at 2.) The Delaware court is an ideal forum to resolve these equity-related questions because Defendants filed counterclaims in the November 2016 Delaware Action concerning "the equity ownership of several other companies—including companies that are the subject of Plaintiffs' [November 2017 Delaware Action] complaint and Defendants' new state-court complaints" in three other states.  (Plaintiffs' Dec. 2 Ltr. at 4.)  There is substantial overlap between the factual and legal questions invoked by each of the parties' claims in the November 2016 and November 2017 Delaware Actions.  And all such claims are pending before the same judge in the Delaware Chancery Court, who is eminently qualified to resolve them.

Also relevant here, and worth noting, is the irony behind Defendants' contention that Zohar has engaged in "gamesmanship" when, a few days before Zohar filed the November 2017 Delaware Action, Defendants filed three separate state court actions in Michigan, Arizona, and California, respectively, seeking declaratory relief concerning their ownership and control of certain assets.  That they would stymie Zohar's efforts to litigate these corporate control cases elsewhere, yet at the same time file their own claims in far-flung state forums, underscores this Court's determination that absent a valid RICO claim, the remaining common law claims should be resolved by state courts.

---

[11]    Defendants also claim that their counterclaims in the November 2016 Delaware Action, "although expressly addressing only the ownership of those three portfolio companies, broadly implicate all of the companies because of the overlapping legal and factual issues with regard to [Tilton's] ownership of the many other portfolio companies now directly at issue" in this action.  (Mot. at 7 n.4.)  That simply validates this Court's view that all of Zohar and Defendants' claims should be heard by a Delaware court that is, by now, well-versed with the facts and the relevant state law.

Supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience, and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); Gilmore v. Gilmore, 2011 WL 5517832, at *2 (S.D.N.Y. Nov. 10, 2011). In accord with that principle, this Court finds that interests of economy, convenience, comity, and fairness weigh against exercising supplemental jurisdiction over the remaining claims.

IV.    Defendants' Third Party Complaint

On November 22, 2017, Defendants answered the Complaint, filed counterclaims against Zohar, and filed third-party claims against MBIA, U.S. Bank, Alvarez & Marsal Zohar Management, and the Zohar III Controlling Class[12] (the "Third Party Complaint"). (Third Party Compl. ¶¶ 1–23.) The Third Party Complaint was filed during the pendency of Defendants' motion to dismiss. Through their prolix pleading, Defendants fire off 22 causes of action that are similar to Zohar's claims. That is, Defendants generally allege that MBIA, U.S. Bank, Alvarez & Marsal Zohar Management, and Zohar III Controlling Class ("Third Party Defendants") orchestrated a wide-ranging fraud to rob Tilton of her control and equity in portfolio companies.

Defendants claim that this Court has original jurisdiction under 28 U.S.C. § 1331, through the RICO claim, and 12 U.S.C. § 632, through the Edge Act, which confers federal jurisdiction in cases where one of the parties—here, U.S. Bank—is a federally chartered corporation engaged in international banking. (Third Party Compl. ¶ 24–26.) They also claim that supplemental jurisdiction over any state law claims, counterclaims, and third-party claims is proper under 28 U.S.C. § 1367(a).

---

[12]    The Zohar III Controlling Class consists of a group of four noteholders who collectively own a majority of Zohar III's Class A notes. (Third Party Compl., ¶ 22.)

Zohar and the Third Party Defendants have yet to answer the Third Party Complaint.[13]  But before they do, a few observations about this Court's jurisdiction over the third-party claims and the propriety of impleading these claims are in order.  There is a question, especially in view of this Court's dismissal of the original action, of whether there is an independent basis for federal jurisdiction or whether the Third Party Complaint may properly be considered under Federal Rule of Civil Procedure 14.

"Federal courts are courts of limited jurisdiction."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  "In the Second Circuit, it is clear that the jurisdiction of the district court over the claims of the plaintiffs is not enhanced by third party complaints."  Arrow Fin. Servs., LLC v. Massil, 2009 WL 348553, at *2 (E.D.N.Y. Feb. 11, 2009) (citing In re Agent Orange Prod. Liab. Litig., 635 F.2d 987, 990 n.6 (2d Cir. 1980)) (internal quotation marks and alterations omitted).

More importantly, it is unclear whether Defendants can establish an independent basis for jurisdiction by asserting counterclaims or third-party claims arising under federal law.  Holmes Grp. Inc. v. Vornado Air Circ. Sys., Inc., 535 U.S. 826, 831 (2002) ("It follows that a counterclaim—which appears as part of the defendant's answer, not as part of the plaintiff's complaint—cannot serve as the basis for 'arising under' jurisdiction.").  The Third Party Complaint asserts two federal statutes from which Defendants' counterclaims and third-party claims arise—RICO and the Edge Act.  Because this Court has dismissed the RICO claim, Defendants may not rely on the RICO statute to create an independent jurisdictional basis for their own claims.  Defendants' reliance on the Edge Act is also unavailing.  "Under the well-pleaded complaint rule, federal question jurisdiction exists only if [a] plaintiff's statement of his

---

[13]     By joint stipulation, the Third Party Defendants shall file a response to the Third Party Complaint by January 12, 2018.  (ECF No. 100.)

own cause of action shows that it is based on federal law." Romano v. Kazacos, 609 F.3d 512, 518 (2d Cir. 2010). It thus follows that "a defendant may not evade this rule by raising a federal question in its responsive pleadings." Calabro v. Aniqa Halal Live Poultry Corp., 650 F.3d 163, 166 (2d Cir. 2011).

Taking RICO and the Edge Act out of the jurisdictional equation, it appears that the remaining basis from which this Court may retain jurisdiction over the Third Party Complaint is under 28 U.S.C. § 1367(a). But it is unclear why exercising supplemental jurisdiction over the third-party claims is appropriate or fair if this Court has already declined to consider Zohar's non-federal claims.

Separately, "whether a court has subject matter jurisdiction over a third-party . . . cause of action is distinct from an assessment of the propriety and merits of an impleader action" under Federal Rule of Civil Procedure 14. Bank of India v. Trendi Sportswear, Inc., 239 F.3d 428, 438 (2d Cir. 2000). Thus, jurisdictional questions aside, Rule 14 provides that a defending party may serve a summons and complaint on a non-party who "is or may be liable to it for all or part of the claim against it." Fed. R. Civ. P. 14(a)(1). A third party claim may be asserted when the third party's liability is somehow dependent on the outcome of the main action or when the third party is secondarily liable to the defendant. See Falcone v. MarineMax, Inc., 659 F. Supp. 2d 394, 401–02 (E.D.N.Y. 2009) (emphasis added). The "purpose of Rule 14 is to avoid two separate actions which should be tried together; to save the time and cost of duplicating evidence; to obtain consistent results; and to do away with the serious handicap to a defendant of a time difference between a judgment against him and a judgment in his favor against a third-party." Horsehead Corp. v. Shinski, 2010 WL 1781596, at *3 (N.D.N.Y. Apr. 30, 2010). A "third-party claim is not permissible simply because it arises out of the same nucleus of facts as

the main claim." Prudential Ins. Co. of Am. v. BMC Indus., Inc., 113 F.R.D. 100, 102 (S.D.N.Y. 1986).

Even if Defendants could establish a basis for supplemental jurisdiction under 28 U.S.C. § 1367, it is not entirely clear whether Defendants' claims against the Third Party Defendants, though related to Zohar's allegations, actually are dependent on the outcome of the original action or allege that the Third Party Defendants are secondarily liable to Defendants. See Siemens Westinghouse Power Corp. v. Dick Corp., 299 F. Supp. 2d 242, 248 (S.D.N.Y. 2004) ("The crucial characteristic of a Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability asserted against him by the original plaintiff. In other words, the outcome of the third-party claim must be contingent on the outcome of the main claim[.]"). Here, while the Third Party Complaint's allegations encompass largely the same cast of characters and investment activities, Defendants appear to seek relief based on the Third Party Defendants' conduct impeding Tilton's efforts to manage her portfolio companies, depriving her of control over those assets, and orchestrating sham auctions to sell off Zohar's collateral. These seem to be the type of allegations that Tilton could have asserted in an independent action against the Third Party Defendants, and appear to contravene the rule that a third-party complaint "cannot be used to bring in other matters that may have some relationship to the case." Doucette v. Vibe Records, Inc., 233 F.R.D. 117, 120 (E.D.N.Y. 2005).

Accordingly, based on this Court's initial observations, Defendants are directed to explain why this Court should exercise jurisdiction over the Third Party Complaint and why the claims therein qualify for an impleader action under Rule 14.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is granted. Consistent with the Joint Stipulation and Order dated December 15, 2017, Zohar and the Third Party Defendants should respond to Defendants' Third Party Complaint by January 12, 2018. Separately, Defendants shall provide an explanation as to why this Court should retain jurisdiction over their claims in the Third Party Complaint and why their third-party claims qualify as an impleader action under Rule 14 by no later than January 26, 2018.

The Clerk of Court is directed to terminate all pending motions on the docket.

Dated: December 29, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.