UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- :

ZOHAR CDO 2003-1, LTD., *et al.*,                   :
                                                    :                17-cv-307(PKC)
        Plaintiffs,          :
                                                    :                OPINION AND ORDER
    -against-                       :
                                                    :
PATRIARCH PARTNERS, LLC, *et al*.,                  :
                                                    :
    Defendants.                     :
                                                    :
------------------------------------------- :

P. KEVIN CASTEL, Senior United States District Judge:[1]

        Third-Party Defendants MBIA Insurance Corp. ("MBIA"), MBIA, Inc.,[2] Alvarez

& Marsal Zohar Management, LLC ("AMZM"), U.S. Bank, N.A.; Credit Value Partners, LP,

Halcyon Capital Management LP, Coöperative Rabobank U.A. ("Coöperative") and Värde

Partners, Inc. ("Värde" and together with Credit Value Partners, Halcyon, and Coöperative,

"Zohar III Controlling Class") move to dismiss a smorgasbord of claims brought by Defendants,

Counterclaim-Plaintiffs, and Third-Party Plaintiffs Lynn Tilton, Patriarch Partners, LLC

("Patriarch Partners"),  Patriarch VIII, LLC ("Patriarch VIII"), Patriarch XIV, LLC ("Patriarch

XIV"), Patriarch XV, LLC ("Patriarch XV" and together with Patriarch Partners, Patriarch VIII,

and Patriarch XIV, "Patriarch"), Octaluna, LLC ("Octaluna I"), Octaluna II, LLC ("Octaluna

II"), and Octalunda III, LLC ("Octaluna III" and together with Octalunas I and II, "Octalunas"),

Ark II CLO 2001-1, Limited and Ark Investment Partners II, L.P. (together "Ark", and, together

---

[1]     The work of the late Judge William H. Pauley, III and his law clerk towards the preparation of this opinion is gratefully acknowledged, although the undersigned takes sole responsibility for its content.
[2]     In their opposition brief, the Patriarch Parties acknowledge that MBIA Insurance Corp., not MBIA Inc., is the proper party in this action.  Accordingly, all claims against MBIA Inc. are dismissed.

with Tilton, Patriarch, the Octalunas, and Ark, "Patriarch Parties"). For the reasons that follow, Third Party Defendants' motions are granted in part in denied in part.

BACKGROUND

Unless otherwise noted, the following facts are derived from the third-party complaint and are accepted as true for purposes of this motion. All reasonable inferences will be drawn in favor on the non-movants.

I. Formation and Structure of the Zohar Funds

In 2000, Lynn Tilton founded Patriarch Partners to develop investment solutions for financial institutions holding large portfolios of nonperforming and distressed loans. (Third-Party Complaint, ECF No. 88 ("TPC"), ¶ 34.) To invest in distressed loans, Tilton, through Patriarch, created numerous collateralized loan obligations ("CLOs"). (TPC ¶ 34.) Under Tilton's CLO model, a CLO used borrowed funds from investors ("noteholders") to purchase a portfolio of loans and, through actively managing and restructuring the underlying companies using a "collateral manager," repay noteholders their principal plus interests, with any residual value going to Tilton as preference shareholder. (TPC ¶ 35.)

In 2003, Tilton created a CLO called Zohar I. (TPC ¶ 39.) Octaluna I, which is wholly owned by Tilton, held all of Zohar I's preference shares. Patriarch VIII, which is also wholly owned by Tilton, acted as the collateral manager of Zohar I. While Zohar I initially focused solely on purchasing distressed senior secured loans, over time, its focus shifted to originating loans for distressed companies alongside Tilton's personal investment vehicles. (TPC ¶ 40.) Tilton,[3] acting through her wholly owned entities, would obtain controlling equity

_____

[3] The TPC frequently refers to actions taken by or against Tilton when those actions may have been taken by or against one of her many wholly owned entities that now comprise the Patriarch Parties. While this is not always made clear in the TPC, this Court will interpret references to Tilton to include, as applicable, the other Patriarch Parties.

positions in the distressed companies ("Portfolio Companies") by acquiring or creating a controlling stake in their equity and then manage those companies in an effort to turn them around and repay the principal and interest owed on the loans to Zohar I.  (TPC ¶ 40.)

Tilton created Zohar II and Zohar III in 2005 and 2007, respectively, based on the same investment strategy as Zohar I.  (TPC ¶ 42.).  Zohar II's collateral was managed by Patriarch XIV and its preference shares were owned by Octaluna II, both wholly owned by Tilton.  Zohar III's collateral was managed by Patriarch XV and its preference shares were owned by Octaluna III, again, both wholly owned by Tilton.

Zohar I, Zohar II, and Zohar III ("Zohar Funds") were each governed by a separate Indenture, Collateral Management Agreement ("CMA"), and Collateral Administration Agreement ("CAA").  (TCP ¶ 43.)  The Indentures described the terms of the offering, including maturity dates of the notes, reporting requirements, priority of payments, the rights of the parties, and the responsibilities of the collateral manager.  (TPC ¶ 44.)  The CMAs were contracts between the Zohar Funds and their respective collateral managers.  (TPC ¶ 44.)

To raise capital, the Zohar Funds issued notes entitling noteholders to periodic interest payments over time and return of the note's principal at a pre-set maturity date.  (TPC ¶ 47.).  Interest payments and other proceeds paid to the Zohar Funds were distributed according to a "waterfall" provision in the government documents.  (TPC ¶ 48.)  Under the terms of the waterfall, funds were generally distributed first, for the payment of certain fees; second, for interest and principal payments to noteholders; and third, a capped distribution to the Zohar Fund's preference shareholder (the Octalunas, and by extension Tilton).  (TPC ¶ 48.)  After all noteholders were repaid in full, the preference shareholder would receive any remaining funds.  (TPC ¶ 48.)  As preference shareholder and sole equity owner of the Zohar Funds, Tilton

(through the Octalunas) was entitled to the residual value of the Zohar Funds after all noteholders were repaid.  (TPC ¶ 58.)  Until that time, Tilton was entitled only to a capped amount of dividends, reached in November 2005, April 2007, and September 2010 for Zohar I, Zohar II, and Zohar III respectively.  (TPC ¶ 58.)

MBIA served as "credit enhancer" for Zohar I and Zohar II as defined in their respective Indentures.  (TPC ¶ 46.)  This meant that MBIA provided an "insurance guaranty" that if Zohar I or Zohar II defaulted on its repayment obligations, MBIA would repay the Class A noteholders of the defaulting fund.  (TPC ¶ 46.)  But in such an event, the noteholders' interests in the Zohar Funds would be subordinated to MBIA's.  (TPC ¶¶ 46, 110.)  And MBIA would have the right to auction off the Zohar Funds' collateral.  (TPC ¶¶ 46, 110.)

In order to eliminate potential disputes with other lenders or equity owners, Tilton, through the Octalunas and other entities, acquired a controlling interest in both the loans and the equity of the Portfolio Companies.  (TPC ¶ 50.)  This allowed Tilton to execute a strategy intended to improve operations, pay off debt, and increase value.  (TPC ¶ 50.).

While Tilton's CLO strategy required obtaining controlling equity positions in the Portfolio Companies, independent ratings agencies—whose ratings were required for the Zohar Funds' notes to be marketable—"refused to permit CLOs to invest in equity, with only narrow exceptions."  (TPC ¶ 59.)  This general prohibition stemmed from the incompatibility of equity ownership with the rating agencies' methodology, as well as tax liability concerns.  (TPC ¶ 61.)  To address these concerns, Tilton alleges that she structured the Zohar Funds such that the Octalunas, rather than the Zohar Funds, would own, hold, and control the equity.  (TPC ¶ 62.)  This meant that the Octalunas (and by extension Tilton) would also bear all tax consequences of

ownership. (TPC ¶ 62.)  Indeed, Tilton has personally reported—and paid—income and other taxes associated with owning both the Zohar Funds and the Portfolio Companies.  (TPC ¶ 70.)

Since the Zohar Funds' formation, Tilton has actively managed and controlled the Portfolio Companies through roles as either manager or director of virtually every Portfolio Company.  (TPC ¶¶ 67–68.)  Tilton has also exercised the ownership rights of the Portfolio Companies' equity since inception of the Zohar Funds.  (TPC ¶ 68.)

The terms of the Indentures reflect this structure by generally prohibiting the Zohar Funds from owning equity.  (TPC ¶ 64.)  However, Tilton listed the Zohar Funds as the "record holder" of the Portfolio Company equity "to memorialize a limited right granted to the Funds by Tilton: that the net proceeds from any sale of equity in the portfolio companies would flow through the Zohar Funds' waterfall."  (TPC ¶ 66.)

In 2015, Tilton amended the LLC agreements for the Portfolio Companies that are LLCs so that the voting control would go to the taxpayer, i.e., Tilton.  (TPC ¶ 115.)  Tilton also executed irrevocable proxies for the Portfolio Companies that are corporations granting Tilton a twenty-year exclusive right to vote the companies' shares.  (TPC ¶ 115.)  The Patriarch Parties allege that these amendments were intended to be made in 2011 but were not due to oversight. (TPC ¶ 114.)

The Patriarch Parties allege that the equity ownership structure was known and accepted by MBIA, the government, and investors.  Indeed, MBIA allegedly confirmed, in prior litigation, its understanding that Tilton owns the Portfolio Companies' equity MBIA now claims was or is owned by the Zohar Funds.  (TPC ¶ 76.)  Further, Tilton has represented to both the IRS and FTC that she, not the Zohar Funds, owns the Portfolio Companies.  (TPC ¶¶ 77–78.)

Finally, Tilton has explained to investors that the Zohar Funds hold only "upside equity" in the Zohar Funds.  (TPC ¶ 79.)

## II.   Negotiations Regarding Restructuring the Zohar Funds

In summer 2012, Tilton and MBIA began negotiations to restructure the Zohar Funds in light of the economic downturn.  (TPC ¶ 91.)  These discussions, which lasted over two years, included a potential extension of the Zohar I maturity date as well as a potential transaction whereby Tilton, through affiliates, would purchase all outstanding Zohar I, II, and III notes.  (TPC ¶ 91.)  However, the Patriarch Parties allege that, due to financial struggles of their own, MBIA leveraged these negotiations to further "a years-long effort" to seize the equity ownership in the Zohar I collateral (including the Portfolio Companies) from Tilton.[4]  (TPC ¶¶ 84–85.)  The Patriarch Parties also allege that MBIA worked in cahoots with the SEC to obtain confidential information regarding the Zohar I collateral (seemingly, the value of the Portfolio Companies).  (TPC ¶¶ 92–93.)

In order to ensure that Tilton did not sell any Zohar I collateral, including the Portfolio Companies, before the Zohar I maturity date, MBIA allegedly induced Tilton to execute the Fifth Supplemental Indenture for Zohar I, promising that MBIA would be "more likely to agree to a restructuring of the Zohar Funds if Tilton executed the agreement."  (TPC ¶ 103.)  The Fifth Supplemental Indenture amended Section 12.2(e), which previously required the collateral manager to direct the fund's trustee to sell "all Collateral Debt Obligations" six months before the maturity date in anticipation of Zohar I's default.  (TPC ¶ 104.)  Under the

---

[4]        MBIA allegedly induced Tilton to buy out a third-party Zohar I noteholder for more than $103 million in exchange for MBIA agreeing to extend the Zohar I maturity date as part of the so called "sham" negotiations.  (TPC ¶ 98.)  These allegations are the subject of a separate ongoing New York State court action and are immaterial to the pending motions.

Fifth Supplemental Indenture, however, Section 12.2(e) allowed, <u>but no longer required</u>, the

collateral manager to direct such a sale.  (TPC ¶ 105.)  This amendment allowed Tilton to refrain

from selling the Zohar I collateral in reliance on MBIA's representations that it would be more

likely to agree to restructuring.  (TPC ¶ 105.)

During negotiations in October 2015, the Patriarch Parties allege MBIA gave

knowingly false assurances that, if the Patriarch Parties resigned as collateral manager, MBIA

would continue to recognize their ownership and control of the Portfolio Companies.  (TPC ¶

120.)  Specifically, on October 24, 2015, MBIA sent a restructuring proposal to the Patriarch

Parties, stating in relevant part:

> MBIA will forbear from any rights it may have to remove Patriarch
> under the Collateral Management Agreements for Zohar I and II as
> long as Patriarch is in full compliance with this agreement.  Should
> Patriarch fail to abide with this agreement, Patriarch shall
> immediately resign from all of its roles in relation to Zohar I and II,
> and the underlying obligors held by these entities: Collateral
> Manager, Loan Agent, CEO and other executive positions at
> obligors, Director roles at obligors.  In addition, MBIA will no
> longer forebear on its rights and remedies . . . . As long as Patriarch
> is in full compliance with this agreement, Patriarch or Lynn Tilton
> will retain their rights, as applicable, as equity holder of the funds
> and underlying portfolio companies . . . .

(MBIA MTD Ex. I, (ECF No. 183-9), at 2.)  The Patriarch Parties allege that this proposal is a

representation that, even if Tilton were to "resign from all of [her] roles in relation to Zohar I and

II," MBIA would recognize that she would "retain [her] rights . . . in underlying portfolio

companies."  (TCP ¶ 120.)

The parties never finalized a restructuring proposal, allegedly because MBIA

never actually intended to restructure Zohar I's maturity date.  (TPC ¶¶ 106–07.)  As a result,

Zohar I defaulted in November 2015.  (TPC ¶ 106.)  Upon default, the noteholders' rights,

including those of the Patriarch Parties, were subordinated to MBIA's rights as "credit enhancer"

obligated to repay the noteholders pursuant to the "insurance guaranty." (TPC ¶¶ 46, 110.) This meant that MBIA became the controlling party of Zohar I.[5] (TPC ¶ 106.)

Following the Zohar I default, on November 22, 2015, the Patriarch Parties commenced an involuntary bankruptcy proceeding against Zohar I in the United States Bankruptcy Court for this district ("New York Bankruptcy"). (Involuntary Petition, ECF No. 1, In re Zohar CDO 2003-1, Ltd., No. 15-23680, 15-23581, 15-23682 (Bankr. S.D.N.Y.).) On February 1, 2016, during an evidentiary hearing on MBIA and the then-Zohar I directors' motions to dismiss the involuntary petition, the parties were ordered to meet and discuss a consensual resolution by Judge Robert Drain. Judge Drain stated, in relevant part:

> The break that we took . . . was sufficiently productive to warrant adjourning the rest of this hearing, based on the following understanding: The parties, primarily MBIA and the petitioning creditors . . . primarily through Ms. Tilton, will meet promptly . . . to discuss implementing two things: One is identifying a person to serve as a fiduciary for and collateral manager for the [Zohar Funds] . . . . As was stated on the record during the evidentiary hearing, Ms. Tilton has been willing to agree to that, if the person is acceptable and a proper process is laid out that's mutually acceptable to the parties for dealing with the underlying loans and the realization of appropriate value for those loans. Ms. Tilton, obviously, would remain in her positions with the underlying portfolio companies, which, at least on this record, appear to be -- appears to be a good thing . . . . Everyone recognizes that the first step in this process needs to happen quite quickly and on a consensual basis; i.e., identifying a person, talking about the process and agreeing on the process, which will include, it's clear to me, some flexibility as information develops and is analyzed by this person. If the parties aren't able to agree on that promptly, I will very seriously entertain either party's request for mediation . . .

(Declaration of Joshua P. Arnold, ECF No. 183 ("Arnold Decl."), Ex. J. 128:1–129:16.) The Patriarch Parties allege that MBIA, by declining to clarify on the record that it did not intend to

---

[5] Likewise, MBIA became the controlling party of Zohar II following its default. The Zohar III Controlling Class became the controlling party of Zohar III upon its default.

allow Tilton to remain in her positions with the Portfolio Companies, induced Tilton to resolve the proceeding and step down as collateral manager.  (TPC ¶ 121.)

Following the hearing with Judge Drain, MBIA and the Patriarch Parties met on February 3, 2016 and exchanged proposed term sheets.  MBIA's proposal included a provision that "Ms. Tilton and Patriarch agree to promptly resign as Collateral Manager of [the Zohar Funds] and simultaneously transfer, no later than March 1, 2016, the Collateral Manager positions for each Zohar fund to a new Collateral Manager mutually agreed upon by Ms. Tilton, Patriarch and MBIA" and "Patriarch Partners Agency Services, LLC will continue in its role as agent bank, and Ms. Tilton will retain all ownership, manager and/or board positions in the underlying portfolio companies."  (Arnold Decl. Ex J., at 4.)  The Patriarch Parties allege that, through this proposal, MBIA represented that Tilton would "retain" "all ownership . . . positions in the underlying portfolio companies" if Tilton resigned as collateral manager.[6]  (TPC ¶ 74.)  It does not appear, nor is it alleged, that the parties reached a final agreement.  The Patriarch Parties voluntarily dismissed the Zohar I Bankruptcy Petition on March 4, 2016—the day after the effective date of their resignation as collateral manager for the Zohar Funds.  (Mot. to Dismiss Involuntary Pet., ECF No. 52, In re Zohar CDO 2003-1, Ltd., No. 15-23680 (Bankr. S.D.N.Y.); TPC ¶¶ 121, 125.)

The Patriarch Parties claim that, based on MBIA's alleged misrepresentations and omissions, the Patriarch Parties voluntarily resigned as collateral manager of the Zohar Funds, effective March 3, 2016.  (TPC ¶ 123.)  Upon the Patriarch Parties' resignation, MBIA appointed AMZM as collateral manager of Zohar I and Zohar II.  (TPC ¶ 125.)  The Zohar III Controlling

---

[6]     In their Opposition Brief, the Patriarch Parties clarify that the statement in TPC ¶ 120 was meant to be the statement in TPC ¶ 74.  (Defendants, Counterclaimants, and Third-Party Plaintiffs' Mem. of Law in Opp'n to Dismissal, ECF No. 197 ("Opp'n"), at 22 n.6)

Class likewise appointed AMZM as the collateral manager for Zohar III.  (TPC ¶ 125.)  Tilton

had no role or input in either decision to hire AMZM.  (TPC ¶ 125.)

As collateral manager for the Zohar Funds, AMZM did not facilitate the creation

of a Trustee Report, as allegedly required on a monthly and quarterly basis under the Indentures

and CMAs.  (TPC ¶ 126.)  Instead, purportedly at MBIA's direction and with the Zohar III

Controlling Class' agreement, AMZM pursued "sham" litigations against the Patriarch Parties in

order to seize the Portfolio Companies' equity and transfer it to MBIA and the Zohar III

Controlling Class.  (TPC ¶ 126.)  AMZM and U.S. Bank have also allegedly refused to distribute

millions of dollars of collateral-management fees to Defendants, pursuant to the Indentures, for

services rendered by Tilton through Patriarch.  (TPC ¶ 130.)

III.    MBIA Challenges Tilton's Ownership of the Portfolio Companies

Following default, MBIA paid its obligations to the noteholders pursuant to its

"insurance guaranty" as "credit enhancer" for Zohar I.  (TPC ¶¶ 46, 110.)  However, Zohar II's

likely default in January 2017 and the "insurance guaranty" obligations that would follow

threatened MBIA with financial collapse.  (TPC ¶ 110.)  While the Third Party Complaint is

silent on the point, MBIA sought to dispose of the Portfolio Companies' equity in order to cover

its required payments to noteholders.  (TPC ¶ 111.)  The Third Party Complaint alleges that

MBIA then planned to sell the Portfolio Companies' equity to generate funds that would exceed

those necessary to pay MBIA's impending insurance liability from Zohar II.

As part of this alleged scheme, MIBA caused AMZM, through the Zohar Funds,

to execute written consents that purported to remove Tilton as a director of three portfolio

companies.  (TPC ¶ 134.)  In November 2016, MBIA, along with Zohar III Controlling Class,

approved the filing of an action in the Chancery Court of Delaware to assert control over three

Portfolio Companies.[7]  (TPC ¶ 135; see also Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc., No. CA-12946 (Del. Ch. Nov. 29, 2016).)  After the TPC was filed, the Delaware Court of Chancery found that "the Zohar Funds," as opposed to the Patriarch Parties, "are the beneficial owners of the disputed Portfolio Companies' shares."  Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc., 2017 WL 5956877, at *39 (Del. Ch. Nov. 30, 2017).  The Chancery Court also concluded that Ms. Tilton had been validly and effectively removed as a director of certain Portfolio Companies.  Id. at *3.

The Zohar I Auction

Upon Zohar I's default, MBIA had the right under the Indenture to direct that Zohar I's collateral be liquidated.  (TPC ¶ 144.)  In June 2016, MBIA directed U.S. Bank, as trustee, to auction off Zohar I's collateral ("Zohar I Auction").  (TPC ¶ 145.)

On September 12, 2016, the Patriarch Parties sued MBIA in New York State Court seeking a temporary restraining order and preliminary injunction of the auction.  (TPC ¶ 146.)  The Patriarch Parties claimed that the auction was scheduled for a commercially unreasonable timeframe and structured in a commercially unreasonable manner.  (TPC ¶ 146.)  They also claimed that the collateral to be auctioned included equity owned by the Patriarch Parties.  (TPC ¶ 146.)

U.S. Bank removed the action to this district.  (TPC ¶ 147.)  The case was assigned to Judge Jed Rakoff, and, following a hearing on the Patriarch Parties' motion for preliminary injunction, he issued an order requiring U.S. Bank to re-notice the auction, distribute

---

[7]    Section 225 of the Delaware Corporation Law permits certain persons to commence a proceeding in the Court of Chancery to determine the validity of any election, appointment, removal or resignation of any director or officer of a Delaware corporation.  The Zohar Funds commenced an action (the "Delaware 225 Action") to declare that written consents were effective in ousting Ms. Tilton from her positions as sole director of certain Portfolio Companies.

the notice to a "reasonably wide group of prospective bidders," allow the auction to remain open for at least 30 days, and in all other respect conduct the auction on modified terms proposed by U.S. Bank.  (TPC ¶ 149.)

Following Judge Rakoff's order, U.S. Bank re-notice the auction for November 29, 2016.  (TPC ¶ 150.)  U.S. Bank then postponed the sale.  (TPC ¶ 150.)  On December 2, 2016, U.S. Bank re-noticed the auction for December 7, 2016.  (TPC ¶ 150.)  Thereafter, U.S. Bank uploaded materials, provided by AMZM, containing confidential information regarding the Portfolio Companies to a data room for potential bidders.  (TPC ¶¶ 139, 150.)

At a hearing on December 7, 2016, Judge Rakoff set the closing date for the auction as  December 21, 2016.  (TPC ¶ 150.)  On December 8, MBIA's liquidation agent, Duff and Phelps, distributed a Notification of Rescheduling of Disposition of Assets.  (TPC ¶ 150.)  Duff and Phelps, however, did not disburse a public bid package containing the complete terms of the sale.  (TPC ¶ 150.)  On December 20, 2016, Duff and Phelps circulated an email stating that the auction would proceed the next day along with a "[c]orrection" directing potential bidders to "refer to the attached Fourth Notice of Public Sale and Invitation to Bid" rather than the December 2, 2016 Third Notice of Public Sale and Invitation to Bid, which had been attached to a "[r]eminder" email also sent on December 20, 2016.  (TPC ¶151.)  Thus, bidders received the Fourth Notice of Public Sale and Invitation to Bid for the first time on the afternoon before the auction occurred.  (TPC ¶ 151.)  Over the Patriarch Parties' objection, the auction took place on December 21, 2016.  (TPC ¶ 151.)  MBIA won the auction with a no-cash, credit-only bid of approximately $148 million.  (TPC ¶152.)  The Patriarch Parties believe that equity in more than twenty Portfolio Companies was improperly included in the Zohar I auction and transferred by U.S Bank to MBIA.  (TPC ¶ 157.)

IV.     Procedural History and Related Cases

        In January 2017, the Zohar Funds commenced this action against the Patriarch

Parties, seeking a declaratory judgment over ownership of the Portfolio Companies, damages

from the Patriarch Parties, and asserting a claim against the Patriarch Parties under the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961et seq.. (See generally

Compl., ECF No. 1.)  In November 2017, the Patriarch Parties filed an answer, as well as

counterclaims and the third-party complaint addressed here. (See generally, TPC.)  In December

2017, the late Judge William H. Pauley, III, to whom the case was assigned dismissed the Zohar

Funds' RICO claim under Rule 12(b)(6), Fed. R. Civ. P., and declined to exercise supplemental

jurisdiction over the remaining claims.  Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC, 286

F. Supp. 3d 634, 657 (S.D.N.Y. 2017).

        On March 11, 2018, Tilton caused Zohar III to commence chapter 11 bankruptcy

proceedings in the United States Bankruptcy Court for the District of Delaware ("Delaware

Bankruptcy").  See In re Zohar III, Corp., No. 18-10512 (Bankr. D. Del.).  The parties eventually

entered into a settlement agreement to monetize the Zohar Funds' interests in the portfolio

companies, which expired on September 30, 2019.  (Settlement Agreement, ECF No. 130-1,

¶¶ 8, 10–12; ECF No. 141, at 2.)  On October 1, 2019, Tilton filed an equitable subordination

complaint in the Delaware Bankruptcy Court.  Thereafter, the Zohar Funds filed a motion to

transfer this case to the Delaware Court, in which the Third-Party Defendants joined.  Judge

Pauley denied that motion.  See Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC, 620 B.R.

456, 469 (S.D.N.Y. 2020).

DISCUSSION

I.     Legal Standard

On a motion to dismiss, a court accepts all facts alleged in the complaint as true and construes all reasonable inferences in a plaintiff's favor.  ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  Nevertheless, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted).  To survive a motion to dismiss, a court must find a plaintiff's claim rests on factual allegations that "raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." (quotation marks omitted)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

II.    Documents Incorporated by Reference

"When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken."  Silsby v. Icahn, 17 F. Supp. 3d 348, 354 (S.D.N.Y.2014) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002)), aff'd sub nom. Lucas v. Icahn, 616 F. App'x 448 (2d Cir. 2015).  Considering such material is an exception to the general rule that "[w]hen material outside the complaint is presented to and not excluded by the court, 'the motion shall be treated as one for summary

judgment.'" <u>Chambers</u>, 282 F.3d at 152 (quoting Fed. R. Civ. P. 12(d)).  But, as noted by the

Second Circuit, "[i]n most instances where this exception is recognized, the incorporated

material is a contract or other legal document containing obligations upon which the plaintiff's

complaint stands or falls, but which for some reason—usually because the document, read in its

entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the

complaint.  The exception thus prevents plaintiffs from generating complaints invulnerable to

Rule 12(b)(6) simply by clever drafting." <u>Glob. Network Commc'ns, Inc. v. City of New York</u>,

458 F.3d 150, 157 (2d Cir. 2006) (citation omitted).

       Here, the Patriarch Parties reference multiple documents containing alleged

misrepresentations and omissions, but do not attach those documents to the TPC.  In its motion

to dismiss, however, MBIA attaches the relevant documents.  (<u>See</u> Arnold Decl. Exs. I, J & K.)

The Patriarch Parties do not challenge that these are the documents to which the TPC refers, but

rather argue that this Court should not consider these documents, (Opp'n, at 27), citing

<u>Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.</u>, 367 F. Supp. 3d 16, 28

(S.D.N.Y. 2019).  But in <u>Oklahoma Firefighters</u>, the Court excluded certain documents in that

case because the complaint made only "a general allusion" to the proffered materials.  <u>Oklahoma</u>

<u>Firefighters Pension & Ret. Sys.</u>, 367 F. Supp. 3d at 28.  Such is not the case here, where the

Patriarch Parties' allegations of fraud directly quote—and cite—the materials attached by MBIA.

Because Arnold Decl. Exhibits I, J, and K are integral to the TPC, this Court may, and will,

consider them on this motion.

III.    <u>Counts 1–3: Common Law Fraud, Negligent Misrepresentation, and Promissory Estoppel</u>

       The Patriarch Parties' first volley of claims allege fraud, negligent

misrepresentation, and promissory estoppel against MBIA.  As alleged, each of these claims is

based on a series of misrepresentations and omissions that ultimately caused the Patriarch Parties to resign as collateral manager of the Zohar Funds.  The Patriarch Parties have made significant use of creative license in characterizing the statements but when the actual statements are scrutinized, they fail to state a plausible claim for relief.

> A.  <u>Common Law Fraud</u>

A New York common law fraud claim is defined as a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury.  <u>Suez Equity Invs., L.P. v. Toronto-Dominion Bank</u>, 250 F.3d 87, 104 (2d Cir. 2001).  Claims of common law fraud must satisfy the requirements of Rule 9(b).  <u>See Abercrombie v. Andrew Coll.</u>, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) ("Rule 9(b) extends to all averments of fraud or mistake." (quoting <u>Frota v. Prudential–Bache Secs., Inc.</u>, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986))).  As a result, in addition to providing a facially plausible claim to relief, the Patriarch Parties "must state with particularity the circumstances constituting fraud . . ."  Fed. R. Civ. P. 9(b).  Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," (Fed. R. Civ. P. 9(b)), the relaxation of the particularity requirement for conditions of mind must not be mistaken for a "license to base claims of fraud on speculation and conclusory allegations," <u>Acito v. IMCERA Grp., Inc.</u>, 47 F.3d 47, 52 (2d Cir. 1995) (quotation marks omitted).

Reviewing the alleged misstatements in context, it is evident why the Patriarch Parties chose not to attach Arnold Decl. Exhibits I, J, and K to the TPC.  To state a claim for fraud, the Patriarch Parties were required to plead a false representation or omission.  When viewed under the bright light of context, however, the Patriarch Parties' purported misstatements

and omissions reveal themselves as nothing more than a smoke-and-mirrors attempt to evade the particularity requirement of Rule 9(b).

First, the Patriarch Parties allege that MBIA, in October 2015, represented that even if they were to "resign from all of [their] roles in relation to Zohar I and II," MBIA would recognize that the Patriarch Parties would "retain [their] rights . . . in underlying portfolio companies." But this is simply not in the proposal. Instead, the proposal states: (1) that "[s]hould Patriarch fail to abide with this agreement, Patriarch shall immediately resign from all of its roles in relation to Zohar I and II, and the underlying obligors held by these entities: Collateral Manager . . ." and (2) that "[a]s long as Patriarch is in full compliance with [the proposed agreement], Patriarch or Lynn Tilton will retain their rights, as applicable, as equity holder of the funds and underlying portfolio companies." (Arnold Decl., Ex. I, at 2.) Nothing in the proposal contemplates the Patriarch Parties retaining ownership rights if they resign as collateral manager. And any representation related to the Patriarch Parties' ownership interest was conditioned on compliance with an agreement that was never consummated. While at the pleading stage this Court must "accept[] all facts alleged in the complaint as true and construe[] all reasonable inferences in a plaintiff's favor," ECA, 553 F.3d at 196, it "need not credit as true 'pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference,'" In re Express Scripts/Anthem ERISA Litig., 285 F. Supp. 3d 655, 679 n.34 (S.D.N.Y. 2018), aff'd sub nom. Doe 1 v. Express Scripts, Inc., 837 F. App'x 44 (2d Cir. 2020) (quoting Xin Wei Lin Chinese Staff & Workers' Ass'n, 2012 WL 5457493, at *4 (S.D.N.Y. Nov. 8, 2012)). As such, these allegations are insufficient to plead a false representation or omission.

Second, the Patriarch Parties claim that a February 1, 2016 statement by Judge Drain in the New York Bankruptcy gives rise to an actionable omission by MBIA. Specifically, the Patriarch Parties allege that MBIA "remained conspicuously and deceptively silent when Judge Drain summarized the parties' 'understanding' that, following Patriarch's resignation as collateral manager, 'Ms. Tilton, obviously, would remain in her positions with the underlying portfolio companies.'" (Opp'n, at 26.) This argument, however, ignores the context of the statement: the negotiation of an interim, non-final settlement "understanding." Indeed, Judge Drain's statements highlight the tentative nature of the "understanding," namely, that "[t]he parties . . . will meet promptly . . . to discuss implementing two things" and "[i]f the parties aren't able to agree on that promptly, I will very seriously entertain either party's request for mediation." (Arnold Decl. Ex. J. 128:6–9, 129:14–16.) In this context, the "understanding" is clearly conditional on reaching a final agreement. As the Patriarch Parties do not allege that a final agreement was ever reached, they fail to state a claim.

Finally, the Patriarch Parties quote a proposal sent by MBIA following the hearing with Judge Drain. Specifically, the MBIA proposal required, in part, that "Ms. Tilton and Patriarch agree to promptly resign as Collateral Manager of [the Zohar Funds] and simultaneously transfer, no later than March 1, 2016, the Collateral Manager positions for each Zohar fund to a new Collateral Manager mutually agreed upon by Ms. Tilton, Patriarch and MBIA" and "Patriarch Partners Agency Services, LLC will continue in its role as agent bank, and Ms. Tilton will retain all ownership, manager and/or board positions in the underlying portfolio companies." Again, context matters, and the fact that this is a proposal makes these conditional "[p]romises of future conduct," which are not actionable unless false at the time they are made. Murray v. Xerox Corp., 811 F.2d 118, 123 (2d Cir. 1987). The Patriarch Parties'

argument that the proposal was false when made because MBIA allegedly had no intent to recognize the Patriarch Parties' ownership interest is belied by the fact that the statement proposes to do just that, subject to certain conditions.  If the Patriarch Parties had agreed to this proposal, MBIA would have been obligated to recognize the Patriarch Parties' interests in the Zohar Funds.  That the Patriarch Parties apparently did not agree to MBIA's proposal does not mean MBIA committed fraud, rather, it indicates that the Patriarch Parties were unable to secure their preferred conditions in the negotiation.  The Patriarch Parties cannot pursue claims that seek to hold MBIA to terms of an agreement it never made.

In analyzing whether a fraud claim based on a representation conditioned on complying with an agreement that was never finalized, the facts of Murray, are instructive. There, plaintiff brought a fraud claim after he was promised a promotion if he moved from Ohio to Rochester, New York and worked at company headquarters for two to three years.  Murray, 811 F.2d at 122.  Plaintiff, however, failed to work in Rochester for the duration required by the alleged promise.  Murray, 811 F.2d at 122.  "[B]ecause the conditions of the promise were never fulfilled, [defendant's] obligation to [plaintiff] never matured."  Murray, 811 F.2d at 122.  Thus, the Second Circuit held that, even if there was a genuine fact issue as to whether a promise was made, the case would not survive a motion for directed verdict.  Murray, 811 F.2d at 122.  Here, even assuming MBIA made the representations alleged by the Patriarch Parties, those representations were always conditioned on, among other things, finalizing an agreement. [8] Because the parties never entered into such agreement, the Patriarch Parties fraud claim fails.

---

[8]     Specifically, the October 2015 statement was conditioned on Tilton paying $100 million of the Zohar I note obligations (Arnold Decl., Ex. I, at 4) and the February 2016 proposal required Tilton to resign as Collateral Manager by March 1, 2016.  (Arnold Decl., Ex. K, at 4.)

The Patriarch Parties also allege that MBIA made "other assurances," (TPC ¶ 122), but this vague allegation fails to meet the particularity requirement of under Rule 9(b). See, e.g., Katz v. Image Innovations Holdings, Inc., 2008 WL 762101, at *2 (S.D.N.Y. Mar. 24, 2008) ("Vague allegations of the content of misrepresentations made by a group of individuals over a period of months does not satisfy the requirements of Rule 9(b)."); Arista Techs., Inc. v. Arthur D. Little Enters., Inc., 125 F. Supp. 2d 641, 647 (E.D.N.Y.2000) (finding that "vague allegations of unstated misrepresentations, assurances, and efforts" are insufficient under Rule 9(b)).

Because the Patriarch Parties fail to plead a false statement or omission with the required particularity, this Court need not address the other elements of the fraud claims.

B. Negligent Misrepresentation

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.  See King v. Crossland Savs. Bank, 111 F.3d 251, 257–58 (2d Cir.1997) (citing Eiseman v. State of New York, 70 N.Y.2d 175, 187, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987); International Prods. Co. v. Erie R. Co., 244 N.Y. 331, 338, 155 N.E. 662 (1927)).

The Patriarch Parties claims for negligent misrepresentation for the same reasons as their fraud claim—the failure to plead a false representation.

The Court has examined the two specifically identified sources of statements---the term sheets provided in October 2015 and the statements and responses to statements in the proceedings before Judge Drain in February 2016. A close review shows that neither set of circumstances gives rise to a plausible allegation of a false statement.

The "other assurances" fair no better when alleged as negligent misrepresentations. "When a negligent representation claim, like this one, is based on the same facts as a fraud claim, it is subject to the heightened pleading standard of Rule 9(b)." Arthur Properties, S.A. v. ABA Gallery, Inc., 2011 WL 5910192, at *5 (S.D.N.Y. Nov. 28, 2011); see also SEC v. Egan, 994 F. Supp. 2d 558, 564 (S.D.N.Y. 2014) (quoting Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004)).

C.  Promissory Estoppel

"The elements of a claim for promissory estoppel under New York law are: (1) a clear and unambiguous promise; (2) upon which the plaintiff reasonably and foreseeably relied; (3) to the plaintiff's detriment." Amida Cap. Mgmt. II, LLC v. Cerberus Cap. Mgmt., L.P., 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (citing Cyberchron Corp. v. Calldata Sys. Dev., 47 F.3d 39, 44 (2d Cir. 1995)).

The statements upon which the Patriarch Parties rely are neither "clear" nor "unambiguous promises." Each statement, or omission, was made in the context of a tentative agreement and are, thus, non-actionable. "Under New York law, there can be no 'clear and unambiguous promise' where the promise is explicitly made conditional or contingent on some future event." Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 510 (S.D.N.Y. 1994) (citing In re Gulf Oil/Cities Service Tender Offer Lit., 725 F. Supp. 712, 735 (S.D.N.Y.1989)). Here,

the future events were reaching final agreements related to the Zohar I restructuring and in the New York Bankruptcy.  As neither event occurred, the alleged promises are non-actionable.

IV.    Counts 4 & 5: Breach of Fiduciary Duty Against AMZM, MBIA, and the Zohar III Controlling Class

The Patriarch Parties next alleges breaches of fiduciary duty by AMZM, MBIA, and the Zohar III Controlling Class.  The elements of a claim for breach of fiduciary duty are: "(1) a fiduciary relationship between the parties and (2) the fiduciary duty has been breached." Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 465 (S.D.N.Y. 2009).  "A cause of action for breach of fiduciary duty may survive, for pleading purposes, where the complaining party sets forth allegations that, apart from the terms of the contract, [an] underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone." EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31 (2005).

In essence, the Patriarch Parties allege that these defendants breached various duties owed to the Zohar Funds, and by extension, to the Patriarch Parties as the preference shareholder of those funds.  The Third Party Complaint expressly alleges that the Patriarch Parties are "noteholders and preference shareholder of the Zohar Funds. . . ." (TPC ¶ 231).[9]  But, because the alleged breached duties and resulting harms impact the Zohar Funds directly, they are derivative claims owned by the Zohar Funds, which are currently in bankruptcy proceedings

---

[9]    Whether the Patriarch Parties are noteholders or preference shareholder of the funds is immaterial.  In either case their claim is derivative of the rights of the Zohar Funds.  Howe v. Bank of New York Mellon, 783 F. Supp. 2d 466, 475 (S.D.N.Y. 2011) ("[T] the cases cited by plaintiff make clear that bondholders may not bring derivative suits in order to vindicate "their own individual rights as bondholders.")  As such, the Patriarch Parties may not bring an action on behalf of the Zohar Funds.  The Indentures provide that "All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee . . ." Zohar I Indenture Section 5.6.  And that the Controlling Party (MBIA for Zohar I and Zohar II) may direct such an action.  Zohar I Indenture Section 5.13.

in Delaware.  See In re Zohar III, Corp., No. 18-10512 (Bankr. D. Del.)).  As a result, the proper

forum for such claims is the Delaware Bankruptcy.

However, if a claim is derivative, then a shareholder—such as the Patriarch

Parties—may not have standing to bring a claim.  The Zohar Funds are organized under the laws

of the Cayman Islands.  (See Adams Decl. Ex. 1 (Zohar I Indenture), Ex. 2 (Zohar II Indenture),

Ex. 3 (Zohar III Indenture).  Under Cayman law, "derivative claims are owned and controlled by

the company, not its shareholders" and, thus, "a shareholder is not permitted to bring a derivative

action on behalf of that company."  Davis v. Scottish Re Grp. Ltd., 160 A.D.3d 114, 116 (1st

Dep't 2018) (quotation omitted).  There are "only four narrow exceptions" to Cayman law's

prohibition against derivative claims: "(1) if the conduct infringed on the shareholder's personal

rights; (2) if the conduct would require a special majority to ratify; (3) if the conduct qualifies as

a fraud on the minority; or (4) if the conduct consists of ultra vires acts."  Davis, 160 A.D.3d at

116 (quotation omitted).

"In assessing whether a claim is derivative, Cayman Islands law 'looks to whether

the shareholder's loss is merely "a reflection of the loss suffered by the company'" and "would

be made good if the company enforced its full rights against the party responsible.""" In re CIL

Ltd., 2018 WL 1989436, at *5 (Bankr. S.D.N.Y. Apr. 25, 2018) (quoting Davis v. Scottish Re

Grp. Ltd., 138 A.D.3d 230, 234 (1st Dep't 2016) (quoting Johnson v. Gore Wood & Co., [2002]

2 AC 1 [HL], 36 (UK)) rev'd on other grounds 88 N.E.3d 892 (2017)).  Accordingly,

> [u]nder Cayman law, shareholders may not recover 'reflective
> losses,' which are losses that the company itself could recover if it
> chose to initiate legal action.  The Cayman courts have held that
> [w]here a company suffers loss caused by a breach of duty owed to
> it, only the company may sue in respect of that loss.  No action lies
> at the suit of a shareholder suing in that capacity and no other to
> make good a diminution in the value of the shareholder's
> shareholding where that merely reflects the loss by the company . .

. there is no discretion involved.  A shareholder cannot sue in a personal capacity for a loss unless that loss is distinct from that of the company, and this rule applies regardless of whether the company itself intends to sue.

Davis, 138 A.D.3d at 234 (citations omitted).

Thus, this Court must determine if the Patriarch Parties' fiduciary claims are derivative.  If they are, as this Court previously held, "[b]ecause these derivative claims would belong to the Zohar Funds and the Zohar Funds are in Chapter 11, those claims must be adjudicated in Bankruptcy."  Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC, 2020 WL 5600851, at *6 (S.D.N.Y. Sept. 18, 2020) (citing In re WorldCom, Inc., 323 B.R. 844, 857 (Bankr. S.D.N.Y. 2005)); see also Mitchell Excavators, Inc. ex rel. Mitchell v. Mitchell, 734 F.2d 129, 131 (2d Cir. 1984).

A. AMZM

The Patriarch Parties' first fiduciary duty claim against AMZM alleges that AMZM attempted to remove Tilton from her positions at the Portfolio Companies in order to effect a "fire-sale" of the Portfolio Companies—"contrary to the interests of the Zohar funds and their ultimate owner." (TPC ¶ 203.)  As an initial matter, the Patriarch Parties have not alleged any harm occurred as a result of the "attempted" removal of Tilton.  Regardless, any loss caused by this alleged breach would be suffered by the Zohar Funds and the Patriarch Parties would only suffer a loss as a result of the Zohar Funds' loss.  Because "a shareholder cannot sue in a personal capacity for a loss unless that loss is distinct from that of the company," this claim is dismissed as derivative.  Davis, 138 A.D.3d at 234.

The Patriarch Parties' next fiduciary duty claim is that AMZM breached its duty "to the Funds" by failing to issue financial reports as required by the Indenture.  (TPC ¶ 204.) This allegedly harmed the Patriarch Parties by depriving them of information necessary to value

the Portfolio Companies.  (TPC ¶ 204.)  But the duty to publish financial reports under the

Indentures is owed by the Zohar Funds—not AMZM.  (Declaration of Blair Adams, ECF No.

193 ("Adams Decl."), Ex. 1 (Zohar I Indenture), § 10.13; Ex. 2 (Zohar II Indenture), § 10.13;

and Ex. 3 (Zohar III Indenture), § 10.10.)[10]  Regardless, even if AMZM were required to publish

the reports, this claim is also derivative.  The Patriarch Parties acknowledge as much in claiming

AMZM breached its duty to the Zohar Funds.  See Davis, 138 A.D.3d at 234 ("[S]hareholders

may not recover 'reflective losses,' which are losses that the company itself could recover if it

chose to initiate legal action." (citations omitted)).

The Patriarch Parties final two fiduciary claims against AMZM, that AMZM

breached its duty to the Zohar Funds by spending money on lawsuits and that it enabled U.S.

Bank to provide prospective bidders for the Zohar Funds with sensitive business information,

also fail to plead a non-derivative claim.  In each instance, the alleged duty was to the Zohar

Funds.  And any damages from the alleged breached would flow through the Zohar Funds before

harming the Patriarch Parties.  As a result, both claims are derivative.  See Davis, 138 A.D.3d at

234.

B.  MBIA and the Zohar III Controlling Class

The Patriarch Parties' fiduciary claims against MBIA and the Zohar III

Controlling Class fair no better.  In essence, the Patriarch Parties claim that MBIA and the Zohar

III Controlling Class directed AMZM's alleged fiduciary breaches, and as a result, breached the

fiduciary duties each owed to the Patriarch Parties.  The Patriarch Parties also claim that MBIA

---

[10]      This Court may consider the Indentures on this motion as they are referenced and relied upon in the TPC.
See Silsby, 17 F. Supp. 3d at 354.

breached its fiduciary duty by directing U.S. Bank to conduct a "sham auction" of the Zohar I collateral to the detriment of Zohar I.

As discussed above, the fiduciary claims against AMZM are derivative. As a result, the claims against MBIA and the Zohar III Controlling Class based on those claims are also derivative. Likewise, the Patriarch Parties claim regarding the auction is dismissed as derivative as it alleges direct harm only to Zohar I. See Davis, 138 A.D.3d at 234.

In an effort to avoid this result, the Patriarch Parties assert that they have derivative standing based on the exception for a fraud on the minority. This argument is meritless. That exception applies against defendants who (1) "controlled a majority of the stock with voting rights" in a company and (2) "committed fraud" against minority investors. Davis, 160 A.D.3d at 114. Here, as the Patriarch Parties own all of the preference shares in the Zohar Funds, the exception is inapplicable, and even then, the Patriarch Parties fail to allege any fraud. (See Section I.)

V.      Counts 6–9: Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Violations of the N.Y. U.C.C. Against MBIA and U.S. Bank

Counts 6–9 & 19 of the TPC claim that MBIA and U.S Bank breached the Indenture, breached the Indenture's implied covenant of good faith and fair dealing, and breached certain provisions of the New York Uniform Commercial Code ("N.Y. U.C.C.") on the grounds that the method, time, place, manner, and terms of the Zohar I Auction were not commercially reasonable. (See TPC ¶¶ 228–29 (Count 6), 240 (Count 7), 254 (Count 8), 257 (Count 9), 319 (Count 19).) None of the Patriarch Parties' claims related to the Zohar I Auction are plead with sufficient plausibility to state a claim.

The parties dispute the nature and import of Judge Rakoff's ruling permitting the Zohar I Auction to proceed with judicially imposed modifications. (16 cv 7128 (JSR) (Doc 76).)

MBIA argues that Judge Rakoff's decision means that the auction was per se reasonable under N.Y. U.C.C. § 9-227(c)(1), which states that "[a] collection, enforcement, disposition, or acceptance is commercially reasonable if it has been approved . . . in a judicial proceeding."  The Patriarch Parties counter that an amendment in the N.Y. U.C.C. removing the word "any" from before "judicial proceeding" means that decisions in a preliminary injunction proceeding are insufficient to trigger per se commercial reasonability under the U.C.C.[11]

The proceeding before Judge Rakoff certainly was a "judicial proceeding" under the common meaning of the words. Indeed, Black's Law Dictionary defines a judicial proceeding as "[a]ny court proceeding; any proceeding initiated to procure an order or decree, whether in law or in equity."  (Black's Law Dictionary (11th ed. 2019).)

"The central dispute at issue" in the case before Judge Rakoff "was the commercial reasonableness vel non of the Auction. . . ."  Patriarch Partners, 2017 WL 3822603, at *3 (S.D.N.Y. Aug. 28, 2017). After a nine-hour evidentiary hearing, Judge Rakoff vacated the temporary restraining order, denied a preliminary injunction and specifically ordered the parties to proceed with the auction with judicially imposed modifications.  Patriarch Partners, 2017 WL 3822603, at *6 (S.D.N.Y. Aug. 28, 2017).  The commercial reasonableness of a prospective auction is likely to be adjudicated in the context of an application for preliminary relief and not at a full trial on the merits.  This Court rejects Patriarch Partners argument that the terms of the auction as modified by Judge Rakoff were not approved in a proper judicial proceeding.  Under the terms of N.Y. U.C.C. § 9-227(c)(1), the proceeding before Judge Rakoff and his Order

---

[11]   U.S. Bank argues that while the ruling does not make the auction per se reasonable, the Patriarch Parties have failed plead facts to show it was unreasonable.  (Third-Party Def. U.S. Bank Nat'l Assoc.'s Mem. of Law in Supp. of its Mot. to Dismiss the Third-Party Compl., ECF No. 186 ("U.S. Bank Br."), at 2.)

foreclose Patriarch Parties attack on the commercial reasonableness of the auction as to any matter that was raised or could have been raised in that proceeding.

But even if that were not the case and the commercial reasonableness were still open to challenge, The Patriarch Parties have not plead facts sufficient to state a claim that the Zohar I auction was commercially unreasonable. The closest Patriarch Parties come to asserting facts to support a claim of unreasonableness is the assertion that "[t]he auction was conducted in a commercially unreasonable manner as a result of U.S. Bank's actions, at MBIA's direction, in the months preceding the sale." (TPC ¶ 153.) These "actions" appear to be a series of rescheduled action dates culminating in the December 21, 2016 Zohar I Auction, which the Patriarch Parties allege took place with one-days' notice.[12] [13] (TPC ¶¶ 151, 153.) Critically, however, the Patriarch Parties do not identify a single potential bidder who was not notified of the auction, was confused by the shifting dates, or was prevented from bidding as a result of the notice issue. Instead, the Patriarch Parties speculate that the changes in auction date and notice issue "dampen[ed] bidder interest and undermin[ed] bidders' opportunit[ies] to properly evaluate the assets." (TPC ¶ 153.) But to survive a motion to dismiss, this Court must find the claim rests on factual allegations that "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. Absent more, the Patriarch Parties fail to state a claim that the Zohar I Auction was commercially unreasonable. Further, because the Patriarch Parties have failed to adequately and plausibly plead that the Zohar I Auction was commercially unreasonable, N.Y. U.C.C. § 9-615(d)(1) is unavailable as a remedy. See Citibank, N.A. v. Solow, 939 N.Y.S.2d 361, 362–63

---

[12]    The Patriarch Parties also complain about the original terms of the auction, but ultimately concede that the auction took place on terms that "acceded" to some of Tilton's demands "and in all other respects . . . on the modified terms proposed by U.S. Bank." (TPC ¶ 149.) The Patriarch Parties raise no specific issues with these terms.

[13]    The Patriarch Parties confusingly allege that the disclosure of confidential information to bidders in the Zohar I auction somehow rendered the auction commercially unreasonable (the exact logic of this argument is unexplained).

(1st Dep't 2012) (finding that where a sale of collateral to a secured party was commercially reasonable, a debtor cannot rely on U.C.C. § 9-615(f), because "while the statute refers to 'calculation,' it addresses the commercial reasonableness of the sale price").

The Patriarch Parties' contract and U.C.C. claims are separately subject to dismissal because the claims of damages and breach of N.Y. U.C.C. § 9-615 stemming from the Zohar I auction are contradicted by the Patriarch Parties own actions.  Under the terms of the Indenture, Octaluna possessed "last look" rights, which enabled it to submit a higher bid than the winning bid submitted by MBIA.  Octaluna did not exercise this right.  If, as plead, the auction resulted in a "fire-sale" of the Zohar I collateral, one would expect that the Patriarch Parties would have submitted a bid exceeding MBIA's by some nominal amount and acquired the Zohar I collateral to the Patriarch Parties' benefit.  To state a claim pursuant to U.C.C. § 9-615, a party must plead that after a disposition of collateral, a secured party failed to "account to and pay a debtor for any surplus."  U.C.C. § 9-615(d)(1).  But if such a surplus existed, it is implausible that Octaluna would not exercise its last looks rights.

## VI.   Count 19: Books and Records Claim Against U.S. Bank

Count 19 also alleges that U.S. Bank refused to permit Patriarch to inspect its books and records relating to the Zohar Funds, despite Patriarch's contractual right to do so. (TPC ¶ 319.)  U.S. Bank argues that this claim should fail because (1) the TPC does not specify the exact provision under which Patriarch claims the contractual right to inspect the Zohar Funds books and records and (2) that the claim lacks "factual support."  (U.S. Bank Br., at 16 n.10.)

"At the pleading stage, a plaintiff alleging breach of contract must, 'at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.'"  Lan Sang v. Ming Hai, 951 F. Supp. 2d 504, 527

(S.D.N.Y. 2013) (quoting Zaro Licensing, Inc. v. Cinmar, Inc., 779 F. Supp. 276, 286 (S.D.N.Y.1991)).  Here, the Patriarch Parties plead that the terms of the Indenture required U.S. Bank to provide access to the Zohar Funds books and records.  "Reference to a specific contractual provision may sometimes be necessary to put the defendant on notice.  Other times it may not."  First Solar, Inc. v. Absolute Process Instruments, Inc., 2018 WL 1166632, at *5 (S.D.N.Y. Feb. 8, 2018).  And although the Patriarch Parties declined to identify the specific provision in the TPC, in their opposition brief they point to Section 6.1(f), which requires U.S. Bank, as trustee, to "permit any representative of a Holder of a Note . . . to examine all books of account and records, reports and other papers of the Trustee relating to the Notes."  (Zohar I Indenture § 6.1(f)).  But regardless of when the Patriarch Parties identified the provision, these allegations are not so vague as to deprive U.S. Bank of sufficient notice to defend these claims. See generally, First Solar, 2018 WL 1166632, at *5 ("the question is not whether the plaintiff has pointed to the specific provision it believes was breached; rather, the question is whether the allegations, taken as a whole, give the defendant fair notice of what the claim is and the grounds upon which it rests." (quotation marks omitted)).

U.S. Bank's next argument, that the allegations lack "factual support" is without merit.  Here, Patriarch alleges a contract between it and U.S. Bank, alleges that the contract required U.S. Bank to allow Patriarch to inspect the books and records of the Zohar Funds, and that, upon the Patriarch Parties' request to inspect such books and records, U.S. Bank refused.  If such a contractual right exists as plead, U.S. Bank's refusal would constitute a breach of contact. The Patriarch Parties have sufficiently plead a breach of the Zohar I Indenture in U.S. Bank's failure to comply with their demand to inspect the Zohar Funds' books and records.

VII.     Counts 10–12: Conversion, and Trespass to Chattels, Against MBIA and
         Aiding and Abetting Conversion against U.S. Bank

Counts 10 and 12 of the TPC allege conversion and trespass to chattels, based on

the allegations that U.S. Bank, at MBIA's direction, ran a commercially unreasonable auction.

Because, as discussed above, the Patriarch Parties fail to adequality plead that the Zohar I

Auction was commercially unreasonable, they cannot state a claim for conversion or trespass to

chattels.

Additionally, New York law is clear that "a cause of action for conversion cannot

be predicated on a mere breach of contract."  Fesseha v. TD Waterhouse Investor Services, Inc.,

761 N.Y.S.2d 22, 24 (1st Dep't 2003); accord Johnson v. Cestone, 80 N.Y.S.3d 15, 17 (1st Dep't

2018).  The Patriarch Parties' conversion claims are based on contract.  As a result, these claims

would still be dismissed, even if they had plead sufficient facts to show a commercially

unreasonable auction.

Count 11 of the TPC alleges U.S. Bank aided and abetted MBIA's conversion.

To state a claim for aiding and abetting conversion, plaintiffs must allege (1) the existence of a

primary violation; (2) actual knowledge of this violation on the part of the aider and abettor; and

(3) substantial assistance by the aider and abettor in the achievement of the primary violation.

Kirschner v. Bennett, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009).  As the Patriarch Parties have

not pled a primary violation, their claim of aiding and abetting conversion against U.S. Bank is

dismissed.

VIII.    Counts 14: Breach of Indenture and CMA

Count 14 of the TPC alleges that AMZM, as collateral manager, breached its

duties under the Indentures and CMAs to issue regular financial reports.  (TPC ¶ 283(a).)  While

the Patriarch Parties did not attach the Indentures or CMAs to the TPC, AMZM appended them

to its motion to dismiss.  (Adams Decl. Ex. 1 (Zohar I Indenture), Ex. 2 (Zohar II Indenture), Ex.

3 (Zohar III Indenture), Ex. 4 (Zohar I CMA), Ex. 5 (Zohar II CMA), Ex. 6 (Zohar III CMA).)

As these documents are referenced and relied upon in the TPC, this Court may consider them.

See Silsby, 17 F. Supp. 3d at 354.

The Patriarch Parties first argue that AMZM was required to produce monthly

reports based on the CMAs and CAAs.[14]  But the Patriarch Parties fail, despite their best efforts,

to identify any provision of the Indentures, CMAs, or CAAs that require AMZM to create and

issue such reports.

The Patriarch Parties point to Section 2.2(f) of the CMA, which states that

AMZM is required to "prepare and deliver such information, reports, schedules and other data

that is required to be prepared and/or delivered by the Collateral Manager under the Indenture

and Section 2 of the Collateral Administration Agreement, as applicable."  (Zohar I CMA

§ 2.2(f).)  The Patriarch Parties do not claim that the Indentures require AMZM to deliver such

reports.  Instead, they argue that Section 2(a) of the CAA creates the requirement.  But that

provision only restates the obligation of Zohar I to issue the reports, stating: "The Collateral

Administrator [i.e. U.S. Bank] shall assist the Collateral Manger [i.e. AMZM] in connection with

. . . providing to [Zohar I] certain reports, schedules and other data which [Zohar I] is required to

prepare and deliver under Art. 10 of the Indenture."  (Zohar I CAA § 2(a) (emphasis added).)

Further, section 2(h) of the CAA states that "[t]he Collateral Manager shall cooperate with the

---

[14]    AMZM also attached the relevant CAAs.  (See Declaration of Blair Adams In Supp. of AMZM's Reply
Memorandum of Law ("Adams Reply Decl."), Ex 1 (Zohar I CAA); Ex. 2 (Zohar II CAA), and Ex. 3 (Zohar III
CAA).  These documents are referenced and relied upon in the TPC, and as a result, this Court may consider them).
See Silsby, 17 F. Supp. 3d at 354.  As each CAA contains essentially identical language, this Court cites the Zohar I
CAA in its analysis rather than citing in triplicate.

Collateral Administrator in connection with the preparation <u>by the Collateral Administrator</u> of the monthly reports . . . ."  (Zohar I CAA § 2(h) (emphasis added).)  And, Section 2(b) provides: "[t]he Collateral Administrator shall perform the following functions . . . (vii) Prepare and arrange for the delivery in accordance with the Indenture of each Monthly Report, Note Valuation Report, Noteholder Report . . . ." (Zohar I CAA § 2(b).)  Finally, under the Zohar I Indenture Section 10,[15] the Issuers—the Zohar Funds—are responsible for delivery of the reports.  (<u>See</u> Zohar I Indenture § 10.13(a) ("The Issuer shall compile and provide to . . . the Collateral Manager [among other parties] and the Holders of the Notes … a monthly report."); Zohar I Indenture § 10.13(b) ("The Issuer shall render an accounting (the "Note Valuation Report") determined as of each Determination Date, and made available to . . . the Collateral Manager [among other parties] and the Holders of Notes . . . .").)  Accordingly, as the Collateral Administrator—U.S. Bank—was required to prepare and arrange for delivery of the reports, and the Zohar Funds were required to deliver such reports, AMZM cannot be held labile for not preparing or delivering them.

In their opposition, the Patriarch Parties also argue that Zohar I CMA Section 2.5 required AMZM to issue the reports.  That provision confers on AMZM "[t]o the extent necessary or appropriate . . . the power to execute and deliver all necessary, desirable and appropriate documents and/or instruments in the name and on behalf of [Zohar I]."  (Zohar I CMA § 2.5.)  The provision addresses AMZM's power to execute and deliver documents on behalf of the Zohar Funds.  It does not shift the obligation placed upon the Issuers, i.e. the Zohar Funds, under section 10 of the Indentures to "compile and provide" and "render an accounting" of specified information.

The Patriarch Parties next argue that AMZM breached the Zohar I Indenture and CMA by providing confidential information to U.S. Bank, which U.S. Bank then provided to

---

[15]     The Zohar II and III Indentures contain identical provisions.

prospective bidders in the Zohar I collateral auction. The Zohar I CMA provides that AMZM "shall, and shall endeavor to cause its and its Affiliates employees . . . that are provided with confidential information . . . to keep confidential information obtained in connection with this Agreement," and that both AMZM and its Affiliates "shall not disclose any such information to non-affiliated third parties." (Zohar I CMA § 6.4.) However, it was U.S. Bank, not AMZM that provided the confidential information. (TPC ¶ 150.) The Patriarch Parties do not dispute this fact, instead, they allege that AMZM and U.S. Bank are "Affiliates," as defined in the Indenture, because both acted at the direction of MBIA. And because U.S. Bank and AMZM were Affiliates, AMZM had a duty to "endeavor to cause [U.S. Bank] . . . to keep confidential information obtained in connection with [the CMA]. (Zohar I CMA § 6.4.) Section 1.1 of the Zohar I Indenture defines Affiliate as "any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person . . . . For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise." (Zohar I CMA § 1.1.) But, even if U.S. Bank and AMZM could be "Affiliates" of MBIA, the Patriarch Parties have not plead that U.S. Bank was an "Affiliate" of AMZM. As AMZM's duties regarding confidential information extended only to "its" "Affiliates," the Patriarch Parties have not established that AMZM was under an obligation to endeavor to prevent U.S. Bank from providing prospective bidders with allegedly confidential information.

Finally, the Patriarch Parties allege that AMZM breached the Zohar I CMA, first, by failing to "manage the Collateral to maximize the repayment to [noteholders]," (Zohar I CMA

§ 2.2(p)), by "allowing MBIA to take measures to ensure that any value in the Zohar I and II collateral would inure to MBIA's benefit at the expense and to the detriment of the noteholders, the portfolio companies, their stakeholders, and Ms. Tilton," (TPC ¶ 283), and second, by taking "action[s] which it knows or should be reasonably expected to know . . . would . . . adversely affect the interests of the holders of the Securities," (Zohar I CMA § 2.6).

The TPC does not include any allegations pertaining to actions taken with respect to the Zohar II collateral.  Rather, the Patriarch Parties merely speculate that "MBIA plans to orchestrate the same sham 'collateral' auction process with Zohar II's assets."  (TPC ¶ 160.) Such speculation is insufficient to state a claim for breach of the CMAs.  See Twombly, 550 U.S. at 555 (2007) (court must find the claim rests on factual allegations that "raise a right to relief above the speculative level.")

Regarding the Zohar I collateral, it is undisputed that, upon default, MBIA became the controlling party of Zohar I and was entitled to direct an auction of the Zohar I collateral.  (TPC ¶¶ 144–45.)  The Patriarch Parties allege no provision under the CMA that would allow AMZM to prevent, or otherwise "take measures" to prevent, MBIA from exercising its rights under the Zohar I indenture.  As such, the TPC fails to state a claim based on these allegations.

Next, the Patriarch Parties allege that AMZM breached its duties by aiding MBIA, including through prosecuting various "sham" litigations, attempting to remove Tilton from her positions at the Portfolio Companies, and participating in MBIA's "scheme" to steal the Portfolio Companies' equity for itself.  The Patriarch Parties argue that because the pleading standard is "liberal" at this stage, such conclusory allegations are sufficient.  (Opp'n at 66.)  But

the Patriarch Parties' allegations must be at least "plausible on its face."  Iqbal, 556 U.S. at 678

(quoting Twombly, 550 U.S. at 570).

Here, the Patriarch Parties have not plausibly alleged that the litigations brought

on behalf of the Zohar Funds are "sham" litigations.  First, the AMZM and the Zohar Funds were

successful in both the books and records suit and the Delaware 225 action.  See Zohar CDO

2003-1, LLC v. Patriarch Partners, LLC, 2016 WL 6248461 (Del. Ch. Oct. 26, 2016), aff'd 165

A.3d 2088 (Del. 2017) (books and records) and Zohar II 2005-1, Ltd., 2017 WL 5956877, at *39

(Section 225 action).  A party successfully vindicating its rights can hardly be considered

frivolous or a "sham."  Finally, the Patriarch Parties allege that the instant litigation is a "sham."

But even though the underlying claims were dismissed, this Court specifically noted that "though

this Court has concluded that some of those predicate acts run afoul of the RICO Amendment,

such a determination does not render the claim immaterial, insubstantial, or frivolous."  Zohar

CDO 2003-1, Ltd., 286 F. Supp. 3d at 652 n.9.  Indeed, most of the claims in the instant

litigation were dismissed due to lack of subject matter jurisdiction, not on the merits.  While the

Patriarch Parties repeatedly label these as "sham" litigations, "[a] pleading that offers mere labels

and conclusions . . . will not do.''  Iqbal, 556 U.S. at 677 (quotation marks omitted).

Further, merely claiming that AMZM "attempted" to remove Tilton from her

positions does not state a plausible claim for relief.  As alleged, Tilton was never removed by

AMZM's actions.  As a result, even if her removal was to the detriment of holders of Securities

in Zohar I, AMZM never finalized the breach nor were the Portfolio Companies damaged.

Finally, AMZM's alleged "participat[ion]" in MBIA's "scheme" amounts to no

more than AMZM pursing litigation with the Patriarch Parties over the ownership of the

Portfolio Company equity and attempting to remove Tilton from her positions at the Portfolio Companies.  As this claim merely rehashes the first two claims, it also fails.

IX.  <u>Count 16: Breach of the Duty of Good Faith and Fair Dealing Against AMZM</u>

Count 16 of the TPC alleges that AMZM breached its duty of good faith and fair dealing for engaging in the same alleged conduct as the breach of contract claim in Count 14. (<u>Compare</u> TPC ¶¶ 276–87 <u>with</u> ¶¶ 294–302.)  Where a plaintiff's breach of duty of good faith and fair dealing claim is based on the same facts as its breach of contract claim, it should be dismissed as duplicative.  <u>See</u> <u>L-7 Designs, Inc. v. Old Navy, LLC</u>, 647 F.3d 419, 434 (2d Cir. 2011) ("Because [plaintiff]'s claim for breach of the implied covenant of good faith and fair dealing . . . is based on the same facts as its claim for breach of contract, it should have been dismissed as redundant.").  As Count 16 is duplicative of Count 14, it is dismissed.

Separately, tIf the Patriarch Parties are seeking to use the implied covenant to insert a contractual duty not set forth in the written agreement, its efforts also fail.  he implied covenant of good faith and fair dealing cannot be employed to create this contractual duty where it otherwise does not exist.  <u>Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.</u>, 976 F.3d 239, 248 (2d Cir. 2020) ("[U]nder New York law, the covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties."); <u>Broder v. Cablevision Sys. Corp.</u>, 418 F.3d 187, 199 (2d Cir. 2005) (same).  Here, the Patriarch Parties seek to impose on AMZM the affirmative duty of issuing monthly financial reports.  However, the relevant contracts create no such affirmative duty for AMZM.  Accordingly, this Court will not allow the Patriarch Parties may not engage in <u>ex post facto</u> revisions of the relevant contracts using the implied covenant of good faith and fair dealing.

X.      Count 17: Tortious Interference

Count 17 alleges tortious interference against MBIA and the Zohar III Controlling Class.  Specifically, the Patriarch Parties argue that MBIA and the Zohar III Controlling Class tortiously interfered with the AMZM's contractual duties under the CMAs.  (TPC ¶ 306–07.)

Under New York law, "the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'"  Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (quoting Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1375 (N.Y. 1996).  As described above, the Patriarch Parties have not adequately plead an "actual breach of contract" by AMZM. Accordingly, the tortious interference claims are dismissed.

XI.     Count 15: Equitable Accounting

To obtain an accounting under New York law, a plaintiff must show: "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal."  IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009).

Because AMZM is no longer the collateral manager, the equitable accounting claim against it is moot.  The Patriarch Parties agree.  (See Opp'n, at 79 n.33.)  The claim against the Zohar Funds is stayed under the automatic stay.  (See Notice of Commencement of Chapter 11 Cases and Automatic Stay, ECF No. 126.)  Thus, the only live claim is against U.S. Bank.

38

This claim is duplicative of the Patriarch Parties' contract claim. "New York courts have dismissed equitable accounting claims where, as here, the plaintiff asserts a breach of contract claim seeking similar relief." Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC, 159 F. Supp. 3d 324, 340 (E.D.N.Y. 2016); see also Herbert H. Landy Ins. Agency, Inc. v. Navigators Mgmt. Co., 2015 WL 170460, at *2 (S.D.N.Y. Jan. 13, 2015) ("Plaintiff's breach of contract claim precludes the related claim for an accounting . . . because an equitable accounting claim cannot coexist with a breach of contract claim covering the same subject matter." (quotation marks omitted)). Where a plaintiff can resort to an action in contract, they cannot also claim that there is no adequate legal remedy. Here, the Patriarch Parties allege that U.S. Bank refused to provide the Patriarch Parties "full and complete financial information about the Funds and their cash flows and distributions" as well as access to the Zohar Funds' books and records. (TPC ¶ 292.) Accordingly, this claim is covered by the contract claim in Count 19 and is dismissed as duplicative.

XII.     Count 18: Breach of Fiduciary Duty Against U.S. Bank

The Patriarch Parties' claims against U.S. Bank for breach of fiduciary duty also mirror its claims for breach of contract. First, the Patriarch Parties' fiduciary duty claims against U.S. Bank regarding the Zohar I Auction fail for the same reasons as its contract claims: the failure to plead a plausible underlying breach. (See Section III.) Second, the Patriarch Parties' claim that U.S. Bank breached its fiduciary duty to the Patriarch Parties by refusing access to the Zohar Funds' books and records. (TPC ¶ 315.) U.S. Bank argues that this claim fails because, where "the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative." Bayerische Landesbank v. Aladdin Capital Mgmt.

LLC, 692 F.3d 42, 58 (2d Cir. 2012); see also Ellington Credit Fund, Ltd. v. Select Portfolio

Servicing, Inc., 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011) (finding where claim "simply restates,

in nearly identical words, the breach of contract claim," the claims are redundant because "any

fiduciary duty here would be derived directly and exclusively from [the] contractual relationship

with [P]laintiffs" (quotation marks omitted)).  But, under New York law, "[i]t is well settled that

the same conduct which may constitute the breach of a contractual obligation may also

constitute the breach of a duty arising out of the relationship created by contract but which is

independent of the contract itself."  Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 167–68

(1st Dep't 1987); see also Davis v. Dime Sav. Bank of New York, FSB, 158 A.D. 2d 50 (3d

Dep't 1990) (same).

        Here, the Patriarch Parties argue that U.S. Bank, as trustee, owed fiduciary duties

to the Zohar I noteholders, including the Patriarch Parties.  (Opp'n, at 73–74.)  Section 6.17 of

the Zohar I Indenture, titled "Fiduciary for Noteholders Only; Agent for the Credit Enhance and

Collateral Manager," supports these allegations.  Thus, while the Indentures, as alleged,

contractually required U.S. Bank to make available the Zohar Funds' books and records, as

pleaded, U.S. Bank also owed the Patriarch Parties an independent fiduciary duty that required

U.S. Bank to make the same records available.  As a result, the Patriarch Parties have adequately

stated a claim that U.S. Bank breached its fiduciary duties in refusing to allow the Patriarch

Parties to review the Zohar Funds' books and records.

XIII.     Count 20: Aiding and Abetting Breach of Fiduciary Duty

        Count 20 of the TPC alleges that MBIA, AMZM, U.S. Bank, and the Zohar III

Controlling Class knowingly aided and abetted each other's breaches of their fiduciary duties.

(TPC ¶ 323.)  Where a plaintiff fails to plead a primary breach of fiduciary duty, it likewise fails

to plead a claim of aiding and abetting that breach.  See OFSI Fund II, LLC v. Can. Imperial Bank of Com., 920 N.Y.S.2d 8, 11 (App. Div. 1st Dep't 2011) (there can be no claim for aiding and abetting where there is no claim for breach of fiduciary duty).  As the Patriarch Parties have not stated a claim for breach of fiduciary duty under regarding Counts 4, Count 5, or the auction-related claims of Count 18, their aiding and abetting claims are dismissed as to those allegations.

Regarding the books-and-records-related claims in Count 18, to prevail on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must plead: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."  Schroeder v. Pinterest Inc., 17 N.Y.S.3d 678, 688–89 (1st Dep't 2015).  Here, the TPC fails to allege that MBIA, AMZM, or the Zohar III Controlling Class knew of, participated in, or induced U.S. Bank to refuse the Patriarch Parties access to the Zohar Funds' books and records.  Accordingly, the Patriarch Parties' aiding and abetting claim is dismissed as to the books-and-records-related claims of Count 18.

XIV.    Counts 21–22: Declaratory Judgments & Count 13: Unjust Enrichment Against MBIA

In Count 21, the Patriarch Parties seek "a declaration that the irrevocable proxies and LLC agreement amendments are valid and binding on the Zohar Funds, and that [the Patriarch Parties have] the authority to control and assert all relevant rights, interests, powers, and authority, including the authority to vote shares in the portfolio companies or direct others to vote such shares, whether with respect to the appointment of directors and officers or otherwise." (TPC ¶ 333.)  In Count 22, the Patriarch Parties seek "a declaration that they are the ultimate and beneficial owners of the equity interests for which the Zohar Funds are the record shareholders, with all relevant equity rights, interests, powers, and authority, including the authority to vote

shares in the portfolio companies or direct others to vote such shares, whether with respect to the appointment of directors and officers or otherwise."  (TPC ¶ 338.)

Third-Party Defendants advance a litany of arguments as to why these claims are not proper.  To begin—and end—this issue is currently being litigated in the Zohar bankruptcy action in the Delaware Bankruptcy Court.  Courts have discretion "to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear."  Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003).  Any determination of who beneficially owns or controls the Zohar Funds should be decided by the Delaware Bankruptcy Court.  See Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC, 620 B.R. 456, 465 (S.D.N.Y. 2020) ("Because these derivative claims would belong to the Zohar Funds and the Zohar Funds are in Chapter 11, those claims must be adjudicated in the Bankruptcy.").  Accordingly, this Court stays its ruling on Counts 21 and 22 pending the outcome of the Delaware Bankruptcy.

Count 13 of the TPC alleges unjust enrichment against MBIA.[16]  The Patriarch Parties condition this claim on a finding that MBIA has "any ownership interest in, or is permitted to exercise voting control over" the Portfolio Companies.  (TPC ¶ 274.)  This claim, in essence, turns on the outcome of the claims asserted in Counts 21 and 22.  As such Count 13 is also stayed.

CONCLUSION

All claims against "MBIA Inc." are dismissed. The Third-Party Defendants' motions are granted in part and denied in part.  Counts 1 through 12 are dismissed, Count 13 is stayed pending certain determinations of the Delaware Bankruptcy Court, Counts 14 through 17

---

[16]    To the extent the Patriarch Parties attempt to plead an unjust enrichment claim regarding Zohar II and Zohar III assets, such a claim is not ripe.  MBIA is not alleged to have acquired any Zohar II or Zohar III assets— meaning that MBIA has not been enriched by these assets, much less unjustly so.

are dismissed, Counts 18 and 19 are dismissed except for the books-and-records-related claims,

Count 20 is dismissed, and Counts 21 and 22 are stayed pending certain determinations of the

Delaware Bankruptcy Court. The Clerk is respectfully directed to administratively terminate the

motions (Doc 189 & 190), subject to reinstatement as to Counts 13, 21 and 22 at the request of a

party after the Delaware Bankruptcy Court rules on certain underlying issues.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: September 29, 2021
      New York, New York